1  CURD, GALINDO & SMITH, L.L.P.
JEFFREY B. SMITH, SBN 150095
2  301 East Ocean Boulevard, Suite 1700
Long Beach, CA 90802
3  Telephone: (562) 624-1177
Facsimile: (562) 624-1178
4  Email: jsmith@cgsattys.com

5  Attorneys for Debtor Layfield & Barrett, APC

6              UNITED STATES BANKRUPTCY COURT

7              CENTRAL DISTRICT OF CALIFORNIA

8                  LOS ANGELES DIVISION

9  In re:                              ) Case No.: 2:17-bk-19548-NB
                                       )
10 LAYFIELD & BARRETT, APC             ) Chapter 11
                                       )
11                                     ) DECLARATION OF PHILIP LAYFIELD IN
                                       ) SUPPORT OF DEBTOR'S OPPOSITION TO
12             Debtor.                 ) EMERGENCY MOTION FOR
                                       ) APPOINTMENT OF INTERIM TRUSTEE
13                                     ) UNDER 11 U.S.C. SECTION 303(g)
                                       )
14                                     )
                                       ) Date: August 8, 2017
15                                     ) Time: 1:00p.m.
                                       ) Place: Courtroom 1545
16                                     ) 255 E. Temple Street
                                       ) Los Angeles, CA 90012
17                                     )
                                       )
18                                     ) HONORABLE NEIL BASON,
                                       ) UNITED STATES BANKRUPTCY JUDGE
19 _____

20 TO THE HONORABLE NEIL BASON, UNITED STATES BANKRUPTCY JUDGE, AND TO

21 INTERESTED PARTIES:

22   COMES NOW PHILIP LAYFIELD and submits his declaration and Exhibits in support of the

23 Opposition of Layfield & Barrett, APC to the EMERGENCY MOTION FOR APPOINTMENT

24 OF INTERIM TRUSTEE UNDER 11 U.S.C. SECTION 303(g), filed by Petitioning Creditors

25 The Dominguez Firm, Mario Lara, Nayazi Reyes and Maria Rios.

26

27

28

Curd, Galindo & Smith, L.L.P.
301 E. Ocean Boulevard, Suite 1700
Long Beach, CA 90802
Ph: (562) 624-1177
Fx: (562) 624-1178

## DECLARATION OF PHILIP LAYFIELD

I, Philip Layfield, hereby declare as follows:

1.  I am an attorney duly licensed to practice law before all courts of the State of California and I am the President and sole beneficial owner of 100% of Layfield & Barrett, APC (hereinafter L&B).I have been a practicing lawyer concentrating on personal injury and business litigation cases for over 15 years.

2.  In 2016 and early 2017 I decided to commence the winding down of L&B in favor of a new business model.  The new business model was to expand to a national firm that focused on larger cases as opposed to high volume.  We would seek out larger tort cases and where necessary team with local lawyers who needed the experience and resources of a national firm of experienced litigators.

3.  I intended to use my experience to market the larger cases for the new business, and to manage the "back office" functions of a large multi-state national practice from off site, with Information Technology, accounting and other functions under my supervision, but performed in favorable labor and overhead markets to save cost.

4.  It was my intention to ultimately remove myself from the day to day handling of cases as a trial lawyer, and to manage the marketing side  of a national law practice from Costa Rica where office and labor costs are very inexpensive.

5.  The new national law firm was formed in early 2017, as detailed more below:  Maximum Legal, LLC a Delaware limited liability company ("ML").

6.  I am the CEO of MLS and sole beneficial owner of 100% of ML's membership interests.

7. ML owns four wholly-owned subsidiary law firms which are: 1. Maximum Legal (California), LLP; 2. Maximum Legal (Arizona) LLC, Maximum Legal (Utah), LLC and Maximum Legal (Florida), PLLC.

8. Some existing cases of L&B would be transferred to ML for handling by one of the ML subsidiaries. Other cases were to be resolved or culled within L&B over the next year as discussed below.

9. The law firm of Jones Waldo in Salt Lake City, Utah prepared the documentation for the winding down of of L&B, the transfer of cases and assets from L&B to ML and/or its subsidiaries, and the formation of ML and its subsidiaries along with the assistance of the former General Counsel of L&B, Todd Wakefield.

10. I am also the CEO of Maximum Legal Services, LLC (hereinafter "MLS") which is not a law firm, but provides the back office litigation support services as well as other services to law firms including ML and its subsidiaries. Through its network of affiliated entities, MLS currently employs approximately 20 individuals in 4 countries. The website is www.maximumlegalservices.com.

11. I have become aware of declarations filed in the Maximum Legal (California), LLP bankruptcy case along with certain declarations filed in this case which are false, deceptive, misleading and inflammatory.

12. I have not fled the country. I have been in constant contact with Joe Barrett, Todd Wakefield and others since my planned move to Costa Rica. My planned move has been in the works for approximately 6 months with the full knowledge of Joe Barrett, Todd Wakefield and all key employees of L&B and ML.

13. Joe Barrett and Todd Wakefield were aware at all time that L&B's Director of Intakes Kenny Palacios and a Team Coordinator John Meneses were relocated to Costa Rica at the same time in order to set up the office. They were provided weekly and sometimes daily updates of the progess being made in Costa Rica.

14. The orderly transition of certain cases, personnel and assets from L&B is outlined in detail in a Memorandum circulated by Todd Wakefield on June 5, 2017 only two months ago. Attached as Exhibit 1 is a true and correct copy of the June 5, 2017 Memorandum.

15. In addition to that Memorandum, a Master Services Agreement was signed with ML and Maximum Legal (Costa Rica) to perform substantial services to ML for multiple years. Maximum Legal (Costa Rica) is not a law firm but a subsidiary of MLS that is authorized to conduct business in Costa Rica. That Master Services Agreement was signed in April 2017. In anticipation of the performance of those services, Costa Rican office space was acquired, employees hired and families moved from California to Costa Rica to set up this substantial operation.

16. I made the L&B management team aware of my plans to step down from active litigation practice in January 2017, to effectuate the new business model. Joe Barrett and Todd Wakefield were intimately involved in those plans. In fact, Todd Wakefield requested that we have a partner meeting in Costa Rica with the intent of mixing a vacation in with the work of transitioning into the MLS business model. The idea that I have hidden myself in Costa Rica to avoid responsibility on any level is patently false and belied by dozens if not hundreds of e-mails that we exchanged about the opening of the Costa Rica operations, and ML and its subsidiaries.

17. Between February 2017 through June of 2017, myself, the lawyers at Jones Waldo and Todd Wakefield worked together on the formation of Maximum Legal, LLC and its wholly-owned subsidiaries, which included Maximum Legal (California), LLP.

18. Signing packages were created for all interested parties, including Joe Barrett and Todd Wakefield. All parties signed the required agreements in the Spring of 2017.

19. Part of the restructuring contemplated the transfer the high-value cases from L&B to ML in exchange for a twenty-five percent referral fee back to L&B in recognition of the substantial work and expenses already incurred by L&B on this portfolio. This transaction was designed to ensure that L&B would have sufficient assets to satisfy all of its obligations during its wind-down process, which included any client matters outstanding, liens and the $4 million Advocate Capital loan.

20. In April 2017, a Master Association Agreement was signed between L&B and ML which transferred a case portfolio worth approximately $10 million from L&B to ML.

21. For the lower value cases still residing at L&B, a "Culling-List" was created whereby Todd Wakefield and team of 3 attorneys and 2 paralegals would attempt to settle, refer or drop cases that didn't make strategic sense for ML to take over. This process was supposed to be completed by June 30, 2017.

22. It was anticipated that ML would initially occupy four separate locations in Los Angeles, Park City, Miami and Scottsdale Arizona respectively.

23. I have read the declarations in support of the motion to appoint a trustee that allege that I have transferred assets to myself from L&B, particularly real estate in Utah and Arizona.

24. L&B was being operated out of office buildings owned by L&B for which I was the personal guarantor on almost $2 million of debt.

25. Neither L&B nor ML were paying rent on the office suites in Arizona or Utah by April 2017. With over $14,000/ month due on the payments for which I was personally responsible, I took it upon myself to find a tenant for the Utah and Arizona locations. I've recently learned that ML has abandoned those buildings. ML has also abandoned the Los Angeles office despite an agreement to occupy those spaces. Attached as Exhibit 2 is a true and correct copy of the lease prepared by Todd Wakefield for the Utah location.

26. Since the plan was to wind down the affairs of L&B within twelve months, a decision was made to separate those assets into an LLC structure. With the full knowledge of Mr. Barrett and Mr. Wakefield, those properties were transferred at fair market value to Layfield V, LLC, which is an entity that I have a financial interest. In fact, Mr. Wakefield prepared the deed transfers with the assistance of his spouse who works at a title company.

27. Those properties had very little equity since they had been acquired using 90% loan to value SBA financing and were not rented at that time.

28. It was agreed that we would credit the 10% equity position in those properties against monies the L&B owed to me.

29. L&B owes me substantial monies. I have unreimbursed expenses in excess of $500,000 and I am the personal guarantor of $4 million in litigation financing from Advocate Capital.

30. I also advanced monies to L&B during 2017 in excess of $500,000. Attached as Exhibit 3 are true and correct copies of bank statements showing those transfers. Joe Barrett and Todd Wakefield have never put one dollar into L&B.

31. Shortly after starting the Costa Rican operations, pursuant to our plans as set out in the Memorandum (Ex. 1) and the various other agreements related to ML and its subsiaries in June of 2017, Mr. Wakefield and Mr. Barrett began behaving erratically. They refused to communicate on basic issues like case status and began having secret meetings without me. They ultimately fired almost the entire staff without my knowledge and with no notice.

32. Mr. Wakefield refused to honor the Master Association Agreements with L&B and the ML agreements with MLS and took extraordinary efforts to "choke-off" all revenue to L&B.

33. Mr. Wakefield and Mr. Barrett filed a bankruptcy petition on behalf of Maximum Legal (California), LLP without the approval of its corporate parent, ML, which I controlled the majority of the vote at the time. They have intentionally misled this court about the ownership structure.

34. I recently learned that Mr. Wakefield and Mr. Barrett are attempting to avoid paying me the $8 million they owe to me as part of a plan to attack my character and L&B.

35. I have also become aware that Mr. Wakefield and Mr. Barrett have been telling people that L&B is out of business and that I have fled the country. These statements are all false. I maintain a 2nd residence in California in the same neighborhood for several years.

36. In early July of 2017, I became aware that Mr. Wakefield had abandoned the culling list and was taking the position that Maximum Legal (California), LLP was not taking over those cases. I attempted to communicate these issues with Mr. Wakefield and he has been unresponsive.

37. For the past three weeks, I have sent numerous communications to Mr. Wakefield to sort out the cases that were still remaining at L&B in order to ascertain if my list of L&B cases was complete and accruate. Additionally, the Chief Operating Officer at MLS has attempted to obtain that list as late as August 3, 2017. Mr. Wakefield assured that he would provide the list and he has failed to provide the list.

38. Myself, along with MLS' Director of Litigation Support and MLS' COO have spent the last 10 days sorting through the cases abandoned by Mr. Wakefield and are actively representing those clients.

39. As one example, Mr. Wakefield agreed to take the responsibility of filing a minor's compromise for a case settled by L&B, but he has completely failed to take even the first steps towards filing the minor's compromise motion  I learned this today by virtue of an email from defense counsel. L&B is now going to handle this petition. A true and correct copy of that email is attached hereto as Exhibit 4.

40. L&B is a functioning law firm with cases throughout the United States. Currently, L&B has 133 matters in various stages from pre-litigation, active litigation, cases which have attorney liens, cases that have been referred to other lawyers as co-counsel, and cases that are currently being referred;

41. The value of these cases exceeds $50 million.

42. The estimated legal revenues from these cases exceeds $6 million.

43. I am more than capable of handling these matters and plan to hire addition staff to maximize the value of the current matters.

44. L&B has pending fees and costs recoverable of approximately $2 million.

45. I am in charge of the L&B attorney client (IOLTA) accounts, and am now also in charge of all ML IOLTA accounts as a result of the recent terminations of Messrs. Wakefiled and Barrett from ML. L&B has hundreds of cases and dozens of settlements that require detailed accounting of costs, fees and client distributions. L&B suffered massive turnover in its finance department with the departure of our controller in March 2017. I have recently been able to hire two Certified Public Accountants at MLS to take over the administration of our IOLTA accounting. I will be supervising those accountants.

46. Mr. Wakefield oversaw the close-out function at L&B through June 30, 2017. He worked with the accountants and finance team. For approximately 18 months, Mr. Wakefield failed to properly account for costs, liens and other important issues. His failure to discharge his basic duties made it extremely difficult and time consuming to finalize close outs. I ultimately realized that I needed to take over this process, which I have.

47. The IOLTA accounting and transition with ML, and now disputes arising between L&B's former lawyers and me has been an admitted quagmire. But appointment of a Chapter 7 trustee will NOT make the matter better, it will make it worse. ML and L&B can and will account for all funds owed to all clients, co-counsel and liendholders through the Chapter 11 process. Chapter 11 is necessary to be able to properly administer this process without the constant attacks on L&B funds being levied improperly by Mr. Barrett, Mr. Wakefield and The Dominguez Firm. In short, they have been substantially interfering with L&B's daily operations.

48. With respect to the allegation about L&B's phone number, being disconnected, that is also intentionally misleading. During the transition from L&B to ML, it was anticipated

that ML would take over the old L&B phone number and L&B would obtain a new toll-free number. On Monday, July 31st, I learned that Maximum Legal (California), LLP was abandoning all office space and not taking any phone numbers. L&B quickly moved to reprogram its phone system. L&B's toll-free number is 855-880-8335, and is working

49. L&B's website was temporarily down while L&B rebranded to remove all old locations, employees and outdated information. That website currently has a "coming soon" page located at www.layfieldbarrett.com, but refers its viewers to our phone #

50. L&B has contracted with MLS to provide back office litigation support.

51. L&B has assets in the millions of dollars.

52. L&B has dozens of cases I am actively working to resolve.

53. L&B has numerous co-counsel relationships.

54. As a result of Mr. Wakefield and Mr. Barrett's smear campaign, L&B has suffered losses in the millions. In fact, on one case that was set to resolve on August 8, 2017, L&B was fired by the client as a direct result of their improper actions. The legal fees in that case alone were anticipated to be in the millions. If the case ultimately goes to trial, I anticipate a verdict in excess of $20 million, which legal fees of $8 million.

55. When I learned of the extent of the misconduct by Messrs. Barrett & Wakefield, I terminated them as Managers of Maximum Legal, LLC effective August 5, 2017. I also terminated Mr. Wakefield as CEO of Maximum Legal, LLC. Additionally, I redeemed their ownership in Maximum Legal, LLC. This was all done with the advice of counsel as to the proper mechanism under the Maximum Legal, LLC Operating Agreement. A true and correct copy of the Operating Agreement of Maximum Legal, LLC is attached herewith as Exhibit 5.

56. On June 30, 2017, I held a status meeting with attorneys at L&B and ML to discuss many pending matters that needed to be addressed. I documented that meeting with follow up notes. Attached as Exhibit 6 is a true and correct copy of that email.

57. Although I was hoping to spend the next year spearheading the growth of MLS, as a result of the attacks on myself personally, L&B and ML, I am going to dedicate myself to resolving all outstanding issues with L&B and assert my rights as the 100% owner of Maximum Legal, LLC.

58. I have instructed counsel to convert this involuntary Chapter 7 to a voluntary Chapter 11 reorganization. Certainly, the mismanagement of Mssrs. Wakefield & Barrett have put a massive financial strain on L&B and it is apparent that L&B will benefit from a reorganization so that it can move to complete the collection of its assets, the payment of all of its debts and the orderly transition of its files

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of August, 2017 in Tamarindo, Costa Rica.

Philip Layfield

**EXHIBIT** 1

# MAXIMUM
## LEGAL

---

### INTERNAL MEMO

| | |
|---|---|
| **TO:** | ALL ATTORNEYS AND STAFF |
| **FROM:** | TODD WAKEFIELD |
| **DATE:** | JUNE 5, 2017 |
| **RE:** | MAXIMUM LEGAL ORGANIZATIONAL UPDATE |

---

## Welcome to the first full week of the Maximum Legal era!

As we move into this exciting new period, it is important that everyone is on the same page on some important organizational issues, so please read this memo carefully, and feel free to ask me any questions. I am in the Park City office today and Tuesday, and will be in the DTLA office again Wednesday through Friday of this week.

**What is the status and relationship of Layfield & Barrett and Maximum Legal?** Maximum Legal is not just a new brand or name being adopted by Layfield & Barrett, APC (L&B). Maximum Legal is a new law firm. It is an entirely new, separate and distinct legal entity (actually, it's group of legal entities – explanation below). L&B continues to exist today as a separate legal entity, but is commencing a process known as "winding down," which will be ongoing for a number of months. When that process is completed, L&B's business operations will be concluded, and that entity will cease to exist. Phil will be overseeing the wind-down of L&B, and is planning to retire from the active practice of law when that process is completed. He will not actively participate in the management or operations of Maximum Legal going forward, other than helping to facilitate a smooth transition over the coming weeks. As the active "partners" in Maximum Legal, Joe and I will be solely responsible for the new firm.

Though Phil may not want the attention, it would be beyond awkward not to acknowledge at this point the enormous sacrifices and investments of time, energy and resources he has made to bring all of us together, and to provide the foundation for this new venture going forward. Though he is preparing to move into new areas of focus, I know he is committed to continuing to do everything he can to support us as we work to succeed and grow.

**What is Maximum Legal?** The vision of Maximum Legal is to be a leading national plaintiff's contingent fee law firm that operates through a number of "member firms" located throughout the United States. The various member firms are constituted and regulated in accordance with relevant state and local regulatory and legal requirements. Currently, there are member firms in the states of California, Utah, Arizona and Florida. Our expectation is that, over time, we will add member firms from many other jurisdictions, all operating as a network under the national banner of Maximum Legal. The various state member firms are owned primarily by the national umbrella entity, Maximum Legal, LLC, and are staffed by lawyers and support staff that will be employed by Maximum Legal Staffing, LLC (also owned by the national umbrella entity).

**Who do I work for?** Under a contractual arrangement between L&B and Maximum Legal Staffing, all former L&B attorneys and staff now work for Maximum Legal Staffing, though you remain formally on the L&B payroll through June 30, 2017. As of July 1, 2017, you will be formally employed by Maximum Legal, and your status will be that of W-2 employees of Maximum Legal Staffing, LLC. Each of you will receive an offer letter shortly to document this change in employment status. There will be no substantive changes with respect to your compensation, benefits, PTO and other terms of employment at this time, and Maximum Legal Staffing will be assuming all L&B liabilities and obligations to individuals who become employees of the new entity.

**Who represents our current clients?** As of now, legal representation is provided to our clients on active cases by the state Maximum Legal member firms for the jurisdiction in which each case is pending – currently Maximum Legal (California), LLP, Maximum Legal (Utah), LLC, Maximum Legal (Arizona), LLC and Maximum Legal (Florida), PLLC. Cases that have previously settled, and a small handful of others where settlement is imminent, are being closed out by L&B.

**What about clients calling about matters previously resolved by L&B?** Clients likely will continue to call with inquiries about cases previously resolved by L&B. If you receive such a call, please inform that client that you work for Maximum Legal and are no longer with L&B, but that you have been provided the following contact information for inquiries to L&B:

Email:

info@layfieldbarrett.com

Physical Mail:

Attention: Layfield & Barrett
382 NE 191st St #42308
Miami, FL 33179-3899

A dedicated phone number also is being established for telephone inquiries, which will be circulated shortly.

# Now what? Now we focus on what this team is built to deliver – Excellence.

I hope each of you will make this new firm your own. Make it something you will be proud to look back on in future years and say,

**"I was part of the team that made it what it is today: a champion for regular people seeking justice – a firm that is sought-after by clients, and admired by the community."**

**EXHIBIT 2**

## LEASE AGREEMENT

THIS LEASE (this "**Lease**") is made and entered into this 6th day of April, 2017, by and between **LAYFIELD V, LLC**, a Delaware limited liability company, whose mailing address is 1000 N. Green Valley Pkwy, #440-312, Henderson, NV 89074 ("**Landlord**"), and **MAXIMUM LEGAL (UTAH), LLC**, a Utah limited liability company, whose mailing address is 2720 Homestead Rd., Ste. 210, Park City, Utah 84098 ("**Tenant**"). Each of Tenant and Landlord is sometimes individually referred to herein as a "**Party**" and, collectively, as the "**Parties**".

1.     Premises.     For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord that certain real property situated in Summit County, Utah, which is legally described in **Exhibit A** attached hereto, together with all easements, rights of way and appurtenances in connection therewith or thereunto belonging and all buildings and improvements presently located thereon (collectively, the "**Premises**").

2.     Initial Term; Renewal Options.

    a.     The initial term of this Lease shall be deemed to have an effective date of April 6, 2017 (the "**Commencement Date**") and, unless earlier terminated pursuant to the provisions of this Lease or applicable laws, shall expire at midnight on March 31, 2022 (the "**Initial Term**"). The Initial Term, together with each Renewal Term over which Tenant extends the term of this Lease is referred to herein as the "**Term**".

    b.     Notwithstanding anything contained in this Lease to the contrary, as long as Tenant is not in default under the terms of this Lease beyond any applicable notice and cure period under this Lease on the date Tenant provides such notice, and provides Landlord with written notice at least ninety (90) days prior to the end of the Initial Term (or the Renewal Term, as applicable), the Tenant shall have the right to extend the Term of this Lease for up to five (5) successive periods of five (5) years each (each, a "**Renewal Term**"). In the event Tenant shall extend the Term for a Renewal Term, as described above, the Lease shall remain in effect, subject to the terms and provisions set forth herein, for the duration of such Renewal Term, unless earlier terminated pursuant to the provisions of this Lease or applicable laws.

3.     Minimum Rent.     Tenant shall pay directly to Landlord, in advance, without right of offset or demand, on or before the first day of each calendar month of the term, "**Minimum Rent**" in the amount of **SIX THOUSAND DOLLARS ($6,000)**. The monthly rent installment for any fractional calendar month at the beginning of the term hereof shall be prorated and paid on or before the commencement of this Lease.

4.     Additional Rent.     It is the intention of Landlord and Tenant that the rent herein specified shall be net to Landlord. Except for property insurance, which shall be obtained and paid for by Landlord, all costs, expenses and obligations of every kind

1

relating to the Premises which may arise or become due during the term of this Lease shall be paid by Tenant. All such costs, expenses and obligations, together with all interest and penalties that may accrue thereon in the event of the failure of Tenant to pay them, and all other damages, costs, expenses and sums that Landlord may suffer or incur or that may become due by reason of any default of Tenant or failure by Tenant to comply with the terms and conditions of this Lease shall be deemed to be "**Additional Rent**" and, in the event of nonpayment, Landlord shall have all the rights and remedies as herein provided for failure to pay rent.

        5.      Payment of Rent. All Minimum Rent and Additional Rent (collectively referred to herein as "**Rent**" or "**Rental**") shall be paid by Tenant to Landlord in lawful money of the United States prior to notice or demand, at the address stated in the Article entitled "Notices" or to such other person or place as Landlord may designate in writing. Tenant shall pay a late fee equal to fifteen percent (15%) of the amount due for any Rent payment not received by Landlord within ten (10) days of the date upon which it is due. Further, any Rent or other payment not made within twenty (20) days of when due shall from and after the expiration of such twenty (20) day period bear interest from the due date at the rate of eighteen percent (18%) per annum.

        6.      Intentionally Omitted.

        7.      Title and Condition of Premises. The Premises are leased to Tenant in their present condition without representation or warranty by Landlord and subject to the existing state of title as of the commencement of the term of this Lease, and to all applicable Legal Requirements. "**Legal Requirements**" means all mortgages, deeds of trusts, laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of and agreements with all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen or unforeseen, ordinary or extraordinary, which now or at any time hereafter may be applicable to the Premises or any part thereof. Tenant has inspected and examined the Premises and has found the same satisfactory.

        8.      Purpose. The Premises are to be used as office space and for no other purpose without the prior written consent of Landlord. Tenant shall obtain at its expense all necessary permits and approvals which may be required, if any, by any governmental entity for Tenant's intended use of the Premises.

        9.      Compliance with Law. Tenant shall comply with and cause the Premises to comply with: (i) all Legal Requirements applicable to the Premises or the use thereof and (ii) all terms, conditions, covenants, agreements and requirements of (x) insurance policies which at any time may be in force with respect to the Premises, and (y) all contracts, agreements, easements, reservations and restrictions existing at the commencement of the term of this Lease or thereafter consented to by Tenant affecting the Premises or the ownership, occupancy or use thereof.

        10.      Hazardous Materials. Tenant covenants that no Hazardous Material will be placed, held, located or disposed of on, under or at the Premises. As used herein,

2

"**Hazardous Material**" means any substance which would cause (i) the Premises or any part thereof to become a hazardous waste treatment, storage or disposal facility within the meaning of, or otherwise bring the Premises or any part thereof within the ambit of, the Resource Conservation and Recovery Act of 1976, or any similar federal or state law or local ordinance or any other environmental law, (ii) a release or threatened release of hazardous waste from the Premises or any part thereof within the meaning of, or otherwise bring the Premises within the ambit of, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any similar federal or state law or local ordinance or any other environmental law or (iii) the discharge of pollutants or effluents into the air of any emissions which would require a permit under the Federal Water Pollution Control Act, or the Clean Air Act, or any similar federal or state law or local ordinance or other environmental law, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, any so-called "Super-fund" or "Superlien" law, or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree, now or hereafter in force, regulating, relating to or imposing liability or standards on conduct concerning any hazardous or toxic material. Notwithstanding anything else to the contrary herein, in the event any Hazardous Material is discovered on, under or at the Premises, Tenant shall notify Landlord of any such discovery, and shall, at its sole cost and expense, comply with all federal, state and local laws and requirements to remedy the situation.

Landlord may at any time during the term and within sixty (60) days thereafter, inspect the Premises for the existence of Hazardous Material on the Premises. In the event Landlord discovers Hazardous Material on the Premises, Tenant shall, at its sole cost and expense and upon demand of Landlord, reimburse Landlord for its costs to inspect the Premises and comply with all federal, state and local laws and requirements for the removal or remediation of the Hazardous Material and shall release, indemnify and hold Landlord harmless against all claims, damages, expenses (including, without limitation, attorneys' fees and reasonable investigative and discovery costs) liabilities and judgments on account of the Hazardous Material on or migrating, leaking or leaching off the Premises. In the event Hazardous Material is discovered on the Premises or other property at any time following the termination or expiration of the Lease, and such Hazardous Material is attributable to Tenant's occupancy of the Premises, Tenant shall release and indemnify Landlord in the manner provided in the preceding sentence. Tenant's indemnification obligations hereunder shall remain effective, notwithstanding the expiration or termination of this Lease.

11.     Taxes. Tenant shall pay, as Additional Rent, any and all property taxes and Other Assessments assessed or levied against the Premises. "**Other Assessments**", as used herein, shall include, without limitation, assessments for benefits from public works or improvements, whether or not begun or completed prior to the commencement of the term hereof and whether or not to be completed within such term, levies, fees, water and sewer rents and charges, and all other governmental charges, general and special, ordinary and extraordinary, foreseen or unforeseen. Such payment shall be made by Tenant within thirty (30) days of Landlord's delivery of notice to Tenant of amounts owed by Tenant pursuant to this Article. Tenant shall pay all taxes levied on personal property and equipment owned by Tenant and kept on the Premises.

3

1267517.2

12.    Liens.  Tenant will not permit to be created or to remain, and will promptly discharge at its expense, any mechanic's, materialman's or other liens against the Premises, or any part thereof or Tenant's interest therein, except such liens, mortgages or encumbrances created by or resulting from any act of Landlord or any person claiming by, through, or under Landlord.

13.    Maintenance and Repair.  Tenant agrees that it will, at its expense, (i) keep and maintain the Premises, including the building and improvements thereon, in a clean and sanitary condition and in good repair, except for ordinary wear and tear; (ii) with reasonable promptness make all repairs of every kind and nature, except as otherwise provided herein, which may be required to be made upon or in connection with the Premises or any part thereof in order to keep and maintain the Premises in good repair, and (iii) will comply with and cause the Premises to comply with the terms and conditions of contracts, easements and restrictions existing as of the commencement of this Lease and affecting the Premises and the ownership, occupancy and use thereof. Landlord shall not be required to maintain, repair or rebuild, or to make any alterations, replacements or renewals of any nature or description to the Premises or the buildings and improvements thereon.

Landlord shall not be liable for damage to Tenant caused by Tenant's failure to keep the Premises in good repair and shall not be liable for any damage done or occasioned by or from (i) the condition of electric wiring, plumbing, gas, water, steam, sewerage or other pipes; (ii) the bursting, leaking or running of any wash stands, toilets, tanks, or waste pipes in, upon, or about the Premises; or (iii) the leaking of the roof of the building on the Premises.

14.    Alterations.  Tenant shall not make or allow to be made any alterations, additions or improvements (sometimes hereafter referred to as "**Alterations**") to or of the Premises, or any part thereof, without first obtaining the written consent of Landlord, which consent may be conditioned upon the requirement that upon demand by Landlord on any expiration or earlier termination of this Lease, Tenant shall remove immediately, at Tenant's sole cost and expense, any Alterations, and repair and restore the portion of the Premises so altered to its original condition, reasonable wear and tear excepted. Plans setting forth in reasonable detail Tenant's proposed Alterations and any contractor or person selected by Tenant to make the same must be submitted with any request for Landlord's consent to Alterations.  Unless Landlord requires otherwise, all Alterations shall become the property of Landlord and shall be surrendered with the Premises as a part thereof, at the expiration or earlier termination of the Lease term.

15.    Fixtures.  Tenant may install, place or erect upon the Premises any equipment, fixtures or other personal property as Tenant deems advisable and all such equipment, fixtures and personal property, whether or not attached to the Premises, shall be and remain the property of Tenant.  At any time during the term of this Lease and for ten (10) days after the expiration or earlier termination thereof, Tenant may remove such items from the Premises, and if not removed within such time, such items will become the property of Landlord.  If any of such property is removed, Tenant shall repair any damage to the Premises resulting from the removal.

4

16.     Signs.  Upon obtaining Landlord's written consent, Tenant may place upon the Premises such signs as may be reasonably necessary for the conduct of Tenant's own business, and such signs shall comply with all applicable ordinances and regulations of any governmental entity having jurisdiction. In no event shall Tenant place any signs on the building that will invalidate any warranty on the roof or other structural components of the building. Additionally, Tenant shall repair any damage to the building resulting from Tenant's installation of any signs.

17.     Utilities.  Within ten (10) days after the Commencement , all applications and accounts for necessary utility services on the Premises shall be made in the name of Tenant only, and Tenant shall be solely liable for utility charges as they become due, including without limitation those for gas, electricity, water, sewer, garbage collection, and telephone services. Tenant shall indemnify Landlord against any liability on such accounts. Landlord shall not be required to furnish any service to the Premises.

18.     Access to the Premises; Signs Posted by Landlord.  Tenant shall permit Landlord or its agents to enter the Premises at all reasonable hours to inspect the Premises or make repairs should Tenant neglect or refuse to make such repairs in accordance with the provisions of this Lease and also to show the Premises to prospective buyers. At any time within one hundred eighty (180) days prior to expiration of the term hereof, Landlord may show the Premises to prospective tenants.

19.     Indemnification.  Tenant hereby indemnifies, holds harmless and agrees to defend Landlord from and against all claims, damages, expenses (including, without limitation, attorneys' fees and reasonable investigative and discovery costs), liabilities and judgments on account of injury to persons, loss of life, or damage to property arising out of the use, non-use, condition or occupation of the Premises and adjoining streets or ways, unless such injury, loss of life, or damage is caused by the gross negligence of Landlord or its agents or employees.

Tenant agrees to take all reasonable actions necessary to assure that no third party, by its trespass or use of the Premises, damages, blocks access to, obstructs Tenant's use of, or obtains rights in, the Premises. Tenant hereby indemnifies, holds harmless, and agrees to defend Landlord from all damages caused to Landlord by such actions of third parties.

Tenant's obligations with respect to indemnification hereunder shall remain effective, notwithstanding the expiration or termination of this Lease, as to claims accruing prior to the expiration or termination of this Lease.

20.     Insurance.

a.      General Requirements.  Any insurance policy required to be maintained and/or caused to be maintained by Tenant under this Article shall be written by insurance companies, satisfactory to Landlord, which are qualified to do business in the State of Utah, and shall contain a provision requiring the insurance company to furnish Landlord thirty (30) days advance written notice of any cancellation or lapse, or

the effective date of any reduction in the amounts of insurance. Tenant shall cause certificates providing such information as requested by Landlord evidencing the existence and limits of its insurance coverage with respect to the Premises to be delivered to Landlord prior to the execution of this Lease. Thereafter, Tenant shall cause similar certificates evidencing renewal policies to be delivered to Landlord at least thirty (30) days prior to the expiration of the term of each policy and at such other times as requested by Landlord. The insurance limits in this Article shall be subject to increase from time to time by such amounts as Landlord may determine is necessary or desirable, as may be evidenced by the practice of similarly situated properties.

           b.    <u>Liability Insurance Coverage and Limits</u>. Tenant shall maintain and/or cause to be maintained, at its sole expense, liability insurance insuring its interest against claims for bodily injury, death and property damage occurring on, in or about the Premises and the ways immediately adjoining the Premises, with a "Combined Single Limit" (covering bodily injury liability and property damage liability) of not less than Two Million Dollars ($2,000,000) for total claims for any one occurrence. Such insurance may be in the form of blanket liability coverage so long as the blanket policy does not reduce the limits nor diminish the coverage required herein.

           c.    <u>Performance of Indemnity Agreements.</u>  All policies of such liability insurance shall insure the performance by Tenant of the indemnity agreements contained herein and shall contain a provision that the insurance company will furnish Landlord and Tenant thirty (30) days advance written notice of any cancellation or lapse, or the effective date of any reduction in the amounts or scope of coverage. Landlord shall promptly notify Tenant of any asserted claim with respect to which Landlord is or may be indemnified against hereunder and shall deliver to Tenant copies of process and pleadings.

        21.    <u>Damage and Destruction</u>. If the Premises or access to it is wholly or partially destroyed by fire or other casualty, Landlord shall, within ninety (90) days after such damage occurs, notify Tenant of Landlord's election to terminate this Lease or restore the improvements on the Premises. If Landlord elects to repair or restore the damaged improvements on the Premises, then Landlord shall rebuild, restore or repair such Premises (excluding any and all improvements installed by Tenant) in substantially the same condition as when furnished to Tenant and all insurance proceeds with respect to such casualty shall be available for such work. If any part of the Premises are rendered sufficiently untenantable so as to interfere materially with Tenant's use, occupancy or enjoyment of Premises, Minimum Rent shall abate during the period of reconstruction in the same proportion to the total Minimum Rent as the portion of the Premises rendered untenantable bears to the entire Premises. If Landlord elects not to restore, this Lease shall terminate effective as of the date of such damage upon Landlord giving Tenant notice of its election as provided above and Landlord shall be entitled to retain all insurance proceeds payable with respect to such casualty.

        If the Premises are damaged or destroyed by fire or other casualty to the extent that Tenant is, in its reasonable opinion, unable to operate its business from the Premises for period in excess of one hundred (120) days, Tenant may terminate this Lease by

6

giving notice thereof to Landlord, such termination to be effective on the date upon which Landlord receives such notice.

22. Condemnation. In the event that all or any material part of the Premises shall be condemned or taken by any public authority or by any other person or corporation under any statute, by eminent domain or by any transfer in lieu thereof, and such condemnation or taking renders the remainder of the Premises unsuitable for the conduct of business operations upon the Premises, Landlord may elect to terminate this Lease by giving Tenant written notice of its intention to so terminate within thirty (30) days after the occurrence of such condemnation or taking. Should this Lease not be so terminated, this Lease shall remain in effect as to the remaining portion of the Premises and commencing with the date of such condemnation or taking, the Minimum Rent shall be proportionately reduced according to the extent to which Tenant is deprived of the use of the Premises, which reduction shall be reasonably determined by Landlord. Tenant shall have no claim or right to any portion of any award given in a condemnation proceeding.

23. Assignment, Subletting, and Encumbrances. Tenant shall not voluntarily or involuntarily assign, transfer, mortgage, pledge, or encumber this Lease or any interest therein, and shall not sublet the Premises or any part thereof without the prior written consent of. Any attempt to do so without such consent shall be voidable and, at Landlord's election, shall constitute a default under this Lease. Subject to the conditions of Landlord set forth in this Article, Landlord's consent shall not be unreasonably withheld. In determining whether or not to grant consent, Landlord may consider: (i) the financial worth of the proposed sublessee or assignee; (ii) the character of the sublessee or assignee (including, whether its business is appropriate to for the Premises, whether its business is consistent with the use restriction contained in this Lease, whether the type of business is restricted under any existing leases, encumbrances or other existing agreements pertaining to the Premises, and whether the business of the proposed sublessee or assignee requires the use or disposal of Hazardous Material); (iii) the business experience of the proposed sublessee or assignee; and (iv) the general business reputation of the proposed sublessee or assignee (including its reputation and record for paying its obligations as they become due). The foregoing considerations are not intended to be exclusive and Landlord may deny consent based on any other reasonable consideration. The Parties acknowledge and agree that the foregoing considerations are reasonable. No consent by Landlord to any assignment or subletting by Tenant shall relieve Tenant of any obligation to be performed by Tenant under this Lease, whether occurring before or after such consent, assignment or subletting. The acceptance of Rent by Landlord from any other person shall not be deemed to be a waiver by Landlord of any provision, or other transfer or be a release of Tenant from any obligation under this Lease. Consent to one assignment, subletting or other transfer shall not be deemed to constitute consent to any subsequent assignment, subletting or other transfer.

24. Peaceable Surrender. At the expiration or termination of this Lease, Tenant agrees to peaceably and promptly surrender possession of the Premises to Landlord in good condition, ordinary wear and tear excepted.

7

25.    Holding Over.  If Tenant holds the Premises after the expiration of the Term hereof (including the Renewal Terms provided for herein) with the consent of Landlord, such holding over shall, in the absence of a written agreement on the subject, be deemed to have created a tenancy from month to month, terminable on thirty (30) days' written notice by either Party to the other, at a minimum monthly rent equal to one hundred twenty-five percent (125%) of the total monthly rent (including Minimum and Additional Rent) paid by Tenant to Landlord under this Lease during the immediately preceding twelve (12) month period, and otherwise subject to all terms of this Lease, including the payment of all other charges payable by Tenant hereunder.

If Tenant fails to surrender the Premises upon the termination of this Lease, Tenant shall indemnify and hold Landlord harmless from loss or liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant arising out of such failure.

26.    Quiet Enjoyment.  Subject to the provisions of this Lease and conditioned upon performance of all of the provisions to be performed by Tenant hereunder, Landlord shall secure to Tenant during the term hereof the quiet and peaceful possession of the Premises and all rights and privileges appurtenant thereto.

27.    Default by Tenant; Remedies of Landlord.  The occurrence of any one or more of the following events shall be deemed a default ("**Default**"):

a.    Tenant fails to pay any Rent to Landlord when the same is due and such failure continues for five (5) days after Landlord has given Tenant written notice specifying the amount due; provided, if Landlord shall be required to provide such notice two (2) times in any calendar year, the next time Tenant fails to timely pay Rent Landlord may terminate this Lease without further notice to Tenant;

b.    Tenant fails to observe and perform any other provision of this Lease to be observed or performed by Tenant, where such failure continues for fifteen (15) days (except where a different period of time is specified in this Lease) after written notice by Landlord to Tenant specifying such failure.  If the nature of such default is such that the same cannot be cured within such fifteen (15) day period, Tenant shall not be deemed to be in default if Tenant shall within such period commence such cure and thereafter diligently prosecute the same to completion.

c.    Tenant files a voluntary petition in bankruptcy or a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution or other relief of the same or different kind under any provision of the bankruptcy laws, or Tenant shall make an assignment for the benefit of creditors;

d.    An involuntary petition in bankruptcy against Tenant or petition or answer made by a person other than Tenant seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution or other relief against Tenant of the same or different kind under any provision of the bankruptcy laws is filed or if a receiver

8

is appointed having jurisdiction of the business property or assets of Tenant on the Premises;

      e.    Tenant makes or has made or furnishes or has furnished any warranty, representation or statement to Landlord in connection with this Lease, or any other agreement to which Tenant and Landlord are parties, which is or was false or misleading in any material respect when made or furnished;

      f.    Tenant fails to cause a release, within ten (10) days after receipt by Tenant of a notice informing Tenant of the filing of any lien arising out of any work performed, materials furnished, or obligations incurred by or for Tenant, which has been filed against the Premises;

      g.    Tenant attempts to transfer, assign, sublet or permit the occupancy of the Premises in contravention of the Article entitled "Assignment, Subletting, and Encumbrances"; or

      h.    Tenant vacates or abandons the Premises.

In any of such events of Default, Landlord shall have the immediate right to re-enter the Premises and expel Tenant or any person or persons occupying the same, with or without legal process, and in any such event, Tenant agrees to peacefully and quietly yield-up and surrender the Premises to Landlord.

In the event of a Default, Landlord may elect to either terminate this Lease by giving written notice to Tenant or from time to time and without terminating this Lease (or Tenant's right to possession of the Premises), attempt to relet the Premises or any part thereof for such term or terms (which may be for a term extending beyond the term of this Lease) and at such rental and upon such other terms and conditions as Landlord deems advisable. Upon any such reletting, Tenant shall immediately vacate the Premises and Tenant shall be immediately liable to pay to Landlord the cost and expense of such reletting, the cost of any alterations and repairs reasonably deemed necessary by Landlord to affect such reletting and the amount, if any, by which the rent reserved in this Lease for the period of such reletting (but not beyond the term of this Lease then in effect) exceeds the amount agreed to be paid as rent for the Premises for such period of reletting.

If Landlord elects to terminate this Lease, Landlord may recover from Tenant:

      (a)    The worth at the time of award of the unpaid rent which had been earned at the time of termination;

      (b)    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

(c)     The worth at the time of award of the amount by which the unpaid rent for the balance of the term then in effect after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; and

(d)     Any other amounts necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom.

(e)     At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law of the state of which the Premises are located.

The "**worth at the time of award**" of the amounts referred to in paragraphs "(a)", "(b)" and "(c)" shall be computed by discounting such amount at a rate equal to one percent (1%) plus the prime rate then in effect at Wells Fargo Bank, N.A.  If any loss shall limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such law.

If a Default occurs and Landlord elects not to terminate the Lease, as provided above, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to possession, and Landlord may enforce all its rights and remedies under this Lease, including the right to recover the rent as it becomes due under this Lease.

Notwithstanding any reletting without termination by Landlord because of any Default, Landlord may at any time after such reletting elect to terminate this Lease for any such Default.  No acceptance by Landlord of a lesser sum than that due by Tenant nor any endorsement or statement or any check or letter accompanying any check shall be deemed an accord and satisfaction.  The rights of Landlord hereunder are cumulative and non-exclusive and Landlord may pursue any and all rights and remedies permitted under the law of the state in which the Premises are located.

Whenever Landlord shall re-enter the Premises pursuant to this Lease, any personal property, not the property of Landlord, which remains in or about the Premises upon the expiration of the term of this Lease (or within forty eight (48) hours after a termination by reason of Tenant's default or abandonment), shall be considered abandoned and Landlord may retain and use the same as its own property in every respect, or at its option may remove any or all of such items and dispose of the same in any manner or respect or store the same in a public warehouse or elsewhere for the account and at the expense and risk of Tenant.  If Tenant shall fail to pay the cost of storing any such property after it has been stored for a period of ten (10) days or more, Landlord at its option may sell any or all such property at public or private sale in such manner and at such times and places as Landlord in its sole discretion may deem proper without notice to or demand upon Tenant for the payment of all or any part of such charges, or the removal of any such property.  Landlord shall apply the proceeds of such sale first to the cost and expense of such sale, including reasonable attorneys' fees actually incurred; second, to the payment of the costs of or charges for storing any such

10

property; third, to the payment of any sums of money which may then or thereafter be due to Landlord from Tenant under any of the terms hereof; and fourth, the balance, if any, to Tenant. Tenant hereby waives all claims for damages that may be caused by Landlord's re-entering and taking possession of the Premises or removing, storing, releasing or disposing of the property belonging to Tenant or to any other person or firm as herein provided, and Tenant shall indemnify and hold harmless Landlord therefrom and no such reentry shall be considered or construed to be a forcible entry. Notwithstanding anything herein to the contrary, Landlord shall be under no obligation to release any personal property remaining upon the Premises to Tenant or any other person unless and until Tenant delivers to Landlord a cash security deposit in an amount equal to the fair market value of such personal property to secure performance of Tenant's obligations hereunder.

If as a matter of law Landlord has no right on Tenant's bankruptcy to terminate this Lease, then if Tenant, as debtor, or its trustee, wishes to assume or assign this Lease, in addition to curing or adequately assuring the cure of all defaults existing under this Lease on Tenant's part on the date of filing of the proceedings (such assurances being described below), Tenant, as debtor, or its trustee, must also furnish adequate assurance of future performance under this Lease. Adequate assurance of curing defaults means depositing with Landlord a sum in cash sufficient to defray the costs of curing all existing defaults. Adequate assurance of future performance under this Lease means depositing a sum equal to three (3) months' rent including all other charges payable by Tenant hereunder, and in the case of an assignee, assuring Landlord that the assignee is financially capable of assuming this Lease and that its use of the Premises will be as provided in this Lease and for no other use. In a bankruptcy reorganization, the debtor or trustee must assume this Lease or assign it within sixty (60) days from the filing of the proceeding or it shall be deemed to have irrevocably rejected and terminated this Lease.

If this Lease is assumed by a bankruptcy trustee appointed for Tenant or by Tenant as debtor-in-possession and thereafter Tenant is liquidated or files a subsequent petition for reorganization pursuant to the bankruptcy, then Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder, by giving Tenant written notice of its election to so terminate no later than thirty (30) days after the occurrence of either of such events.

When, pursuant to a bankruptcy, a trustee or debtor-in-possession shall be obligated to pay reasonable use and occupancy charges for the use of the Premises or any portion thereof, such charges shall not be less than all rent and other monetary obligations of Tenant hereunder and shall be payable, to the fullest extent permitted by the bankruptcy, within the time periods provided in this Lease.

28.     Landlord's Default. In the case of a monetary default, Landlord shall have a period of thirty (30) days after notice thereof from Tenant to cure such monetary default. In the case of a non-monetary default, Landlord shall commence promptly to cure such default immediately after receipt of written notice from Tenant specifying the nature of such default and shall complete such cure within sixty (60) days thereafter, provided that if the nature of the non-monetary default is such that it cannot be cured

11

within such sixty (60) day period, Landlord shall have such additional time as may be reasonably necessary to complete its performance so long as Landlord has proceeded with diligence since its receipt of Tenant's notice and is then proceeding with diligence to cure such default.

29.    Waiver of Default.  The waiver by either Party of any default in the performance by the other of any covenant contained herein shall not be construed to be a waiver of any preceding or subsequent default of the same or any other covenant contained herein.  The subsequent acceptance of Rent or other sums hereunder by Landlord shall not be deemed a waiver of any preceding default other than the failure of Tenant to pay the particular Rent or other sum or portion thereof so accepted, regardless of Landlord's knowledge of such preceding default at the time of acceptance of such Rent or other sum.

30.    Subordination; Attornment; Estoppel Certificates.  This Lease is junior, subject and subordinate to all mortgages, deeds of trust and other security instruments of any kind now encumbering the Premises or any portion thereof.  Landlord reserves the right to place liens and other encumbrances on the Premises or any part thereof or interest therein superior in lien and effect to this Lease.  This Lease, at the option of Landlord, shall be subject and subordinate to any and all such liens or encumbrances now or hereafter imposed by Landlord without the necessity of the execution and delivery of any further instruments on the part of Tenant to effectuate such subordination.  Tenant covenants and agrees to execute and deliver upon demand such further instruments evidencing such subordination of this Lease as may be requested by Landlord.  Notwithstanding such subordination, Tenant's right to quiet possession of the Premises shall not be disturbed by future encumbrances so long as Tenant shall pay the Rent and observe and perform all of the provisions of this Lease to be observed and performed by Tenant, unless this Lease is terminated pursuant to specific provisions relating thereto contained in this Lease.  In the event of the foreclosure of any such lien or encumbrance, or the transfer of title to or Landlord's leasehold interest in the Premises, Tenant shall attorn to the transferee, and will recognize such transferee as Landlord under this Lease provided that Tenant's right to quiet possession of the Premises is not affected solely as a result of such foreclosure or transfer and that Tenant receives a notice from Landlord informing Tenant of such change.

Tenant shall at any time and from time to time upon not less than fifteen (15) days prior notice from Landlord, execute, acknowledge and deliver to Landlord or any proposed mortgagee, purchaser or successor in interest, a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications) and the dates to which the Minimum Rent, Additional Rent and other charges have been paid in advance, if any, and stating whether or not to the best knowledge of Tenant, Landlord is in default in the performance of any covenant, agreement or condition contained in this Lease and, if so, specifying each such default of which Tenant may have knowledge, and stating such other reasonable matters as Landlord may request.  Tenant acknowledges that any such statement delivered pursuant

12

to this paragraph may be relied upon by Landlord, any prospective mortgagee or other like encumbrancer thereof or any assignee of any such encumbrancer upon the Premises.

31.     Broker's Commission.  Landlord and Tenant hereby warrant and represent that it has not entered into any contracts whatsoever with any brokers or finders or in any manner obligated itself to pay any real estate commission or finder's fee on account of this transaction.  Tenant hereby agrees to indemnify and hold Landlord harmless from any claim arising from real estate commissions or finders' fees.

32.     Notices.  Rent and all notices, demands, requests, consents, approvals and other instruments required or permitted to be given pursuant to this Lease shall be in writing and shall be deemed to have been properly given if in writing, personally delivered, or forwarded by postage prepaid, certified or registered mail, return receipt requested, or by another commercially recognized means of delivery (e.g., Federal Express), addressed to the appropriate address set forth in the preamble to this Lease; provided, however, Landlord and Tenant may from time to time specify for purposes of this Lease any other address upon fifteen (15) days' written notice thereof to the other Party.

33.     Effect of Conveyance.  If during the term of this Lease Landlord sells or conveys its interest in the Premises or this Lease, then from and after the effective date of such sale, Landlord shall be released and discharged from any and all further obligations and responsibilities under this Lease, except those accrued of which Landlord has notice at the time of sale.  Landlord shall provide Tenant with written notice of the sale of its interest in the Premises; provided, failure to provide such notice shall not defeat the release and discharge contained in this Article.

34.     Costs and Attorneys' Fees.  In the event either Party brings or commences a legal proceeding to enforce any of the terms of this Lease, the prevailing Party in such action shall have the right to recover reasonable attorneys' fees and costs from the other Party, to be fixed by the court in the same action.  The term "**legal proceedings**", as used herein, shall include appeals from a lower court judgment as well as proceedings in the Federal Bankruptcy Court, whether or not they are adversary proceedings or contested matters.  The "**prevailing Party**" involved in proceedings in the Federal Bankruptcy Court shall mean the prevailing Party in an adversary proceeding or contested matter, or any other actions taken by the non-bankrupt Party which are reasonably necessary to protect its rights under this Lease.  The  "**prevailing Party**" involved in proceedings in any court other than the Federal Bankruptcy Court shall mean the Party that prevails in obtaining a remedy or relief which most nearly reflects the remedy or relief which the Party sought.

35.     Miscellaneous.

a.     Severability.  If any term or provision of this Lease or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall

not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

b.      Relationship Between the Parties.  The provisions of this Lease are not intended to create, nor shall they be in any way interpreted to create, a joint venture, a partnership, or any other similar relationship between the Parties except that of landlord and tenant.

c.      Governing Law.  This Lease shall be construed and enforced in accordance with, and governed by, the law of the State of Utah.

d.      Interpretation and Construction.  This Lease shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against either Party.  The captions in this Lease are for convenience only and do not define, limit or construe the contents of this Lease.  When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.  The term "**Landlord**" as used in this Lease shall mean only the owner(s) of the Premises at the time in question.  If Landlord shall convey its interest in the Premises during the Term of this Lease, then from and after the effective date of the conveyance, Landlord shall be released and discharged from any and all obligations under this Lease except those accrued as of the effective time of conveyance.

e.      Remedies Not Exclusive; No Waiver.  The various rights and remedies herein contained and reserved to each of the Parties, except as herein otherwise expressly provided, shall not be considered as exclusive of any other right or remedy of such Party but shall be construed as cumulative and shall be in addition to every other remedy now or hereafter existing at law, in equity or by statute.  No delay or omission of the right to exercise any power or remedy by either Party shall impair any such right, power or remedy or be construed as a waiver of any default or nonperformance or as acquiescence therein.

f.      Entire Agreement.  This Lease is and shall be considered to be the only agreement or understanding between the Parties with respect to the subject matter hereof.  All negotiations and oral agreements acceptable to both Parties have been incorporated herein.  It may not be amended or modified by any act or conduct of the Parties or by oral agreement, unless reduced to writing.

g.      Successors and Assigns.  All of the rights and obligations of the Parties under this Lease shall bind, and the benefits shall inure to, their respective legal representatives, successors and assigns.

[SIGNATURE PAGE FOLLOWS]

14

**IN WITNESS WHEREOF**, this Lease has been executed as of the date first above written by the undersigned Parties.

"LANDLORD"

**LAYFIELD V, LLC,**
a Delaware limited liability company

By: _Philip Layfield (Apr 10, 2017)_ _____

Philip J. Layfield, Manager

"TENANT"

**MAXIMUM LEGAL (UTAH), LLC,**
a Utah limited liability company

By:    **MAXIMUM LEGAL, LLC,**
a Delaware limited liability company

By: _Philip Layfield (Apr 10, 2017)_ _____

Philip J. Layfield, Manager

1

## EXHIBIT A

### LEGAL DESCRIPTION

The following real property located in Summit County, Utah:

Units 200, 210 and 220, TOLL CREEK VILLAGE 2, a Utah Condominium Project, together with its appurtenant undivided ownership interest in and to the Common Areas and Facilities, as established and described in the Record of Survey Map recorded February 27, 2008, as Entry No. 838524, and in the Declaration of Covenants, Conditions and Restrictions of Toll Creek Village Office Condominiums, recorded September 2, 2005 as Entry No. 749496 in Book 1730 at page 1816, the Amendment to Declaration of Covenants, Conditions and Restrictions of Toll Creek Village Office Condominiums recorded February 27, 2008 as Entry No. 838525 in Book 1916 at page 1360, and Third Amendment to Declaration of Covenants, Conditions and Restrictions of Toll Creek Village Office Condominiums recorded September 19, 2013 as Entry No. 979487 in Book 2207 at page 1236, records of Summit County, Utah. TCVC-2-200

Storage Unit A, TOLL CREEK VILLAGE SECOND AMENDED, a Utah Condominium Project, together with its appurtenant undivided ownership interest in and to the Common Areas and Facilities, as established and described in the Record of Survey Map recorded August 13, 2010 as Entry No. 904718, and in the Declaration of Covenants, Conditions and Restrictions of Toll Creek Village Office Condominiums, recorded September 2, 2005 as Entry No. 749496 in Book 1730 at page 1816, the Amendment to Declaration of Covenants, Conditions and Restrictions of Toll Creek Village Office Condominiums recorded February 27, 2008, as Entry No. 838525 in Book 1916 at page 1360, and Third Amendment to Declaration of Covenants, Conditions and Restrictions of Toll Creek Village Office Condominiums recorded September 19, 2013 as Entry No. 979487 in Book 2207 at page 1236, records of Summit County, Utah. TCVC-A-2AM

Exhibit A to Lease Agreement

# Lease Agreement Layfield V to Maximum Legal (Utah)

Adobe Sign Document History                           04/10/2017

| Created: | 04/10/2017 |
|---|---|
| By: | Todd Wakefield (T.wakefield@layfieldbarrett.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAowDmzz41v6c1dl1G1-k5ebdV6D4SflzX |

## "Lease Agreement Layfield V to Maximum Legal (Utah)" History

Document created by Todd Wakefield (T.wakefield@layfieldbarrett.com)
04/10/2017 - 5:03:15 PM PDT- IP address: 50.232.165.98

Document emailed to Philip Layfield (p@layfieldbarrett.com) for signature
04/10/2017 - 5:04:08 PM PDT

Document viewed by Philip Layfield (p@layfieldbarrett.com)
04/10/2017 - 5:04:48 PM PDT- IP address: 68.225.252.76

Document e-signed by Philip Layfield (p@layfieldbarrett.com)
Signature Date: 04/10/2017 - 5:07:05 PM PDT - Time Source: server- IP address: 68.225.252.76

Signed document emailed to Todd Wakefield (T.wakefield@layfieldbarrett.com) and Philip Layfield (p@layfieldbarrett.com)
04/10/2017 - 5:07:05 PM PDT



LAYFIELD BARRETT          Powered by
Adobe Sign

**EXHIBIT 3**

# ESQUIRE® BANK

## Monthly Statement

LAYFIELD & BARRETT, APC
9170 IRVINE CENTER DR STE #100
IRVINE CA 92618



BUSINESS CHECKING

20.00

| | Date | Balance |
|---|---|---|

**Continued on Next Page**

LAYFIELD & BARRETT, APC



Layfield & Barrett, AP
WIRE IN/MR PHILIP JAMES LAYFIE          85000.00     1-23

Layfield Barrett #525
WIRE IN/MR PHILIP JAMES LAYFIE         125000.00     1-25

Continued on Next Page



# ESQUIRE® BANK

## Monthly Statement

1-31-17

LAYFIELD & BARRETT, APC

# ⚖ ESQUIRE® BANK

*Monthly Statement*

LAYFIELD & BARRETT,APC
9170 IRVINE CENTER DR STE #100
IRVINE CA 92618



BUSINESS CHECKING

31



| | Date | Balance |
|---|---|---|

Continued on Next Page

LAYFIELD & BARRETT, APC

LAYFIELD & BARRETT



| | | |
|---|---|---|
| WIRE IN/MR PHILIP JAMES LAYFIE<br>LD/23215352/ | 25000.00 | 3-23 |
| WIRE IN/MR PHILIP JAMES LAYFIE<br>LD/23251458/ | 7500.00 | 3-27 |

LAYFIELD & BARRETT

Continued on Next Page



LAYFIELD & BARRETT,APC



# ESQUIRE® BANK

*Monthly Statement*

LAYFIELD & BARRETT,APC
9170 IRVINE CENTER DR STE #100
IRVINE CA 92618



BUSINESS  CHECKING

| | | Date | Balance |
|---|---|---|---|
| WEB XFER FR DDA 001022010878 | 2000.00 | 6-01 | 2891.71- |
| WIRE IN/MR PHILIP JAMES LAYFIE | 200000.00 | 6-12 | |

Continued on Next Page

LAYFIELD & BARRETT, APC

LAYFIELD & BARRETT



WIRE IN/MR PHILIP JAMES LAYFIE    50000.00   6-20   350506.94

LAYFIELD AND BARRETT

  6-28   251.36

LAYFIELD & BARRETT
WIRE IN/MR PHILIP JAMES LAYFIE    15000.00   6-29   15251.36

**EXHIBIT 4**

From: Philip Layfield - To: Veronica Maravilla - Date: August 7, 2017 at 2:03 PM

Laya:

I have been forwarded the below email.  I have no idea what Mr. Wakefield is doing, but as co-counsel, we will take over the filing of this petition immediately.

I apologize for Mr. Wakefield's lack of diligence.  Since he is not a California lawyers, I suspect that he doesn't know what he's doing here.

From: Veronica Maravilla <v.maravilla@maximumlegalservices.com>
...

From: Veronica Maravilla - To: phil@maximumlegalservices.com - Date: August 7, 2017 at 12:59 PM

FYI

-----Original Message-----
From: Laya Dogmetchi [mailto:ldogmetchi@ulichlaw.com]
Sent: Monday, August 7, 2017 9:52 AM
To: Todd D Wakefield <t.wakefield@maximum-legal.com>
Cc: Janet Keuper <jkeuper@snw-law.com>; Veronica Maravilla <v.maravilla@maximumlegalservices.com>;
Marianne Westerdoll <mwesterdoll@ulichlaw.com>; Maximum Legal Trial Team <mltrial@maximum-
legal.com>; Maximum Legal Trial Team 2 <mltrial2@maximum-legal.com>; Joe Barrett <joe@maximum-
legal.com>; Aaron Lavine <a.lavine@maximum-legal.com>; Christina Hicklin <c.hicklin@maximum-
legal.com>; Rita Mims <r.mims@maximumlegalservices.com>
Subject: RE: Velasco: Fully Executed Release and Settlement Agreement

Mr. Wakefiled: What's going on with the Minor's Comp. hearing? Where are your papers?

Regards,
Laya

Laya Dogmetchi, Esq.
ULICH GANION BALMUTH FISHER LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
N (949)250-9797;  (949)250-9777
ldogmetchi@ulichlaw.com
www.ulichlaw.com

This message may contain information which is confidential and privileged.  Unless you are the intended
addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the
message or any information contained in the message.  If you have received this message in error, please advise
the sender by reply email and delete the message.  Thank you.

-----Original Message-----
From: Laya Dogmetchi
Sent: Monday, July 24, 2017 11:00 AM
To: 'Todd D Wakefield' <t.wakefield@maximum-legal.com>
Cc: Janet Keuper <jkeuper@snw-law.com>; Veronica Maravilla <v.maravilla@maximumlegalservices.com>;
Marianne Westerdoll <mwesterdoll@ulichlaw.com>; Maximum Legal Trial Team <mltrial@maximum-
legal.com>; Maximum Legal Trial Team 2 <mltrial2@maximum-legal.com>; Joe Barrett <joe@maximum-
legal.com>; Aaron Lavine <a.lavine@maximum-legal.com>; Christina Hicklin <c.hicklin@maximum-
legal.com>; Rita Mims <r.mims@maximumlegalservices.com>
Subject: RE: Velasco: Fully Executed Release and Settlement Agreement

I don't think you've got enough days as far as notice goes. For the Aug. 10th day to be good, papers should have
been personally-served last Wednesday or mail-served the week before. So the 10th won't work now as far as a
hearing date. Are you getting a new hearing date?

Laya Dogmetchi, Esq.
ULICH GANION BALMUTH FISHER LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
N (949)250-9797;  (949)250-9777
ldogmetchi@ulichlaw.com

This message may contain information which is confidential and privileged. Unless you are the intended
addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the
message or any information contained in the message. If you have received this message in error, please advise
the sender by reply email and delete the message. Thank you.

-----Original Message-----
From: Todd D Wakefield [mailto:t.wakefield@maximum-legal.com]
Sent: Monday, July 24, 2017 10:45 AM
To: Laya Dogmetchi <ldogmetchi@ulichlaw.com>
Cc: Janet Keuper <jkeuper@snw-law.com>; Veronica Maravilla <v.maravilla@maximumlegalservices.com>;
Marianne Westerdoll <mwesterdoll@ulichlaw.com>; Maximum Legal Trial Team <mltrial@maximum-
legal.com>; Maximum Legal Trial Team 2 <mltrial2@maximum-legal.com>; Joe Barrett <joe@maximum-
legal.com>; Aaron Lavine <a.lavine@maximum-legal.com>; Christina Hicklin <c.hicklin@maximum-
legal.com>; Rita Mims <r.mims@maximumlegalservices.com>
Subject: Re: Velasco: Fully Executed Release and Settlement Agreement

Laya - I do not understand why a notice of lien was filed for L&B. We were not consulted about that. But, the
minors comp hearing date remains good. The petition will be filed shortly, and the date will hold.


Todd Wakefield
435-640-4582


> On Jul 24, 2017, at 11:42 AM, Laya Dogmetchi <ldogmetchi@ulichlaw.com> wrote:
>
> Regarding the notice of lien you e-mailed, I also am confused. I thought Maximum associated in with
Layfield...so Layfield remains counsel of record. So, why the lien?
>
> Also, we have not received any paperwork on the minor's comp petition, so I will assume that the hearing date
you advised us of previously (via e-mail) - - i.e., August 10th - - is no longer good. So, would someone please
shed some light as to what is going on in this regard?
>
> Thank you,
> Laya
>
> Laya Dogmetchi, Esq.
> ULICH GANION BALMUTH FISHER LLP
> 4041 MacArthur Blvd., Suite 300
> Newport Beach, California 92660
> N (949)250-9797;  (949)250-9777
> ldogmetchi@ulichlaw.com
> www.ulichlaw.com
>
> This message may contain information which is confidential and privileged. Unless you are the intended
addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the
message or any information contained in the message. If you have received this message in error, please advise
the sender by reply email and delete the message. Thank you.
>
> -----Original Message-----
> From: Janet Keuper [mailto:jkeuper@snw-law.com]
> Sent: Thursday, July 20, 2017 11:30 AM
> To: Veronica Maravilla <v.maravilla@maximumlegalservices.com>; Todd D
> Wakefield <t.wakefield@maximum-legal.com>; Laya Dogmetchi
> <ldogmetchi@ulichlaw.com>

> <mltrial2@maximum-legal.com>; Joe Barrett <joe@maximum-legal.com>;
> Aaron Lavine <a.lavine@maximum-legal.com>; Christina Hicklin
> <c.hicklin@maximum-legal.com>; Rita Mims
> <r.mims@maximumlegalservices.com>
> Subject: RE: Velasco: Fully Executed Release and Settlement Agreement
>
> Well, now I am totally confused. I thought you were no longer with the firm?? Anyway, can someone please
let me know status of the Minor's Comp?
>
> -----Original Message-----
> From: Veronica Maravilla [mailto:v.maravilla@maximumlegalservices.com]
> Sent: Thursday, July 20, 2017 11:25 AM
> To: Todd D Wakefield; Janet Keuper; Laya Dogmetchi
> Cc: Marianne Westerdoll; Maximum Legal Trial Team; Maximum Legal Trial
> Team 2; Joe Barrett; Aaron Lavine; Christina Hicklin; Rita Mims
> Subject: RE: Velasco: Fully Executed Release and Settlement Agreement
>
> Janet and Laya,
>
> Attached please find a courtesy copy of the Notice of Lien on behalf of Layfield & Barrett, APC.
>
> Veronica Maravilla
> Director of Litigation Support
>
>
> E-mail: v.maravilla@maximumlegalservices.com
> Phone: (323) 524-9408 • Fax: (800) 644-9861 •
> www.maximumlegalservices.com Maximum Legal (California), LLP • US Bank
> Tower, 633 West 5th Street, Suite 3300 • Los Angeles • CA • 90071 •
> United States
>
> This message is confidential. It may also be privileged or otherwise protected by the work product doctrine or
other legal rules. If you have received it by mistake, please let us know by e-mail reply, and delete it from your
system. You may not copy this message or disclose its contents to anyone. Please send us by fax any message
containing deadlines as incoming e-mails may not be screened for response deadlines. The integrity and security
of this message cannot be guaranteed on the Internet. Maximum Legal is a national law firm which operates
through a number of professional firms and constituent entities (the Member Firms) located throughout the
United States to provide legal and other client related professional services. The Member Firms are constituted
and regulated in accordance with relevant local regulatory and legal requirements. The use of the name
Maximum Legal is for description purposes only and does not imply that all Member Firms are in a partnership
with, or are part of, Maximum Legal, LLC. The responsibility for the provision of services to the client is
defined in the terms of the engagement between the Member Firm and the client.
>
>
> -----Original Message-----
> From: Todd D Wakefield
> Sent: Thursday, July 20, 2017 10:44 AM
> To: Janet Keuper <jkeuper@snw-law.com>; Veronica Maravilla
> <v.maravilla@maximumlegalservices.com>; Laya Dogmetchi
> <ldogmetchi@ulichlaw.com>; Michelle Soto <m.soto@maximum-legal.com>
> Cc: Marianne Westerdoll <mwesterdoll@ulichlaw.com>; Maximum Legal
> Trial Team <mltrial@maximum-legal.com>; Maximum Legal Trial Team 2
> <mltrial2@maximum-legal.com>; Joe Barrett <joe@maximum-legal.com>;
> Aaron Lavine <a.lavine@maximum-legal.com>; Christina Hicklin

>
> Janet - Michelle Soto and Veronica Maravilla are no longer employed with this firm. The attorneys handling
this case on behalf of the plaintiff now are Joe Barrett and Aaron Lavine, who are copied on this email, along
with their paralegal, Christina Hicklin. Appropriate notices are being prepared and will be filed shortly. Please
ensure that all communications with the plaintiff occur through these individuals going forward.
>
> Todd D. Wakefield
> CEO
>
>
> E-mail: t.wakefield@maximum-legal.com
> Phone: (435) 602-4544 • Fax: (800) 573-7059 • www.LayfieldBarrett.com
>
> Maximum Legal (Utah), LLC • 2720 Homestead Road Suite 200 • Park City
> • UT • 84098 • United States
>
> This message is confidential. It may also be privileged or otherwise protected by work product immunity or
other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your
system; you may not copy this message or disclose its contents to anyone. Please send us by fax any message
containing deadlines as incoming e-mails are not screened for response deadlines. The integrity and security of
this message cannot be guaranteed on the Internet.
>
> -----Original Message-----
> From: Janet Keuper [mailto:jkeuper@snw-law.com]
> Sent: Thursday, July 20, 2017 11:00 AM
> To: Veronica Maravilla <v.maravilla@maximumlegalservices.com>; Laya
> Dogmetchi <ldogmetchi@ulichlaw.com>; Michelle Soto
> <m.soto@maximum-legal.com>
> Cc: Marianne Westerdoll <mwesterdoll@ulichlaw.com>; Maximum Legal
> Trial Team <mltrial@maximum-legal.com>; Maximum Legal Trial Team 2
> <mltrial2@maximum-legal.com>
> Subject: RE: Velasco: Fully Executed Release and Settlement Agreement
>
> Michelle - Is the Minor's Comp still going on August 10? I have not received any papers from you yet. Can
you get me a status so that I can make sure the appearance is covered, as I will be out of town...
>
> Thank you...
>
> Janet L. Keuper, Esq.
> SEKI, NISHIMURA & WATASE, LLP
> 600 Wilshire Boulevard, Suite 1250
> Los Angeles, CA 90017
> (213) 481-2869
>
>
>
> -----Original Message-----
> From: Veronica Maravilla [mailto:v.maravilla@maximum-legal.com]
> Sent: Monday, July 10, 2017 10:55 AM
> To: Laya Dogmetchi; Michelle Soto; Janet Keuper
> Cc: Marianne Westerdoll; Maximum Legal Trial Team; Maximum Legal Trial
> Team 2
> Subject: RE: Velasco: Fully Executed Release and Settlement Agreement
>

>
>
>
>
>
> E-mail: v.maravilla@maximum-legal.com
> Phone: • Fax: • www.LayfieldBarrett.com
>
> • • • • •
>
> This message is confidential. It may also be privileged or otherwise protected by work product immunity or
other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your
system; you may not copy this message or disclose its contents to anyone. Please send us by fax any message
containing deadlines as incoming e-mails are not screened for response deadlines. The integrity and security of
this message cannot be guaranteed on the Internet.
>
> -----Original Message-----
> From: Laya Dogmetchi [mailto:ldogmetchi@ulichlaw.com]
> Sent: Monday, July 10, 2017 10:53 AM
> To: Michelle Soto <m.soto@maximum-legal.com>; Heidi Sinavsky
> <h.sinavsky@maximum-legal.com>; Janet Keuper <jkeuper@snw-law.com>
> Cc: Veronica Maravilla <v.maravilla@maximum-legal.com>; Marianne
> Westerdoll <mwesterdoll@ulichlaw.com>
> Subject: RE: Velasco: Fully Executed Release and Settlement Agreement
>
> Also, please be advised that we just got word that Metro's Claims Committee approved Plaintiff's proposed
settlement with Metro this morning (which is conditioned on a favorable ruling on a minor's comp. petition).
So, at this juncture, we await hearing from Plaintiff's counsel in this regard. We also have not received any
papers or proper notice in this regard - - have you, Janet?
>
> Laya Dogmetchi, Esq.
> ULICH GANION BALMUTH FISHER LLP
> 4041 MacArthur Blvd., Suite 300
> Newport Beach, California 92660
> N (949)250-9797; 7 (949)250-9777
> ldogmetchi@ulichlaw.com
> www.ulichlaw.com
>
> This message may contain information which is confidential and privileged. Unless you are the intended
addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the
message or any information contained in the message. If you have received this message in error, please advise
the sender by reply email and delete the message. Thank you.
>
> -----Original Message-----
> From: Michelle Soto [mailto:m.soto@maximum-legal.com]
> Sent: Monday, July 10, 2017 10:03 AM
> To: Laya Dogmetchi <ldogmetchi@ulichlaw.com>; Heidi Sinavsky
> <h.sinavsky@maximum-legal.com>; Janet Keuper <jkeuper@snw-law.com>
> Cc: Veronica Maravilla <v.maravilla@maximum-legal.com>; Marianne
> Westerdoll <mwesterdoll@ulichlaw.com>
> Subject: RE: Velasco: Fully Executed Release and Settlement Agreement
>
> Thank you, Laya.
>

>
>
> E-mail: m.soto@maximum-legal.com
> Phone: (323) 524-9415 • Fax: (800) 644-9861 • www.LayfieldBarrett.com
>
> Maximum Legal (California), LLP • US Bank Tower, 633 West 5th Street,
> Suite 3300 • Los Angeles • CA • 90071 • United States
>
> This message is confidential. It may also be privileged or otherwise protected by work product immunity or
other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your
system; you may not copy this message or disclose its contents to anyone. Please send us by fax any message
containing deadlines as incoming e-mails are not screened for response deadlines. The integrity and security of
this message cannot be guaranteed on the Internet.
>
> -----Original Message-----
> From: Laya Dogmetchi [mailto:ldogmetchi@ulichlaw.com]
> Sent: Monday, July 10, 2017 9:56 AM
> To: Heidi Sinavsky <h.sinavsky@maximum-legal.com>; Michelle Soto
> <m.soto@maximum-legal.com>; Janet Keuper <jkeuper@snw-law.com>
> Cc: Veronica Maravilla <v.maravilla@maximum-legal.com>; Marianne
> Westerdoll <mwesterdoll@ulichlaw.com>
> Subject: Velasco: Fully Executed Release and Settlement Agreement
>
> Dear Counsel:
>
> Attached please find a fully executed copy of the release and settlement agreement in the above matter.
>
> Regards,
> Laya
>
> Laya Dogmetchi, Esq.
> ULICH GANION BALMUTH FISHER LLP
> 4041 MacArthur Blvd., Suite 300
> Newport Beach, California 92660
> N (949)250-9797; 7 (949)250-9777
> ldogmetchi@ulichlaw.com
> www.ulichlaw.com
>
> This message may contain information which is confidential and privileged. Unless you are the intended
addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the
message or any information contained in the message. If you have received this message in error, please advise
the sender by reply email and delete the message. Thank you.
>
> -----Original Message-----
> From: copiers@ulichlaw.com [mailto:copiers@ulichlaw.com]
> Sent: Monday, July 10, 2017 6:50 AM
> To: Laya Dogmetchi <ldogmetchi@ulichlaw.com>
> Subject: Message from "RNP044071"
>
> This E-mail was sent from "RNP044071" (Aficio MP 6001).
>
> Scan Date: 07.10.2017 09:49:58 (-0400) Queries to:
> copiers@ulichlaw.com

**Subject: Re: Velasco: Fully Executed Release and Settlement Agreement**

From: Philip Layfield - To: Rita Mims - Date: July 24, 2017 at 11:51 AM

Ok. Our lien is valid and they can file the petition.
...

**Subject: Re: Velasco: Fully Executed Release and Settlement Agreement**

From: Philip Layfield - To: Rita Mims, Veronica Maravilla - Date: July 20, 2017 at 11:51 AM

Wasn't it completely settled while it was still an L&B case? If so, we should get the majority of the proceeds.
...

**Subject: Re: Velasco: Fully Executed Release and Settlement Agreement**

From: Philip Layfield - To: Veronica Maravilla, Rita Mims - Date: July 20, 2017 at 11:49 AM

Ok. File a notice of lien then.
...