**BRADLEY ARANT BOULT CUMMINGS LLP**
Roger G. Jones (Pro Hoc Vice)
1600 Division Street
Suite 700
Nashville TN  37219
615-252-2323
rjones@Bradley.com

**LOBEL WEILAND GOLDEN FRIEDMAN LLP**
Jeffrey I. Golden, State Bar No. 133040
jgolden@lwgfllp.com
Faye C. Rasch, State Bar No. 253838
frasch@lwgfllp.com
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Telephone       714-966-1000
Facsimile       714-966-1002

Attorneys for Advocate Capital, Inc.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No. 2:17-bk-19548-NB |
| LAYFIELD & BARRETT, APC, | Chapter 11 |
| Debtor. | Adv. Pro. No. _____ |
| ADVOCATE CAPITAL, INC., | COMPLAINT FOR: |
| Plaintiff, | (1)   DECLARATORY RELIEF; AND |
| v. | (2)   TURNOVER OF PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. § 542. |
| MAXIMUM LEGAL (CALIFORNIA), LLP, CALIFORNIA ATTORNEY LENDING II, INC. MAXIMUM LEGAL, LLC, TODD D. WAKEFIELD, JOSEPH MARTIN BARRETT AND RICHARD M. PACHULSKI, TRUSTEE, | |
| Defendants. | |

1

Comes now Advocate Capital, Inc., by and through its counsel, and for its complaint against the Defendants, Maximum Legal (California), LLP, California Attorney Lending II, Inc., Maximum Legal, LLC, Todd D. Wakefield, Joseph Martin Barrett and Richard M. Pachulski, Trustee, would hereby show the Court as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to the provisions of 28 U.S.C. §§ 157(b) and 1334 and the reference order of the United States District Court for the Central District of California.

2.      This adversary proceeding relates to the Chapter 11 cases of Layfield & Barrett, APC, Case No. 2:17-bk-19548-NB, and Maximum Legal (California), LLP, Case No. 2:17-bk-18433 NB, now pending in this Court.

3.      The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K).

4.      Venue herein is proper pursuant to the provisions of 28 U.S.C. §§ 1408 and 1409.

## PARTIES

5.      Plaintiff, Advocate Capital, Inc. ("Advocate"), is a Tennessee corporation with its principal place of business at 1 Vantage Way, Suite C200, Nashville, Tennessee 37228.

6.      Defendant, Maximum Legal (California), LLP ("Maximum Legal California"), purports to be California limited liability partnership.

7.      Defendant, California Attorney Lending II, Inc. ("California Attorney Lending"), is a New York corporation with its principal place of business at 6400 Main Street, Suite 120, Williamsville, New York 14221.

8.      Defendant, Maximum Legal, LLC ("Maximum Legal Delaware"), purports to be a Delaware limited liability company.

9.      Defendant Todd D. Wakefield ("Mr. Wakefield") is an individual and resident of Utah.

10.   Defendant Joseph Martin Barrett ("Mr. Barrett") is an individual and resident of California.

11.   Defendant Richard M. Pachulski, Trustee, is the duly appointed Chapter 11 Trustee for Layfield & Barrett, APC ("L&B"), Case No. 2:17-bk-18433-NB, now pending in this Court.

## GENERAL ALLEGATIONS

### B.   Advocate's Loan and Collateral

12.   On August 7, 2016, L&B executed an Amended and Restated Master Loan and Security Agreement in favor of Advocate (the "Amended & Restated Loan Agreement"). The Amended & Restated Loan Agreement constitutes an amendment and restatement of numerous prior loan agreements substantially in the same form (the "Prior Loan Agreements, and together with the Amended & Restated Loan Agreement, collectively, the "Loan Agreement").   A copy of the Amended and Restated Loan Agreement is attached hereto as Exhibit A.

13.   L&B defaulted on its indebtedness and obligations under the Loan Agreement (the "Obligations") by failing or refusing to pay the interest and other charges due under the Loan Agreement on July 15, 2017, and by failing to pay the Obligations in full when they matured on August 7, 2017.   All the Obligations are presently due and payable in full.

14.   The Obligations outstanding include $3,995,992.39 in principal plus accrued but unpaid interest, finance charges, legal fees and expenses.

15.   L&B was a law firm engaged in representation of clients in personal injury, mass tort and class action cases.   L&B typically entered into contingent fee arrangements with its clients and advanced various expenses to be repaid from any recoveries.

16.     Under the Loan Agreement, L&B granted Advocate a continuing security interest in various collateral including, but not limited to, the following (the "Collateral"):

> All accounts, instruments, chattel paper, general intangibles, payment intangibles (all as defined in Article 9 of the Code), and all similar rights that Borrower may have of every nature and kind, including specifically and without limitation, all of Borrower's rights to receive payment or otherwise, for legal and other services rendered and to be rendered, and for costs and expenses advanced and to be advanced, and all other rights and interest that Borrower may have in and with respect to each and every Client Matter.

(*See* Ex. A, at pp. 6-7.)  The Collateral includes, but is not limited to, any and all amounts that are now, or in the future, owed L&B including, but not limited to, any and all legal fees due L&B, as well as any and all reimbursements due L&B for any costs and expenses advanced by L&B arising out of any lawsuits.

17.     Advocate perfected the security interest granted it under the Loan Agreement by filing a UCC financing statement with the office of the Secretary of State for the State of California on August 14, 2013.  A copy of Advocate's UCC financing statement is attached hereto as Exhibit B.

## C.     **Mr. Wakefield's Failed Attempt to Organize Maximum Legal California**

18.     On March 28, 2017, Mr. Wakefield filed an Application to Register a Limited Liability Partnership (LLP) (the "Application to Register") with the California Secretary of State seeking to organize a California limited liability partnership known as Maximum Legal (California), LLP.  A copy of the Application to Register is attached hereto as Exhibit C.

19.     Mr. Wakefield asserts that, at the time he filed the Application to Register, he was the "sole partner" of Maximum Legal California.

20.     Mr. Wakefield asserts that, at the time the case was filed, he was the "sole partner" of Maximum Legal California.

21.     Despite Mr. Wakefield's filing of the Application to Register, Maximum Legal California was not duly formed or organized and has never existed.

22.     California does not permit the formation of a limited liability partnership with only one partner.  For a limited liability partnership to be properly formed and exist, it must have two (2) or more partners.  *See* Cal. Corp. Code §§ 16101(8)(A) and (9), and 16202.

**D.     <u>Sham and Fraudulent Transactions to Avoid L&B's Creditors</u>**

23.     Mr. Wakefield attempted to form Maximum Legal California pursuant to an agreement among L&B, Mr. Philip Layfield ("<u>Mr. Layfield</u>"), Mr. Barrett, and Mr. Wakefield to transfer L&B's assets to Maximum Legal, LLC ("<u>Maximum Legal Delaware</u>"), a Delaware limited liability company, and its affiliates.

24.     In April 2017, Mr. Layfield was a shareholder of L&B.

25.     Upon information and belief, in April 2017, Mr. Barrett was a shareholder of L&B.

26.     In April 2017, Mr. Wakefield was an officer of L&B.

27.     In April 2017, Mr. Layfield, Mr. Barrett and Mr. Wakefield were members of Maximum Legal Delaware.

28.     In April 2017, Mr. Layfield, Mr. Barrett and Mr. Wakefield were managers of Maximum Legal Delaware.

29.     When Mr. Wakefield attempted to form Maximum Legal California, Mr. Layfield, Mr. Barrett and Mr. Wakefield intended that Maximum Legal California would be an affiliate of Maximum Legal Delaware.

30.     Mr. Layfield, Mr. Barrett and Mr. Wakefield, in their capacities as managers of Maximum Legal Delaware, executed that Action By Written Consent of

Managers of Maximum Legal, LLC dated as of April 15, 2017 (the "Consent Action").

A copy of the Consent Action is attached hereto as Exhibit D.

31.    Upon information and belief, the Consent Action was not actually executed until May or June 2017.

32.    L&B executed a Bill of Sale dated as of April 15, 2017, purporting to transfer all L&B's "Non-case Assets" to Maximum Legal Delaware (the "Bill of Sale"). A copy of the Bill of Sale is attached hereto as Exhibit E.

33.    Upon information and belief, the Bill of Sale was not actually executed until sometime in May or June 2017.

34.    L&B and Maximum Legal Delaware executed that Master Association Agreement dated as of April 15, 2017 (the "Master Association Agreement").  A copy of the Master Association Agreement is attached hereto as Exhibit F.

35.    Upon information and belief, the Master Association Agreement was not actually executed until sometime in May or June 2017.

36.    Under the Master Association Agreement, Maximum Legal Delaware or one of its affiliates would associate into L&B's 147 pre-litigation and pending cases and receive 75% of any fees in such cases. *See* Master Association Agreement ¶ 5.

37.    The Barrett Law Firm, APC, which was owned by Mr. Barrett, and Mr. Wakefield executed various agreements dated as of June 1, 2017, under which each purchased 25% of the membership units of Maximum Legal Delaware from Maximum Legal Holdings, LLC ("Maximum Legal Holdings"), a Delaware limited liability company, and executed promissory notes in favor of Maximum Legal Holdings (collectively the "Purchase Agreements").   Copies of the Purchase Agreements are attached hereto as Exhibit G.

38.    Mr. Layfield formed Maximum Legal Holdings on or about March 20, 2017, and was its sole member.

39.    The Application to Register filed by Mr. Wakefield represented that its address was 633 W 5th Street, #330, Los Angeles, California, which was L&B's office.

40.     From the time of Mr. Wakefield's failed attempt to form Maximum Legal California until this case was filed, Maximum Legal California did not own or lease any office space.

41.     From the time of Mr. Wakefield's failed attempt to form Maximum Legal California until at least late June 2017, Maximum Legal California had no business operations separate and apart from those of L&B.

42.     From the time of Mr. Wakefield's failed attempt to form Maximum Legal California until at least late June 2017, Maximum Legal California had no employees.

43.     From the time of Mr. Wakefield's failed attempt to form Maximum Legal California until at least late June 2017, Maximum Legal California had no tangible assets.

44.     Prior to April 2017, L&B had used client funds to finance its operations.

45.     A true and exact copy of the California Bar's First Amended Notice of Disciplinary Charges against Mr. Layfield related to the misappropriation of client funds by Mr. Layfield and L&B is attached hereto as Exhibit H.

46.     In April 2017, Mr. Wakefield and Mr. Barrett knew that L&B had failed to turnover client funds to clients and that clients had threatened formal action against L&B.

47.     In April 2017, Mr. Wakefield and Mr. Barrett knew that L&B was insolvent.

48.     In April 2017, Mr. Wakefield and Mr. Barrett knew that L&B was indebted to Advocate and that L&B had granted Advocate a security interest in L&B's accounts including, but not limited to, all attorneys' fees and expense reimbursements due or to become due to L&B.

49.     The formation of Maximum Legal Delaware and Maximum Legal Holdings, the failed attempt to form Maximum Legal California, the Bill of Sale, the Master Association Agreement and the Purchase Agreements were all parts of a larger

1    sham transaction intended by the parties thereto to avoid payment of L&B's clients and

2    creditors including Advocate.

3        50.    The formation of Maximum legal Delaware and Maximum Legal

4    Holdings, the failed attempt to form Maximum Legal California, the Bill of Sale, the

5    Master Association Agreement and the Purchase Agreements were undertaken and

6    executed by the parties thereto at a time when L&B was insolvent and with the intent to

7    defraud L&B's clients and creditors including Advocate.

8            **E.    The Teitelbaum Case**

9        51.    On September 28, 2015, the case styled *Teitelbaum v. Lyft, Inc., et al.*,

10   was filed in the Superior Court for Los Angeles County, California, Case No. 596036

11   (the "Teitelbaum Case").

12       52.    On June 30, 2017, a Notice of Change of Address and Notice of

13   Association was filed in the Teitelbaum Case purporting to evidence a change in

14   address for L&B and the association of Maximum Legal California as "co-counsel" for

15   the plaintiff (the "Notice of Association").  A copy of the Notice of Association is

16   attached hereto as Exhibit I.

17       53.    On June 30, 2017, a Notice of Settlement of Entire Case ("Notice of

18   Settlement") was filed in the Teitelbaum Case evidencing that the Teitelbaum Case had

19   settled on June 26, 2017.  A copy of the Notice of Settlement is attached hereto as

20   Exhibit J.

21       54.    When the Teitelbaum Case settled, L&B became entitled to a

22   contingency fee and reimbursement of expenses (the "Teitelbaum Fee").

23       55.    Maximum Legal California did not purport to associate into in the

24   Teitelbaum Case until after the Teitelbaum Case had settled and L&B had become

25   entitled to the Teitelbaum Fee.

26       56.    Since Maximum Legal California was not duly organized and never

27   existed, its purported association into the Teitelbaum Case was a nullity.

28

57.     The Teitelbaum Case was one of L&B's pending cases that was subject to the Master Association Agreement.  *See* Master Association Agreement and Ex. A attached thereto.

58.     Maximum Legal California's purported association into the Teitelbaum Case was part and parcel of the sham transaction and fraudulent scheme described in Paragraphs 23-50 above.

59.     Maximum Legal California, Mr. Wakefield and/or Mr. Barrett received payment of some or all the Teitelbaum Fee.

**F.     California Attorney Lending's Purported Security Interest**

60.     Maximum Legal California purported to execute a First Amended and Restated Term Promissory Note dated as of July 7, 2017, in the principal amount of $215,000 in favor of California Attorney Lending (the "Amended Note").  (*See* Docket No. 41, Ex. A.)

61.     The Amended Note purports to be an amendment and restatement of a Term Promissory Note dated as of June 30, 2017, in the principal amount of $75,000.00.  (*Id.*, at p. 11.)   The original Term Promissory Note purports to have been executed on the same day that Maximum Legal California purported to associate into the Teitelbaum Case.

62.     Mr. Wakefield, Mr. Barrett and Maximum Legal Delaware guaranteed payment of the Amended Note.  Mr. Wakefield purported to be the Chief Executive Officer of Maximum Legal Delaware.

63.     Since Maximum Legal California was not duly organized and never existed, the Amended Note is unenforceable.

64.     Mr. Wakefield, Mr. Barrett, Maximum Legal California and Maximum Legal Delaware purported to execute a First Amended and Restated Security Agreement dated as July 7, 2017, in favor of California Attorney Lending (the "Amended Security Agreement").  (*See* Docket No. 41, Ex. B.).

9

65.     The Amended Security Agreement purported to be an amendment and restatement of a Security Agreement dated as of June 30, 2017, and executed by Maximum Legal California and possibly others.   The original security agreement purports to have been executed on the same day that Maximum Legal California purported to associate into the Teitelbaum Case.

### G.     Advocate's Security Interest in the Teitelbaum Fee

66.     At all times relevant herein, Advocate held a valid and properly, first priority perfected security interest in the Teitelbaum Fee.

67.     Advocate did not consent to any disposition of the Teitelbaum Fee or the transfer of any portion thereof to Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and/or Mr. Barrett.

68.     The purported transfer of the Teitelbaum Fee to Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and/or Mr. Barrett was part and parcel of the sham transactions described in Paragraphs 23-50 above, and, is, therefore, void and unenforceable.

69.     The purported transfer of the Teitelbaum Fee to Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and/or Mr. Barrett was part and parcel of the fraudulent transactions described in Paragraphs 23-50 above, and, is, therefore, void and unenforceable.

70.     Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and Mr. Barrett obtained no rights in the Teitelbaum Fee, and, therefore, California Attorney Lending's purported security interest did not attach to the Teitelbaum Fee.

71.     Even if Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and Mr. Barrett obtained rights in the Teitelbaum Fee, the Amended Note, which is purportedly secured by California Attorney Lending's security interest in the Teitelbaum Fee, is unenforceable due to the fact Maximum Legal California was not duly formed and never existed.

72.     To the extent Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and Mr. Barrett obtained rights in the Teitelbaum Fee, they did so subject to Advocate's security interest.

73.     To the extent California Attorney Lending obtained a security interest in the Teitelbaum Fee, Advocate's security interest is senior in priority to any security interest of California Attorney Lending.

### FIRST CLAIM FOR RELIEF
(Declaratory Relief)

74.    Advocate incorporates by reference and realleges the allegations contained in paragraphs 1-73 above as if fully set forth herein.

75.    This is an action for declaratory relief brought pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure to determine the validity, priority and extent of Advocate's security interest in the Teitelbaum Fee.

76.    Advocate seeks a declaratory judgment that (i) Advocate holds a valid and properly perfected security interest in the Teitelbaum Fee, (ii) Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and/or Mr. Barrett did not obtain any rights in the Teitelbaum Fee, and, therefore, California Attorney Lending's purported security interest did not attach to the Teitelbaum Fee, and (iii) to the extent Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and Mr. Barrett obtained any rights in the Teitelbaum Fee and California Attorney Lending's purported security interest attached to the Teitelbaum Fee, Advocate's security interest in the Teitelbaum Fee is senior in priority to any security interest held by California Attorney Lending in the Teitelbaum Fee.

### SECOND CLAIM FOR RELIEF
(For Turnover of Property of the Estate)

77.    Advocate incorporates each and every allegation contained in paragraphs 1 through 73, inclusive, as though fully set forth herein.

78.    Advocate is informed and believes, and on that basis alleges, that on the Petition Date, L&B held a legal and/or equitable interest in the Teitelbaum Fee.

79.    Advocate is informed and believes, and on that basis alleges, that on the Petition Date, the Teitelbaum Fee was under the control of L&B.

80.    As a result of the foregoing, Advocate seeks turnover of the Teitelbaum Fee from the Defendants to the Estate for the benefit of the Estate pursuant to 11 U.S.C. § 542.

WHEREFORE, Advocate Capital, Inc. respectfully requests that the Court enter judgment: (i) determining the validity, priority and extent of Advocate's security interest in the Teitelbaum Fee, (ii) declaring that Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and/or Mr. Barrett did not obtain any rights in the Teitelbaum Fee, and, therefore, California Attorney Lending's purported security interest did not attach to the Teitelbaum Fee; (iii) declaring that, to the extent Maximum Legal California, Maximum Legal Delaware, Mr. Wakefield and/or Mr. Barrett obtained any rights in the Teitelbaum Fee and California Attorney Lending's security interest attached to the Teitelbaum Fee, Advocate holds a valid and properly perfected security interest in the Teitelbaum Fee that is senior in priority to any security interest held by California Attorney Lending; (iv) ordering that the Defendants turnover the Teitelbaum Fee to the Estate and (iv) granting such other and further relief as is just and appropriate.

Dated: October 17, 2017

LOBEL WEILAND GOLDEN FRIEDMAN LLP


By: /S/ JEFFREY GOLDEN
    Jeffrey I. Golden
    Attorneys for Advocate Capital, Inc.

BRADLEY ARANT BOULT CUMMINGS LLP


By:    /S/ROGER G. JONES
    Roger G. Jones
    Attorneys for Advocate Capital, Inc.

13

Multi-State

**AMENDED AND RESTATED MASTER LOAN AND SECURITY AGREEMENT**

---

Borrower: **Layfield & Barrett, APC**

Lender: **ADVOCATE CAPITAL, INC.,
or its assign**

Date: **8/7/2016**

---

This **AMENDED AND RESTATED MASTER LOAN AND SECURITY AGREEMENT is entered into by and
between the above-named Borrower and Advocate Capital, Inc., or its assign, as Lender.**

WHEREAS, Borrower and Lender entered into that certain Master Loan and Security Agreement dated
8/7/2013, as extended from time to time (the "Prior Agreement").

WHEREAS, Borrower and Lender desire to amend and restate the Prior Agreement pursuant to the
terms and provisions hereof.

NOW THEREFORE, FOR VALUABLE CONSIDERATION RECEIVED, Borrower, Lender, and each Guarantor
unconditionally agree that the Prior Agreement is amended and restated to provide in full as follows:

     **1.**    **DEFINITIONS.** The following terms shall have the following meanings when used in this
Agreement.

**Advance.** The term "Advance" refers to each and every advance of funds, extension of credit, and other credit
accommodation as provided under this Agreement that Lender may now or in the future extend to Borrower.

**Agreement.** The term "Agreement" refers to this Amended and Restated Master Loan and Security Agreement, as
this Agreement may be amended or modified from time to time, together with all exhibits, addenda, and schedules
attached or to be attached to this Agreement.

**Borrower.** The term "Borrower" refers to the Borrower or Borrowers named above, and each Successor Borrower.
Each Borrower and Successor Borrower are sometimes hereinafter individually, collectively and interchangeably
referred to as "Borrower."

**Borrower Attorneys.** The term "Borrower Attorneys" refers to each attorney who practices law as an owner or
employee of Borrower.

**Client.** The term "Client" refers to each person and entity for which Borrower performs legal and other services.

**Client Matter.** The term "Client Matter" refers to each present and future undertaking and/or engagement for
legal and other services performed and to be performed by Borrower and by Borrower Attorneys and non-attorney
personnel, of every nature and kind without limitation, and whether in the form of assertion or defense of legal
claims, or otherwise, and whether or not the subject of litigation, arbitration, mediation or other contested
controversy.

**Case Expense Advance.** The term "Case Expense Advance" refers to an Advance made in connection with a
particular Client Matter.

**Code.** The term "Code" refers to the Uniform Commercial Code as adopted in the State of Tennessee.

**Collateral.** The term "Collateral" shall have the meaning provided in the "Description of Collateral" section hereof.

**Event of Default.** The term "Event of Default" shall have the meaning defined in this Agreement and in each
Related Document, as applicable.

1

**Gross Amount Advanced.** The term "Gross Amount Advanced" refers to the total amount of each Advance made under this Agreement, inclusive of Origination Fees withheld by Lender from the cash amount actually advanced to Borrower or to others on Borrower's behalf, as applicable.

**Guarantor.** The term "Guarantor" refers individually, collectively and interchangeably to each person, firm, corporation, or other entity guaranteeing payment and performance of the Obligations.

**Guaranty.** The term "Guaranty" refers to any agreement under which a Guarantor guarantees payment and performance of any Borrower Obligation.

**Lender.** The term "Lender" refers to Advocate Capital, Inc., its successors and assigns, and to each subsequent holder of any Borrower Obligation.

**Maturity Date.** The term "Maturity Date" means the first to occur of (i) the first anniversary date following the execution of this Agreement (or such later alternate maturity date as agreed to by Lender in writing in its sole and absolute discretion from time to time), or (ii) demand by Lender, in its sole and absolute discretion.

**Obligations.** The term "Obligations" refers to the Gross Amount Advanced and all other indebtedness, obligations, and liabilities that Borrower may now and in the future owe to or incur in favor of Lender, whether direct or indirect, absolute or contingent, liquidated or unliquidated, and whether due or to become due, of every nature and kind whatsoever, in principal, interest, fees, costs, expenses and attorneys' fees, and including without limitation, all other indebtedness, obligations, fees, costs, and expenses for which Borrower may be responsible under this Agreement and under each Related Document, as applicable.

**Origination Fees.** The term "Origination Fees" shall have such meaning as described under the Fee section hereof.

**Out-of-Balance Event.** The term "Out-of-Balance Event" shall have the meaning provided in the Fee section hereof.

**Related Document.** The term "Related Document" refers to each and every additional agreement, addendum, guaranty, mortgage, deed of trust, security agreement, assignment of life insurance, financing statement, promissory note, request for advance, and all other instruments and documents in any way relating to any Obligation, or relating to any other relationship between the parties.

**Successor Borrower.** The term "Successor Borrower" refers to each person or entity that is a successor to the Borrower named above whether as a result of subsequent name change or reorganization, merger or consolidation, acquisition of assets, or continuation of business operations, in whole or in part, or in combination with others. Each Successor Borrower shall be fully obligated for payment and satisfaction of the above-named Obligations in favor of Lender, and all property and assets of the above-named Borrower acquired by Successor Borrower shall remain subject to Lender's security interest, together with all like property and assets then owned or later acquired by Successor Borrower. Each Successor Borrower shall be obligated under this Agreement as a "new debtor" within the context of Section 9-203(d) of the Code, to the same extent as the Borrower named above is originally bound. This definition does not abrogate the requirements of notice and/or approval arising under this Agreement regarding change of name, merger, or any other event by which a Successor Borrower may arise.

**Working Capital Advance.** The term "Working Capital Advance" refers to an Advance made to fund working capital needs of Borrower and which is not a Case Expense Advance.

2.     **ADDITIONAL DEFINITIONS; CONSTRUCTION.**     Terms not otherwise defined in this Agreement shall have the meanings provided in each Related Document, in the Code, and as used in the commercial practices of lenders in the State of Tennessee. In this Agreement, singular words include the plural, and the plural words include the singular. All amounts shall be payable in U.S. dollars.

3.     **REQUESTS FOR ADVANCES.** So long as no Event of Default exists, and until such time as Lender may advise Borrower that Lender shall not consider further requests from Borrower for Advances under this Agreement, Borrower may request Lender to extend credit in the form of Advances for either Case Expense Advances or Working Capital Advances. Requests for multiple Advances can be made at one time. Requests for Advances must be made in accordance with procedures established by Lender from time to time, and must be accompanied by whatever documentation and cost estimates Lender may then require. In the instance of every Case Expense Advance, Borrower shall provide Lender with name and address of the particular Client, and the identity of the particular Client Matter in connection with which the Advance is being requested. Requests for

2

Advances may be submitted by any authorized representative of Borrower. Oral requests must be confirmed in writing.

4.    **ABSOLUTE DISCRETIONARY NATURE OF LENDING RELATIONSHIP**. Lender shall have no obligation whatsoever, under this Agreement or otherwise, to make Advances to Borrower under any circumstance. Lender's decision to do so is and shall always be solely within Lender's sole and absolute judgment and discretion, and Lender may refuse to make Advances to Borrower, and may limit the purpose or purposes for which the proceeds of an Advance may be used, or may limit the aggregate amount of Advances, or the amount of any single Advance, for any or no reason, with or without cause. Nothing under this Agreement, under any statement or letter as to internally approved lending limits, or under an existing or future agreement or understanding between the parties, whether in writing or in the form of oral statements, or any conduct or course of dealing on the part of Lender, or on the part of its officers, employees, agents, or attorneys, may be construed by Borrower, or by Borrower's owners, or by any Guarantor, or by any court of law, to in any way obligate or commit Lender to make Advances to Borrower, or to amend, alter or in any way modify the discretionary nature of the lending relationship between Lender and Borrower. Borrower and each Guarantor recognize that the above provisions are essential, bargained-for covenants, which may not be waived or modified by Lender under any circumstance.

5.    **FUNDING OF ADVANCES**. Lender may make Advance proceeds available in the form of a check or draft payable to Borrower's order, or in the form of a direct deposit into Borrower's designated deposit account with Borrower's bank. Lender additionally may elect to fund Advances by making payments directly to third-party payees designated by Borrower and as approved by Lender.

6.    **USE OF ADVANCE PROCEEDS**. Case Expense Advances are advanced to reimburse Borrower for expenses already incurred and paid by Borrower in connection with a particular Client Matter. Working Capital Advances may be used for any lawful purpose to meet the working capital needs of Borrower. In no event may the proceeds of any Advance be used for personal purposes. Lender hereby reserves the right to further restrict the use of Advance proceeds in its sole and absolute discretion.

7.    **PROMISE TO PAY**. Borrower (and each Successor Borrower, as applicable) unconditionally promises to timely pay to Lender all principal, interest, expenses, fees, charges and other amounts from time to time included in the Obligations.

8.    **INTEREST**. Interest will be assessed on the unpaid principal balance of the Obligations, as outstanding from time to time, as follows:

(a)    **Rate of Interest.**

(N/A) Fixed Interest. Interest will be assessed by application of a fixed interest rate of N/A% per annum.

(N/A) Prime-Based Variable Interest. Interest will be assessed on a variable basis by application of a variable interest rate per annum equal to the following:

(1)    for Case Expense Advances, N/A% in excess of the then applicable Prime Rate published from time to time in the Money Section of the New York regional edition of *The Wall Street Journal*, and

(2)    for Working Capital Advances, N/A% in excess of the then applicable Prime Rate published from time to time in the Money Section of the New York regional edition of The Wall Street Journal.

The Prime-Based variable interest rate shall be adjusted from time to time on a daily basis based upon the Wall Street Journal Prime Rate. Lender reserves the right to substitute an alternative interest index should such rate no longer be published.

(X) LIBOR-Based Variable Interest. Interest will be assessed on a variable basis by application of a variable interest rate per annum equal to the following:

(1)    for Case Expense Advances, 6% in excess of the then applicable one-month LIBOR Rate published from time to time in the Money Rates Section of *The Wall Street Journal Online*, and

(2)    for Working Capital Advances, 4% in excess of the then applicable one-month LIBOR Rate published from time to time in the Money Rates Section of *The Wall Street Journal Online*.

3

The LIBOR-Based variable interest rate shall be adjusted each Friday based upon the one-month LIBOR Rate published in the Money Rates Section of *The Wall Street Journal Online* as of noon local time in Nashville, Tennessee. If a Friday is not a regular business day for Lender, the LIBOR-Based variable interest rate shall be adjusted as of the next preceding day that is a regular business day for Lender. Lender reserves the right to substitute an alternative interest index if such rate is no longer so published or if any of Lender's capital sources cease making LIBOR-based funding available to Lender.

(b) **Method of Interest Assessment.** Interest will be assessed on a daily basis over each day of the calendar year (365 days, or 366 days in a leap year) by application of a daily interest factor determined by dividing then applicable per annum interest rate by 365.

(c) **Default Interest.** Should an Event of Default occur or exist under this Agreement or under any Related Document, Lender may, at its sole option and discretion, elect to prospectively increase the interest rate then applicable to the unpaid Obligations to the default rate equal to the maximum rate of interest permitted by applicable law or, if applicable law does not then provide for a maximum rate of interest, at twenty-four percent (24%) per annum. At any time that any financial report or other report due under this Agreement is delinquent and Lender has not yet elected to apply the full default rate, if Lender so elects, the interest rate then applicable to the unpaid Obligations shall increase to four percent (4%) above the otherwise applicable rate.

9.    **FEES.** Borrower promises to pay Lender the following fees and charges:

(a)    **Case Expense Advances.**

(X)    **Origination Fees.** As additional consideration for the use of the money advanced for each Case Expense Advance, Borrower agrees to pay Lender Origination Fees with respect to each Case Expense Advance in amount equal to 2% of the Gross Amount Advanced for Case Expense Advances. Origination Fees will be withheld by Lender upon the making of each Case Expense Advance from the actual cash amount advanced; provided that Lender reserves the right, in its sole and absolute discretion, to not withhold payment of Origination Fees but rather add Origination Fees to the then unpaid principal balance of the Obligations. Once withheld or added to the principal balance of the Obligations, as the case may be, Origination Fees shall for all purposes be deemed to be fully earned by Lender, and (unless required by applicable law) are not subject to refund or rebate.

(X)    **Administration Fees.** As additional consideration for the use of the money advanced for each Case Expense Advance, Borrower agrees to pay Lender Administration Fees in an amount equal to six tenths of one percent (0.6%) per month on the outstanding principal of the Gross Amount Advanced for Case Expense Advances, payable in arrears on the last day of each calendar month.

(N/A)    **Annual Fee.** As additional consideration for the use of the money advanced for each Case Expense Advance, Borrower shall pay to Lender an Annual Fee equal to $N/A. Such Annual Fee will be due initially as of the execution of this Agreement and then upon any renewal hereof, approval of which is subject to Lender's sole and absolute discretion. The Annual Fee is not a commitment fee.

(b)    **Additional Fees and Charges.** Borrower agrees to pay additional fees and charges to Lender for Case Expense Advances in such amounts and for such purposes as the parties may agree to in writing.

(c)    **Working Capital Advances.**

(N/A)    **Origination Fees.** As additional consideration for the use of the money advanced for each Working Capital Advance, Borrower agrees to pay Lender Origination Fees with respect to each Working Capital Advance in amount equal to N/A% of the Gross Amount Advanced for Working Capital Advances. Origination Fees will be withheld by Lender upon the making of each Working Capital Advance from the actual cash amount advanced; provided that Lender reserves the right, in its sole and absolute discretion, to not withhold payment of Origination Fees but rather add Origination Fees to the then unpaid principal balance of the Obligations. Once withheld or added to the principal balance of the Obligations, as the case may be, Origination Fees shall for all purposes be deemed to be fully earned by Lender, and (unless required by applicable law) are not subject to refund or rebate.

4

(N/A) **Administration Fees.** As additional consideration for the use of the money advanced for each Working Capital Advance, Borrower agrees to pay Lender Administration Fees in an amount equal to N/A tenths of one percent (0.N/A%) per month on the outstanding principal of the Gross Amount Advanced for Working Capital Advances, payable in arrears on the last day of each calendar month.

(X) **Annual Fee.** As additional consideration for Lender's diligence efforts to inspect, service, and verify collateral for Working Capital Advances, Borrower shall pay to Lender an Annual Fee equal to $10,000.00. Such Annual Fee will be due initially as of the execution of this Agreement and then upon any renewal hereof, approval of which is subject to Lender's sole and absolute discretion. The Annual Fee is not a commitment fee.

(d)    **Additional Fees and Charges.** Borrower agrees to pay additional fees and charges to Lender for Working Capital Advancers in such amounts and for such purposes as the parties may agree to in writing.

10.    **SAVINGS CLAUSE.** Under no circumstances shall the rate or amount of interest or other fees or charges payable by Borrower exceed the maximum rate or amount allowed by applicable law, it being Lender's intent to strictly comply with all laws relating to limitations on interest, fees, and other charges. Accordingly, notwithstanding any provision of this Agreement to the contrary, Borrower shall not be obligated to pay, nor will Lender accept payment of interest, fees, or other charges in excess of those allowed by applicable law. Case Expense Advances and Working Capital Advances shall be considered separately as to what provisions of Tennessee law determine the authorization of interest, fees, and other charges under those two types of loans. Should Lender receive interest, fees, or other charges in excess of those allowed by applicable law, Lender may at its option refund the amount erroneously paid, or Lender may credit that amount to Borrower's then outstanding Obligations. All interest, fees, and other charges hereunder shall be characterized as would best support their enforceability under applicable law. Administration Fees shall be characterized as interest. Without limiting the foregoing, in determining any effective interest rate, any prepaid interest shall be spread over the entirety of the principal of all Advances of the same type (i.e., Case Expense Advances or Working Capital Advances) outstanding from time to time and shall be spread over the shorter of (a) the period from the date of such Advance(s) to the applicable Maturity Date when the Advance becomes due under subsection (i) of the above definition of Maturity Date, as it may be extended, or (b) the period from the date of such Advance(s) to the applicable Maturity Date when the Advance becomes due by Lender's demand under subsection (ii) of the above definition of Maturity Date, unless an Event of Default exists at the time of such demand, in which case the period under (a) shall control.*[1]

11.    **EVIDENCE OF INDEBTEDNESS.** The parties agree and covenant that it is not necessary for Borrower to execute one or more promissory notes in favor of Lender to evidence the Obligations under this Agreement. Lender's internal records, including Lender's daily computer print-outs, shall serve for all purposes as conclusive evidence of the outstanding principal balance of all Obligations, as well as the amount of interest, fees, charges and expenses that may be owed by Borrower to Lender at any time.

12.    **PAYMENTS.** Borrower unconditionally promises to make payments to Lender as follows:

(a)    **Payment of all Outstanding Principal.** All principal outstanding under the Obligations shall become due upon the Maturity Date. Partial payments of principal may also become due, without demand, as provided below.

(b)    **Full Payment of Advances for Particular Client Matters.** Borrower shall pay Lender the entire principal amount outstanding under all Case Expense Advances made with respect to a particular Client Matter upon the occurrence of any of the following events (each a "Payment Event"): (i) the date on which Borrower ceases to be counsel of record with respect to the particular Client Matter, whether by reason of resignation, termination, withdrawal, or otherwise; or (ii) the date on which the particular Client Matter is abandoned by the Client; or (iii) the date on which the Client Matter is finally dismissed or becomes final and is no longer subject to appeal; or (iv) the date on which the ability of Borrower to request Advances hereunder is

---

[1] The following provision applies to Texas Borrowers only. The interest rates contracted for, charged, to be received, are limited by, and shall not exceed the applicable quarterly ceiling which is from time to time in effect under Chapter 303 of the Texas Finance Code, as amended; such quarterly ceiling to be adjusted on the first day of each calendar quarter. The parties elect not to be governed by Chapter 346 of the Texas Finance Code.

5

terminated by either Borrower or Lender pursuant to the terms of this Agreement. Borrower shall immediately notify Lender upon the occurrence of a Payment Event.

(c)   **Partial Payments of Advances for Particular Client Matters.** Borrower shall immediately pay to Lender, as a principal payment on the relevant Case Expense Advance, the amount of any funds received by Borrower, or paid to a third party for Borrower's benefit, on account of Borrower's fees or expenses with respect to a Client Matter that is associated with a Case Expense Advance. Borrower shall hold any such funds it may receive in trust for and on behalf of Lender, with assumption of full fiduciary duties and obligations, and shall not distribute or apply such funds for any other purpose before payment to Lender. Borrower further agrees that all such funds in Borrower's possession shall be considered attorney trust funds subject to Borrower's ethical duties and responsibilities. Additionally, it is the intent of Borrower and Lender that at no time shall the principal amount outstanding under all Case Expense Advances made with respect to a particular Client Matter exceed the amount owed by the applicable Client to Borrower in connection with such Client Matter. In the event such excess (an "Out-of-Balance Event") exists for any reason, then Borrower shall immediately notify Lender and pay to Lender the amount of any such excess.

(d)   **Interest Payments.** Interest on the outstanding Obligations shall be payable monthly in arrears on the first business day of each calendar month and on the Maturity Date. Lender will provide Borrower with a monthly statement indicating the amount of interest due.

(e)   **Administrative Fees.** Administrative Fees on the outstanding principal balance of the Gross Amount Advanced shall be payable monthly in arrears on the first business day of each calendar month and on the Maturity Date. Lender will provide Borrower with a monthly statement indicating the amount of Administrative Fees due.

(f)   **Form of Payments.** Borrower shall mail, transmit, or deliver all payments to Lender at Lender's address shown above, or at such other place as Lender may designate in writing. Lender reserves the right, at any time and for any reason, to require that Borrower make payment by certified or cashier's check, or alternatively, in the form of electronic deposits in immediately available funds into Lender's designated deposit account.

(g)   **Timing of Payments.** All payments must be received by Lender by no later than 11:00 AM Central Standard Time, or Central Daylight Time, on the business day that such payment is due, with each payment received after such time and on such date being deemed to have been received and credited on the next succeeding business day, subject to additional daily interest over the period of extension. Payments that are due on a day other than a business day shall be deemed to be due on the first business day following the due date, subject to additional daily interest over the period of extension.

(h)   **Application of Payments.** All payments received by Lender shall be applied first to unpaid interest, then to unpaid fees, charges and expenses, and finally to the unpaid principal balance of the outstanding Obligations, in such order and with such priority as Lender may determine within its sole and absolute discretion.

(i)   **No Deduction, Set-Off, Recoupment or Counterclaim.** Borrower's obligation to make payments of principal, interest and fees to Lender shall be absolute and unconditional, and shall not be subject to deduction, set-off, recoupment or counterclaim for any reason.

13.   **GRANT OF SECURITY INTEREST.** For valuable consideration received, Borrower (and each Successor Borrower, as applicable) hereby grants Lender a continuing security interest in the Collateral described herein to secure prompt and punctual payment and performance of the Obligations, and agrees that Lender shall have all of the rights and remedies provided in this Agreement, in addition to all other rights and remedies that Lender may have under the Code, and under applicable law, and otherwise.*

14.   **DESCRIPTION OF COLLATERAL.** The Collateral shall consist of any and all of Borrower's (and each Successor Borrower's, as applicable) present and future rights, title and interest in and to the following described property and rights, together with any and all present and future additions thereto, substitutions therefor, replacements and proceeds thereof, and all collateral and supporting obligations with respect thereto:

(i)   All accounts, instruments, chattel paper, general intangibles, payment intangibles (all as defined in Article 9 of the Code), and all similar rights that Borrower may have of every nature and kind, including specifically and without limitation, all of Borrower's rights to receive payment or otherwise, for legal and other services rendered and to be rendered, and for costs and expenses advanced and to be advanced, and all other rights and interest that Borrower may have in and with respect to each and every Client Matter; and

6

(ii)     All credits, monies, and properties of Borrower now and in the future in Lender's possession or under Lender's control; and

(iii)    Rights under life insurance and other policies of insurance with respect to any Guarantors, that may be assigned to Lender under such forms and under such terms and conditions as Lender may require.

15.    **CONTINUING SECURITY INTEREST TO SECURE PRESENT AND FUTURE OBLIGATIONS.** Borrower affirms that Borrower has granted a continuing security interest in the Collateral to secure any and all present and future Obligations of Borrower in favor of Lender, with the continuing preferences and priorities as provided under applicable law.

16.    **PERFECTION OF SECURITY INTEREST.**  Borrower (and each Successor Borrower, as applicable) authorizes Lender to file such financing statements and to take whatever additional actions may be necessary or proper within Lender's sole and absolute discretion to perfect and continue perfection of Lender's security interest, including without limitation the delivery and endorsement of any instrument. Borrower agrees to reimburse Lender for all expenses paid to governmental authorities incidental to the perfection, continuation, and termination of perfection of Lender's security interest, including without limitation, reimbursement of all filing fees, filing taxes, and documentary stamps as may be required under the laws of each jurisdiction where a filing is made.

17.    **TRANSACTIONS INVOLVING COLLATERAL.**  Borrower shall not transfer, assign, or otherwise dispose of any of the Collateral. Borrower shall not encumber or otherwise permit the Collateral to be subject to any encumbrance or lien, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Additionally, Borrower shall not release, compromise, or extend payment under any account or general intangible included in the Collateral, other than granting such regular and recurring discounts, credits and adjustments as may be reasonably allowed by Borrower in the ordinary course of Borrower's business; provided that the granting of any of the foregoing shall be subject to being characterized as an Out-of-Balance Event and subject to the prepayment requirements arising as a result thereof. Unless waived by Lender, all proceeds of Collateral, in any form, that are received by Borrower shall be held in trust for Lender, and shall immediately be delivered to Lender on demand or as otherwise required in this Agreement.

18.    **GUARANTORS.**  Borrower and all Guarantors for the Obligations who sign this Agreement and/or separate guaranty agreements have applied jointly to Lender for the credit arising hereunder and all such Guarantors have direct or indirect interests in Borrower sufficient that the making of Advances by Lender is sufficient consideration and value for their obligations to Lender. Each Guarantor acknowledges and agrees that, if such Guarantor withdraws from Borrower and takes his/her law practice elsewhere, or if a Guarantor by any other means provides (or controls the provision of) professional services regarding any Client Matter in a capacity other than through Borrower, Lender's security interest in such Client Matter and all related Collateral shall continue so that all legal fees and expenses to which Borrower would have been entitled under the terms of its original engagement shall continue to secure the Obligations. Each Guarantor further hereby grants to Lender a security interest in all such Guarantor's own present and future interest, if any, in any Client Matter and in all proceeds thereof, including, but not limited to, all such accounts, instruments, chattel paper, general intangibles, and payment intangibles (all as defined in Article 9 of the Code). Provisions of this Agreement relating to the attachment, perfection, remedies, and other matters with respect to Borrower's grant of a security interest to Lender shall also apply to the security interest granted by each Guarantor.

19.    **RELEASE OF LENDER'S SECURITY INTEREST IN THE COLLATERAL AND RELEASE OF GUARANTORS.**  Lender will have no obligation whatsoever to terminate its continuing security rights and interest under this Agreement, or the continuing obligations of each Guarantor under their respective Guaranties, unless and until Lender is completely satisfied that all the Obligations have been fully and indefeasibly paid and satisfied.

20.    **REPRESENTATIONS AND WARRANTIES.**  Borrower represents, warrants and certifies to Lender, as of the date of this Agreement, and as of the date of each Advance, and at all times while any Obligation is outstanding, that:

(a)     **Organization and Authority.**  Borrower is duly organized, validly existing, and is qualified and fully authorized to do business, and is in good standing in each jurisdiction where the nature of Borrower's business requires Borrower to be so qualified. Each Borrower Attorney is duly licensed to practice law in each jurisdiction where the attorney is required to be licensed, and each Borrower Attorney is in good standing with the bar association, and when required, with the applicable courts of that state having registration or licensure authority over legal practitioners.

7

(b)     **Authorization.**  Borrower's execution, delivery and performance of this Agreement and each Related Document have been duly authorized, and do not conflict with, and will not result in a breach of Borrower's governing agreements, or any other agreement or instrument which may be binding upon Borrower or its owners, and will not violate any law, ethical rule or principle, or court decree or order applicable to Borrower and/or to Borrower Attorneys. Borrower has the full power and authority to enter into Advances and to grant a security interest in the Collateral in favor of Lender.

(c)     **Binding Effectiveness.**  This Agreement and each Related Document have been duly and properly executed and delivered by Borrower, and constitute Borrower's legal, valid and binding obligation, enforceable in accordance with their terms, subject only to applicable bankruptcy and debtor relief laws.

(d)     **Financial Statements.**  All balance sheets, statements of profit and loss, and other financial data, which have been or will be furnished by Borrower to Lender, fairly present the financial condition of Borrower's business as of the date or dates stated, and the results of Borrower's operations for the periods for which the same are furnished. There has been no change in the business, earnings, prospects, assets, liabilities, or condition (financial or otherwise) of Borrower from that set forth in the most recent financial statements furnished to Lender other than changes in the ordinary course of Borrower's business, none of which changes have been materially adverse. All other information, reports, papers and data furnished or to be furnished by Borrower, or its representatives, and by each Guarantor, to Lender, are and will be accurate and correct in all material respects, and complete insofar as completeness may be necessary to give Lender a true and accurate knowledge of the subject matter. Unless Lender otherwise agrees in writing, all financial statements are and will be prepared in accordance with generally accepted accounting principles.

(e)     **Claims, Complaints, and Litigation.**  Other than as previously disclosed to Lender in writing, there are no claims, complaints, litigation, or legal or administrative proceedings, ethical or other investigations, or other actions or matters pending, or to the knowledge of Borrower, threatened against or affecting Borrower, or against any of Borrower Attorneys, or against any Guarantor, the outcome of which could have a material adverse affect on Borrower's or any Guarantor's financial condition.

(f)     **Information.**  All information provided and to be provided to Lender by Borrower and by each Guarantor for the purposes of or in connection with this Agreement, or by Borrower in connection with each requested Advance, or other transactions between the parties, is and will continue to be true and accurate in every material respect, and none of the information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

(g)     **Title to, Existence and Collectability of Collateral.**  Borrower is the sole owner of the Collateral, free and clear of all encumbrances except for Lender's security interest. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement, or to which Lender has specifically consented. To the best of Borrower's knowledge, all of Borrower's accounts and general intangibles included within the Collateral: (a) validly exist, and are legally enforceable against the account debtors and other obligors thereunder without being subject to reduction, compromise, defense, or setoff for any reason other than regular discounts, credits or adjustments allowed by Borrower in the ordinary course of Borrower's business; (b) are not evidenced by a judgment, instrument, or chattel paper, unless such judgment has been assigned, and such instrument or chattel paper has been endorsed and delivered to Lender; (c) are derived from *bona fide* transactions for legal and other services performed or to be performed, and for costs and expenses advanced, all in accordance with the terms set forth in the billing memoranda, statements and invoices relating thereto; and (d) are owed by account debtors or other obligors with the capacity to contract, in the amount shown on Borrower's books and records.

(h)     **Taxes.**  To the best of Borrower's knowledge, all tax returns and reports of Borrower and each Guarantor that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those which Borrower and each Guarantor have disclosed to Lender in writing are presently or to be contested in good faith for which adequate reserves have been provided.

(i)     **Commercial Purpose.**  The proceeds of Borrower's Advances are and may be used solely for commercial purposes, and are in no way to be construed as "consumer transactions."

(j)     **No Event of Default.**  No Event of Default exists under this Agreement or under any Related Document.

(k)     **Survival of Representations and Warranties.**  Borrower and each Guarantor acknowledge that Lender, without independent investigation, is relying, and will continue to rely upon the above representations and warranties, as well as those contained in each Related Document, in extending Advances to Borrower. All such representations and warranties shall remain in full force and effect, as when made hereunder

8

and as reaffirmed as of the date of each Advance request hereunder, until such time as the Obligations have been fully paid and satisfied.

21.    **AFFIRMATIVE COVENANTS.**  So long as this Agreement remains in effect, Borrower shall:

(a)    **Change in Borrower's Business Locations.**  Immediately notify Lender in writing of any change in location of any Borrower's (a) residence if Borrower is an individual or sole proprietorship, (b) principal place of business if Borrower is a business entity that is created without any state filings, or (c) state of organization if Borrower is a business entity that is created by state filings. Borrower will additionally notify Lender immediately in writing of any change in the location where Borrower's books and records are kept. (The duty of notice in this section does not abrogate any applicable requirement that Lender consent to such an event.)

(b)    **Change in Legal Name or Form of Business Organization.**  Immediately notify Lender in writing of any change in Borrower's legal name, or should Borrower change its form of business organization (e.g.; convert from a partnership into a limited liability company), or should Borrower merge with or into, or acquire the assets of another entity.  (The duty of notice in this section does not abrogate any applicable requirement that Lender consent to such an event.)

(c)    **Employee Benefit Plans.**  Maintain each employee benefit plan as to which Borrower may have any liability in compliance with all applicable law and regulations.

(d)    **Examination.**  To the extent permitted under applicable ethical rules governing the conduct of law firms and legal practitioners, permit Lender, and any designee of Lender including without limitation any secured senior lender of Lender, to examine, audit and copy Borrower's books, records, ledgers, computer files and programs at all reasonable times, and answer all questions and inquiries, and provide Lender with such additional documentation as Lender may request.

(e)    **Financial Condition.**  Promptly inform Lender in writing of (a) all material adverse change in Borrower's and any Guarantor's financial condition, and (b) the assertion of any claim or complaint against Borrower, or any Borrower Attorneys, or against any Guarantor, which could materially affect Borrower's or any Guarantor's financial condition.

(f)    **Financial Information.**  Provide Lender with such financial information and statements, reports, agings of receivables and payables, budgets, forecasts, tax returns, and such other reports with respect to Borrower's business operations, at such times, and at such intervals and in such detail as Lender may request.

(g)    **Financial Records.**  Maintain financial and accounting records in accordance with general accepted accounting principles (unless Lender otherwise agrees in writing to some other standard). If and when requested by Lender, Borrower shall provide Lender with financial statements in form and containing such information as Lender may require within its sole and absolute discretion.

(h)    **Insurance.**  Maintain professional liability, errors and omissions, and fidelity insurance, and such other insurance coverages as may be customary among comparable law firms practicing within Borrower's community, or as may be required by Lender, in such form, amounts, and with such companies as may be reasonably acceptable to Lender. If requested by Lender, Borrower shall deliver to Lender from time to time policies or certificates of insurance in a form satisfactory to Lender. Borrower shall further timely provide Lender with evidence of the continuation of such insurance prior to the expiration thereof, and Borrower shall immediately notify lender should any such insurance be cancelled, or terminated, or otherwise not be renewed and replaced with comparable insurance.

(i)    **Other Payments.**  Pay promptly when due all contractual obligations calling for the payment of money, and all claims, assessments and charges which constitute, or, if unpaid, may become a lien, charge or encumbrance upon Borrower's business or any of Borrower's properties or assets.

(j)    **Performance; Notice of Default.**  Perform and comply with all terms, conditions and provisions of this Agreement and each Related Document, and promptly notify Lender if Borrower knows or has reason to know of any event that may constitute or give rise to an Event of Default.

(k)    **Personal Financial Statements.**  Each Guarantor shall provide Lender with personal financial statements listing Guarantor's assets and liabilities, including contingent liabilities, in such form and substance, and at such intervals as Lender may require.

9

(l)    **Reports.** Within fifteen (15) business days of a request, Borrower shall provide Lender with such reports, and to the extent not otherwise prohibited under ethical rules or principles, provide Lender with such information as Lender may request with respect to Borrower's Clients and Client Matters for which Case Expense Advances or Working Capital Advances have been obtained under this Agreement. Without limiting the generality of the foregoing, Lender may request the following at any time: (a) for all currently contested Client Matters, a complete listing of such Client Matters including (i) the name of the Client with address, (ii) the name of the defendant(s) and addresses for each defendant, (iii) case number and (iv) court venue; and (b) for all Client Matters (whether currently contested or not), an accounts receivable aging report for each such Client Matter along with the name and address of each related Client. If any reports that are not delivered as required, the interest rate shall increase as described above in the "Interest" section hereof.

(m)    **Taxes.** Pay promptly when due all taxes, governmental assessments and other fees and charges applicable to Borrower, its business operations, properties and assets. If and when requested by Lender, Borrower shall provide Lender with evidence that Borrower has timely complied with the requirements of this provision.

22.    **NEGATIVE COVENANTS.** So long as this Agreement remains in effect, Borrower and its owners will not, without Lender's prior written consent: (a) cease operations; (b) liquidate, merge, transfer, acquire, or consolidate with any other entity; (c) change Borrower's legal name or form of business organization; (d) change the closing date of Borrower's fiscal year; (e) dissolve or transfer any of Borrower's properties or assets other than in the ordinary course of Borrower's business; (f) change the location of Borrower's (i) residence if Borrower is an individual, (ii) principal place of business if Borrower is a business entity that is created without any state filings, (iii) state of organization if Borrower is a business entity that is created by state filings; or (g) make any substantial disbursement or use of Borrower's funds except in the ordinary course of Borrower's business.

23.    **EVENTS OF DEFAULT.** The following are Events of Default under this Agreement:

(a)    **Payment Default.** Should Borrower fail to make any payment to Lender upon demand or when otherwise when due of principal, interest, fees, expenses, charges, or other amounts included in the Obligations (time being of the essence).

(b)    **Creditor Proceedings.** Should any other creditor attempt to take or exercise any rights against any of the Collateral, or against any of Borrower's or any Guarantor's other properties or assets.

(c)    **False Statements.** Should any representation, warranty or statement made to Lender, or any Guarantor, under this Agreement, or under any Related Document, or in connection with any Advance, prove to be false or misleading in any material respect as of the date made or reaffirmed.

(d)    **Filing of a Tax Lien.** Should a tax lien or notice of tax lien be filed against Borrower, or against any Guarantor, or against any of their properties or assets.

(e)    **Guarantor's Death.** Should any Guarantor die.

(f)    **Insolvency.** Should Borrower or any Guarantor become insolvent, or apply for bankruptcy or other relief from creditors, or should a petition be filed against Borrower or any Guarantor under any federal or state bankruptcy law.

(g)    **Other Defaults.** Should Borrower or any Guarantor fail to comply with or perform under any covenant, term or condition of this Agreement or any Related Document.

(h)    **Guarantor Claims.** Should any Guarantor claim to withdraw, terminate, or otherwise limit the scope or effect of his/her Guaranty.

24.    **LENDER'S RIGHTS AND REMEDIES IN EVENT OF DEFAULT.** Lender shall have the following right and remedies following the occurrence of any Event of Default:

(a)    **Security Rights and Remedies.** Lender shall have all of the rights and remedies available to a secured party generally under the Code.

(b)    **Collection Rights.** Lender shall have the right to directly collect and receive all proceeds and payments arising under or in any way accruing from the Collateral as such amounts become due and payable. Borrower and each Guarantor unconditionally agree to assist Borrower in such collection efforts. Lender may direct the court in which any Client Claim is pending, or any person, firm, corporation, or other entity holding

any of the Collateral, or owing payment thereon, to make payment directly to Lender. Borrower agrees to execute, or cause the execution, of all notices, pleadings, and other filings as may be required to facilitate Lender's collection of such amounts. Lender may in its own name or in the name of Borrower: (a) compromise or extend time for payment with respect to all or any portion of the Collateral for such amount and upon such terms as Lender may determine within Lender's sole and absolute discretion; (b) demand, collect, receive, sue for and give aquittances for any and all amounts due or to become due with respect to the Collateral; (c) take control of cash or other proceeds of the Collateral; (d) endorse Borrower's name on any notes, acceptances, checks, drafts, money orders, and other evidences of payment of the Collateral that may come into Lender's possession; (e) sign Borrower's name on any invoice, or billing statement relating to any of the Collateral; (f) apply for and obtain the appointment of a receiver for Borrower, and (g) do all other acts and things necessary within Lender's sole and absolute discretion to carry out the intent of this Agreement. Beyond the requirements of the Code, Lender and its officers, employees, agents and attorneys, shall have no fiduciary or other duty or responsibility to Borrower to preserve or maximize recovery of payments on the Collateral. Borrower hereby irrevocably appoints Lender as Borrower's attorney-in-fact for the purpose of taking any action permitted by this Agreement in Borrower's name.

(c)     **Right of Set-Off.**   Lender may at any time (whether or not an Event of Default then exists), and for any or no reason, with or without cause, set-off and apply any and all credits, monies, and properties of Borrower then in Lender's possession or under Lender's control, against any outstanding Obligations.

(d)     **Application of Proceeds.**   All proceeds derived from the collection, sale, or other disposition of the Collateral will be applied: (a) first to reimbursement of all expenses incurred by Lender in exercising and enforcing its security rights and remedies, including without limitation, reimbursement of Lender's reasonable collection expenses, attorneys' fees and court costs; and (b) to the payment of the outstanding Obligations in such order and with such priorities as Lender may determine within its sole and absolute discretion.

(e)     **Specific Performance.**   Lender may file suit against Borrower and any Guarantor seeking specific performance of Borrower's and any Guarantor's agreements, covenants, and obligations in favor of Lender.

(f)     **Cumulative Remedies.**   All of Lender's rights and remedies, whether under this Agreement, or under any Related Document, or under the Code, or other applicable law, are and shall be cumulative, and may be exercised singularly or concurrently. Lender's election to pursue any particular remedy will not preclude Lender from pursuing any other remedy. Furthermore, Lender's election to make expenditure or to take any action to perform an obligation of Borrower under this Agreement or any Related Document, or otherwise, after Borrower's failure to do so, shall not affect Lender's right to declare an Event of Default to exist, or otherwise preclude Lender from exercising any of its rights or remedies.

25.    <u>**WAIVERS WITH RESPECT TO OBLIGATIONS**</u>.   Borrower and each Guarantor waive notice of default, demand and notice of demand, presentment for payment, protest and notice of protest, and notice of non-payment, with respect to the Obligations. Borrower and each Guarantor agree that discharge or release of any party who is, may, or will be liable to Lender for payment and performance of any Obligation, under a Guaranty or otherwise, or the release of the Collateral securing repayment of any Obligation shall not have the effect of releasing or otherwise diminishing or reducing the actual or potential liability of Borrower and/or any Guarantor, who shall remain liable to Lender, and/or of releasing any Collateral not expressly released by Lender. Lender's acceptance of payment other than in accordance with the terms of this Agreement, or Lender's subsequent agreement to extend or modify such repayment terms, shall likewise not have the effect of releasing any party or parties from their respective Obligations to Lender, and/or of releasing any of the Collateral. No course of dealing between Borrower and Lender, and between Lender and any Guarantor, nor any failure or delay on the part of Lender to exercise any of the rights and remedies granted under this Agreement, or under any Guaranty, or under any other agreement or agreements by and between the parties, or under the Code or other applicable law, shall have the effect of waiving any of Lender's rights and remedies. Any partial exercise of any rights and remedies granted to Lender shall furthermore not constitute a waiver of any of Lender's other rights and remedies, it being Borrower's and each Guarantor's intent and agreement that Lender's rights and remedies shall be cumulative in nature. Borrower and each Guarantor further agree that, upon the occurrence of an Event of Default under this Agreement, any waiver or forbearance on the part of Lender to pursue the rights and remedies available to Lender, shall be binding upon Lender only to the extent that Lender specifically agrees to any such waiver or forbearance in writing. A waiver or forbearance as to one Event of Default shall not constitute a waiver or forbearance as to any other Event of Default. None of the warranties, conditions, provisions and terms contained in this Agreement, or in any Related Document, shall be deemed to have been waived by any act or knowledge of Lender, its agents, officers or employees; but only by an instrument in writing specifying such waiver, signed by a duly authorized officer of Lender and delivered to Borrower.

26.    <u>**PROTECTION OF LENDER'S SECURITY RIGHTS**</u>.   Borrower agrees to promptly notify Lender of the assertion, or threatened assertion, of any claim, action, or proceeding affecting the Collateral, or the collection of all or any part thereof. Borrower will be fully responsible for any losses that Lender may suffer as a

11

result of anyone other than Lender asserting any rights or interest in or to the Collateral. Borrower and each Guarantor agrees to appear in and to defend all actions or proceedings purporting to affect Lender's security interests in any of the Collateral subject to this Agreement and any of the rights and powers granted Lender hereunder. In the event that Borrower fails to do what is required of it under this Agreement, or if any action or proceeding is commenced naming Lender as a party or affecting Lender's security interests or the rights and powers granted under this Agreement, then Lender may, without releasing Borrower from any of its obligations under this Agreement, do whatever Lender believes to be necessary and proper within its sole and absolute discretion to protect the security of this Agreement, including without limitation making additional Advances on Borrower's behalf.

27.    **INDEMNIFICATION OF LENDER**.    Borrower and each Guarantor unconditionally agree to indemnify, defend and save and hold Lender, its parent, subsidiaries and affiliated companies, and their officers, directors, employees, agents, and attorneys, harmless from any and all actual or threatened claims, investigations, suits, damages, losses, costs and expenses (including without limitation, Lender's legal costs and expenses), liabilities, penalties, fines and forfeitures, arising out of or in any way occasioned by this Agreement, and any Advance, or other relationship between the parties. The foregoing indemnity provisions shall survive the termination of this Agreement as to all matters arising or accruing prior to such cancellation, and the foregoing indemnity shall survive in the event that Lender elects to exercise any of the remedies as provided under this Agreement following default hereunder.

28.    **EXECUTION OF ADDITIONAL DOCUMENTS**.    Borrower agrees to execute all additional documents, instruments and agreements that Lender may deem to be necessary and proper, within its sole and absolute discretion, in form and substance satisfactory to Lender, to keep this Agreement in effect, to better reflect the true intent of this Agreement, and to consummate fully all of the transactions contemplated hereby and by any other agreement, instrument or document heretofore, now or at any time or times hereafter executed by Borrower and delivered to Lender.

29.    **TERMINATION OF ADDITIONAL BORROWINGS**.

(a)    **Termination by Borrower**.  Borrower may, at any time and for any or no reason, advise Lender in writing that Borrower will no longer request Lender to make additional Advances under this Agreement.

(b)    **Termination by Lender**.  Lender may, at any time (whether or not an Event of Default then exists), and for any or no reason, with or without cause, advise Borrower in writing that Lender will no longer consider requests by Borrower to obtain additional Advances under this Agreement.

30.    **MISCELLANEOUS PROVISIONS**.    The following miscellaneous provisions are part of this Agreement:

(a)    **Amendments**.  No term or provision of this Agreement or any Related Document will be deemed to be altered or amended in any way unless such an amendment or alteration is contained in a separate written instrument signed by both Borrower and Lender in hand (to avoid doubt, the text of an email or a voice mail shall not be binding but an email may be used to transmit a binding facsimile of a written document). No conduct or course of dealing on the part of Lender, or any oral statement on the part of Lender's officers, employees, agents, or attorneys, may be construed by Borrower, or by Borrower's owners, or by any Guarantor, or by any court of law, to amend, alter or in any way modify the provisions of this Agreement, or the relationship of the parties, or the obligation of any party to any other person or entity.

(b)    **Applicable Law**.  This Agreement and each Related Document has been and will be delivered to and shall be deemed to be accepted by Lender in the State of Tennessee. This Agreement and the relationship of the parties is subject to, and is to be construed in accordance with the laws of the State of Tennessee, regardless of the conflict of law rules of that state.

Notwithstanding the foregoing, or any contrary provision of the above Section captioned "Savings Clause," or any other provision of this Agreement, if an Annual Fee is paid respecting any Working Capital Advance and the interest rate charged on such Advance at any time exceeds the Applicable Formula Rate as provided under Tennessee law, the substantive laws of the state where Borrower's main office is located shall apply to determine the interest, fees, and other charges that are permitted to be charged on such Advance (if such charges are permitted under such laws), but for no other purpose.

(c)    **Captioned Headings**.  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of the Agreement.

12

(d) **Costs and Expenses.** As additional consideration for the use of the money advanced under Case Expense Advances, if there is any Event of Default under this Agreement, Borrower shall pay to Lender the amount of Lender's costs and expenses (including the allocated cost of Lender's personnel) incurred in connection with Lender's subsequent due diligence examinations of Borrower. As additional consideration for the inspection, servicing, and verification of collateral related to Working Capital Advances, if there is any Event of Default under this Agreement, Borrower shall pay to Lender the amount of Lender's costs and expenses (including the allocated cost of Lender's personnel) incurred in connection with Lender's subsequent due diligence examinations of Borrower related to Working Capital Advances. Borrower further agrees to reimburse Lender on demand for all of Lender's costs and expenses incurred in connection with the enforcement of Lender's rights and remedies under this Agreement or of any negotiations, amendment, workout, forbearance, or other events in response to any (or to prevent any) Event of Default, including without limitation, the reimbursement of the reasonable fees and expenses of Lender's attorneys, the allocated cost of Lender's personnel, travel expenses, the anticipated costs of post-judgment collection efforts, collection efforts during a bankruptcy case in which Borrower or any Guarantor is a debtor, and all other such costs and expenses, whether or not a lawsuit is filed.

(e) **Electronic Storage; Reproduction Deemed an Original.** Lender may electronically store and preserve this Agreement and each Related Document, and discard and otherwise destroy the original signed document(s). Any reproduction of this Agreement or any Related Document derived from Lender's electronic storage system shall be deemed to be original and authentic, and may serve in the place of the original signed document for all purposes.

(f) **Joint and Several Liability.** Each Borrower (if there is more than one) and each Guarantor are obligated under this Agreement and each Related Document on a "joint and several" basis. Each Borrower and Guarantor hereby waives any defense of impairment of collateral, diligence in collection, right to receive notice of or consent to extensions, and any other defenses of suretyship that may otherwise apply.

(g) **Multiple Counterparts.** This Agreement and each Related Document may be executed in multiple counterparts, any one of which will be deemed an original for all purposes.

(h) **Notices.** To give Borrower or any Guarantor any notice under this Agreement or under a Related Document, Lender may hand deliver or mail, email, fax, or otherwise communicate the notice to Borrower or any Guarantor at Borrower's or the Guarantor's current address found in Lender's files. If there is more than one Borrower or Guarantor, notice to any one Borrower or Guarantor will be considered notice to all Borrowers and Guarantors. To give Lender any notice under this Agreement, Borrower or any Guarantor must mail the notice to Lender by registered or certified mail to Lender's address specified by this Agreement, or to any other address that Lender may specify.

(i) **No Partnership or Agency.** Neither this Agreement, nor any other agreement or understanding between the parties, may be construed by any third person or any court to evidence or create a partnership, joint venture, agency, or fiduciary relationship between Borrower and Lender, it being the intent of the parties to absolutely disavow any such relationship.

(j) **No Waiver of Rights.** Lender will not be deemed to waive any right or remedy under this Agreement or under each Related Document unless the waiver is in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right or remedy may be construed by Borrower, or by Borrower's owners, or by any Guarantor, or by any court of law, as a waiver or forbearance of any such right or remedy or of any other right or remedy that may be available to Lender. Lender's written waiver of a provision of this Agreement or any Related Document will not prejudice, and may not in any way be construed as a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement or any Related Document. No course of dealing between Lender and Borrower, or between Lender and any Guarantor, may be constituted as a waiver of any of Lender's rights or remedies, or of any obligation of Borrower or any Guarantor.

(k) **Prior Agreements.** This Agreement replaces all prior agreements and written and verbal understandings between the parties with respect to all matters discussed in or relating to this Agreement. To the extent that any prior Related Document is not replaced with a new Related Document, the prior Related Document will remain in full force and effect. All financing statements now in effect and in any way related to the Collateral will remain in full force and effect, with priority not impaired in any way, until terminated by Lender.

(l) **Severability.** If a court finds any provision of this Agreement, or any Related Document, to be invalid or unenforceable, the offending provision will be deemed to be modified to be within the limits of enforceability or validity. However, if this cannot be done, the offending provision will be deemed to be stricken and all other provisions of this Agreement will remain valid, enforceable and in effect.

13

(m)    **Sole Discretion of Lender.**  Whenever Lender's consent, approval, or action is required or permitted under this Agreement or under any Related Document, Lender's decision whether to consent, approve, or otherwise act will be in the sole and absolute discretion of Lender, and Lender's decision will be final and conclusive.

(n)    **Conduct and Waivers.**  Lender shall not in any event be liable for indirect or consequential damages in any matter arising from or related to this Agreement.  If at any time Borrower or a Guarantor believes that Lender has breached any obligation or law with respect to this Agreement, such Borrower or Guarantor shall promptly so advise Lender in writing.  As further consideration for any extension of the alternate maturity date hereof, increase, or other accommodation by Lender, upon the effectiveness of such accommodation, without any further documentation, Borrower and Guarantors shall be deemed to have released Lender and its affiliates and related parties from any liability to Borrower or Guarantor arising from or related to this Agreement, except for duties of subsequent performance under this Agreement and the Related Documents as so amended.

(o)    **Successors and Assigns Bound; Consent to Participation.**  Each and every covenant and obligation of this Agreement and each Related Document shall be binding upon Borrower and on any Guarantor, and shall be binding on each of their successors, heirs, representatives and assigns. Lender may transfer, sell and assign (and may have already transferred, sold, and assigned) all or any portion of the Obligations or this Agreement to one or more third persons without notice to Borrower and without the necessity of obtaining Borrower's consent.  Without limiting the generality of the foregoing, Advocate Capital, Inc. may have previously assigned its rights hereunder to an affiliate, or may do so in the future, while retaining the role of servicer.  At all times that such an assignment is in effect (including as of the date of this Agreement, if applicable), all amendments, taking of collateral, waivers, administration of advances, and other actions taken by Advocate Capital, Inc. regarding this Agreement or the Obligations shall be deemed taken in its capacity as servicer for, and for the account of, its affiliate, whether taken in the name of Advocate Capital, Inc. alone or taken expressly in its capacity as servicer for its affiliate.  Borrower may not, however, assign its rights under this Agreement or under any Related Document without Lender's prior written consent.

(p)    **Taxation.**  Borrower agrees to pay, or to reimburse Lender for the payment of, all UCC filing taxes and other taxes and assessments payable to governmental authorities that may be imposed upon Lender as a direct result of this Agreement or of Lender's security interest in the Collateral, except for any taxes based upon the net income of Lender.

(q)    **Unconditional and Irrevocable Nature of Agreements and Consents.**  Borrower's and each Guarantor's covenants, agreements and consents under this Agreement and under each Related Document, are and shall be unconditional and irrevocable, and may not be withdrawn or otherwise revoked by Borrower or by any Guarantor under any circumstance, other than as a result of Lender's prior written consent, which Lender has the right to reject or withhold for any or no reason, with or without cause.

31.    **Effect of Amendment and Restatement.**  This Agreement is a continuation of the Prior Agreement, and the amendment and restatement of the Prior Agreement hereby does not impair in any way the continued attachment, perfection or priority of any security interest or other rights arising under the Prior Agreement.

32.    **CONSENT TO JURISDICTION AND VENUE.**  BORROWER AND EACH GUARANTOR HEREBY SUBMIT TO THE EXCLUSIVE JURISDICTION AND EXCLUSIVE VENUE OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT COURT OF TENNESSEE, AND OF ANY TENNESSEE STATE COURT SITTING IN NASHVILLE, TENNESSEE, FOR THE PURPOSE OF LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT, EACH RELATED DOCUMENT, AND WITH RESPECT TO EACH TRANSACTION CONTEMPLATED HEREBY AND THEREBY. BORROWER AND EACH GUARANTOR IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION TO WHICH BORROWER AND ANY GUARANTOR MAY NOW AND IN THE FUTURE HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH TENNESSEE COURT, AND ANY CLAIM THAT ANY SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  NOTWITHSTANDING THE FOREGOING, LENDER MAY ELECT TO BRING AN ACTION AGAINST BORROWER OR ANY GUARANTOR, OR WITH RESPECT TO ANY PROPERTY, IN ANY COURT WITH APPROPRIATE JURISDICTION OVER THE PARTIES OR SUCH PROPERTY.

33.    **JURY WAIVER.**  LENDER, BORROWER AND EACH GUARANTOR WAIVE THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY.

BORROWER AND EACH GUARANTOR CERTIFY THAT: (1) THEY HAVE AGREED TO BE SUBJECT TO THIS AGREEMENT AND EACH RELATED DOCUMENT AS THEIR OWN FREE ACT AND DEED, WITHOUT DURESS OR COERCION; (2) THEY HAVE CAREFULLY READ THIS AGREEMENT AND EACH RELATED DOCUMENT, AND AGREE TO ALL THEIR TERMS AS WRITTEN; (3) THEY HAVE KNOWINGLY CONSENTED TO ALL WAIVERS; AND (4) NEITHER LENDER NOR

14

ANYONE CONNECTED WITH LENDER HAS MADE ANY STATEMENT OR PROMISE THAT MAY CONTRADICT IN ANY WAY WHAT IS WRITTEN IN THIS AGREEMENT OR IN ANY RELATED DOCUMENT.

EACH GUARANTOR ADDITIONALLY ACKNOWLEDGES THAT PAYMENT OF THE OBLIGATIONS MAY BE GUARANTEED BY ADDITIONAL GUARANTORS WHO ARE NOT PARTY TO THIS AGREEMENT AND THAT THE EXISTENCE OF SUCH ADDITIONAL GUARANTORS IN NO WAY LIMITS EACH UNDERSIGNED GUARANTOR'S JOINT AND SEVERAL OBLIGATIONS HEREUNDER AND UNDER THE APPLICABLE GUARANTY.

This Amended and Restated Master Loan and Security Agreement is executed as of the date first written above.

LENDER:

ADVOCATE CAPITAL, INC.
for itself and its assigns

By:        Paul Myers
Title:     Chief Credit Officer
Address:   One Vantage Way, Suite C-200
           Nashville, TN  37228

**BORROWER:**

Name:     Layfield & Barrett, APC

Address:  9170 Irvine Drive, Ste 100
          Irvine, CA 92618

Authorized Signatory: Philip J. Layfield
Title: Owner

**GUARANTOR:**

Name:     Phillip J. Layfield

Address:  31381 Trigo Trail
          Coto de Caza, CA  92679

* Each Guarantor must sign this Agreement.        MS #551954.2 (4/6/05)

15

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>Corporation Service Company<br>800-858-5294 | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address)<br>CORPORATION SERVICE COMPANY<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62703<br>USA | **DOCUMENT NUMBER: 54607000002**<br>**FILING NUMBER: 16-7520780551**<br>**FILING DATE: 04/20/2016 12:30**<br><br>IMAGE GENERATED ELECTRONICALLY FOR XML FILING<br>THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY |

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME**<br>Layfield & Barrett, APC | | | | | |
| OR  **1b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **1c. MAILING ADDRESS**<br>9170 Irvine Drive, Ste 100 | CITY<br>Irvine | STATE<br>CA | POSTAL CODE<br>92618 | | COUNTRY<br>USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | | |
| OR  **2b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **2c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| **3a. ORGANIZATION'S NAME**<br>Advocate Capital, Inc. | | | | | |
| OR  **3b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **3c. MAILING ADDRESS**<br>One Vantage Way, Suite C-200 | CITY<br>Nashville | STATE<br>TN | POSTAL CODE<br>37228 | | COUNTRY<br>USA |

4. **COLLATERAL:** This financing statement covers the following collateral:
All accounts, general intangibles, payment intangibles and all similar rights that Debtor may have of every nature and kind, including specifically and without limitation all of Debtor's rights to receive payment or otherwise, for legal and other services rendered and to be rendered, and for costs and expenses advanced and to be advanced, and all other rights and interest that Debtor may have in and with respect to each and every client matter; and all credits, monies, and properties of Debtor now and in the future in Secured Party's possession or under Secured Party's control, whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions; all records of any kind relating to any of the foregoing; and all proceeds (including insurance, chattel paper and other accounts proceeds).

NOTICE: By agreement, Debtor is prohibited from granting additional security

| | |
|---|---|
| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions)  ☐ being administered by a Decedent's Personal Representative | |
| 6a. Check only if applicable and check only one box:<br>☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box:<br>☐ Agricultural Lien  ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor | |
| 8. OPTIONAL FILER REFERENCE DATA:<br>[114884176] | |

FILING OFFICE COPY

Page 2

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

| | | |
|---|---|---|
| | 9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because individual Debtor name did not fit, check here ☐ | |
| **OR** | 9a. ORGANIZATION'S NAME<br>Layfield & Barrett, APC | |
| | 9b. INDIVIDUAL'S SURNAME | |
| | FIRST PERSONAL NAME | |
| | ADDITIONAL NAME(S)/INTITAL(S)        SUFFIX | **DOCUMENT NUMBER:** 54607000002<br>IMAGE GENERATED ELECTRONICALLY FOR XML FILING<br>THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY |

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | | |
|---|---|---|---|---|---|
| **OR** | 10a. ORGANIZATION'S NAME | | | | |
| | 10b. INDIVIDUAL'S SURNAME | | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | | | |
|---|---|---|---|---|---|
| **OR** | 11a. ORGANIZATION'S NAME | | | | |
| | 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (collateral):
interests in the collateral and in collateral proceeds. Competing
creditors are prohibited from collecting or attempting to collect Debtor's accounts and payment intangibles to the detriment of
Secured Party's security rights and interests therein. This Notice is made and directed to potential competing creditors pursuant to
Official Comment 5 to UCC 9-331.

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT:<br>☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing. |
|---|---|
| 15. Name and address of RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

FILING OFFICE COPY

2020171280001



**FILED**
Secretary of State
State of California

APR 28 2017

I CC

This Space For Office Use Only

| LLP-1 | Application to Register a Limited Liability Partnership (LLP) |
|---|---|

To register an LLP in California, fill out this form, and submit for filing along with:
- A $70 filing fee, and
- If the LLP is formed in another state or country, a certificate of good standing, issued within the last six (6) months by the agency where the LLP is formed.
- A separate, non-refundable $15 service fee also must be included, if you drop off the completed form.

Attach extra pages if you need to include any other matters.

*Important!* LLPs in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

For questions about this form, go to: www.sos.ca.gov/business/be/filing-tips.htm

**Name to be used for this LLP in California**

① Maximum Legal (California), LLP
_Proposed LLP Name_

The name must end with: "Registered Limited Liability Partnership," "Limited Liability Partnership," "L.L.P.," "LLP," "R.L.L.P.," or "RLLP."

**Place of Formation**

② The LLP is registering as a *(check only one box)*:
- a. ☑ California registered LLP formed under the laws of California.
- b. ☐ Foreign LLP formed under the laws of _____ _List the state or country where the foreign LLP is formed._

**LLP Addresses**

③ a. 633 W 5th St #3300                    Los Angeles            CA    90071
_Street Address of Principal Office_                _City (no abbreviations)_        _State_  _Zip_

b. _____
_Mailing Address of Principal Office, if different from 3a_        _City (no abbreviations)_        _State_  _Zip_

**Service of Process** (List a California resident or an active 1505 corporation in California that agrees to be your agent to accept service of process in case the LLP is sued. You may list any adult who lives in California. You may not list an LLP as your agent.)

④ a. Universal Registered Agents, Inc.
_Agent's Name_

b. _____                                CA
_Agent's Street Address (if agent is not a corporation)_        _City (no abbreviations)_        _State_  _Zip_

**Type of Business**

⑤ The business in which the LLP is engaged is *(check only one box)*:
- ☐ The practice of Architecture
- ☐ The practice of Engineering
- ☐ The practice of Land Surveying
- ☑ The practice of Law
- ☐ The practice of Public Accountancy
- ☐ Related to: _____
_List the name of the LLP to which your LLP is related, exactly as it appears on the records of the California Secretary of State. A related LLP is a California registered LLP that practices public accountancy or law, or is a foreign LLP._

**Read and sign below:** This form must be signed by one or more authorized partners, or if registering a foreign LLP, by a person with authority to do so under the laws of the state or country where the foreign LLP is formed. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are part of this registration.

_____                    Todd D. Wakefield              Partner
_Sign here_                _Print your name here_            _Your business title_

| Make check/money order payable to: Secretary of State. Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | **By Mail** Secretary of State Business Entities, P.O. Box 944228 Sacramento, CA 94244-2280 | **Drop-Off** Secretary of State 1500 11th Street, 3rd Floor Sacramento, CA 95814 |
|---|---|---|

Corporations Code §§ 16101, 16952, 16953, 16958, 16959, Revenue and Taxation Code § 17948
LLP-1 (REV 01/2013)

2013 California Secretary of State
www.sos.ca.gov/business/be

EXHIBIT C  PAGE 31



I hereby certify that the foregoing
transcript of_____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

MAY 1 0 2017

Date:_____

ALEX PADILLA, Secretary of State

EXHIBIT C  PAGE 32

## ACTION BY WRITTEN CONSENT OF MANAGERS
### OF
### MAXIMUM LEGAL, LLC

The undersigned, being all of the Board of Managers of Maximum Legal, LLC, a Delaware limited liability company (the "Company"), in accordance with Section 5.3(g) of the Limited Liability Company Agreement of the Company, hereby adopt the following resolutions by written consent:

WHEREAS, the Company has determined that it is in its best interest to transfer and assign immediately all of its right, title and interest in and to all of its outstanding shares in Layfield & Barrett, APC ("L&B") to Maximum Legal Holdings, LLC;

WHEREAS, the Company has negotiated a purchase from L&B of all of its non-case assets (i.e., furniture, computers, software, intellectual property, trade secrets, etc. (collectively, the "Non-case Assets");

WHEREAS, the Company has negotiated a Master Association Agreement with L&B to associate into approximately 147 pre-litigation and litigation cases which L&B has acquired and performed varying levels of work on, and for which L&B foresees a need for additional resources in the near future;

NOW, THEREFORE, IT IS RESOLVED, that the purchase of the Non-case Assets from Layfield & Barrett, APC, for $1,000,000 due and payable on July 1, 2017, pursuant to the Bill of Sale set forth in Exhibit A hereto, is hereby approved;

FURTHER RESOLVED, that the transfer and assignment of all of the Company's right, title and interest in and to L&B in exchange for and consideration of a release of any obligations of the Company to Maximum Legal Holdings, LLC arising in connection with any transfers of L&B shares among and between the Company and Maximum Legal Holdings, LLC is hereby approved;

FURTHER RESOLVED, that the Company's entry into a Master Association Agreement with L&B, substantially in the form set forth in Exhibit B attached hereto, is hereby approved;

FURTHER RESOLVED, that the Chief Executive Officer (CEO) and/or any other Manager of the Company be, and hereby is, authorized and directed to take all such actions, and to prepare, execute, and deliver any and all such instruments which they may deem necessary or advisable to carry out the intent of these resolutions.

IN WITNESS WHEREOF, the undersigned have executed this Action by Written Consent of Managers this 15th day of April, 2017. This Consent may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall

1273996.1

constitute one and the same instrument.  This Consent may be executed by facsimile signature which will constitute an original signature.

MANAGERS:

_____
Philip J. Layfield

_____
Joseph M. Barrett

_____
Todd D. Wakefield

EXHIBIT D  PAGE  34

# Exhibit A

## BILL OF SALE

This Bill of Sale is made as of the 15th day of April, 2017 by Layfield & Barrett, APC, a California professional corporation ("Company"), in favor of Maximum Legal, LLC, a Delaware limited liability company ("Shareholder").

Company has agreed to transfer, assign, and convey to Shareholder, all of Company's right, title and interest in those assets identified on Exhibit "A" attached hereto (the "Non-case Assets").

## BILL OF SALE

NOW THEREFORE, in consideration of the mutual covenants contained herein and for the good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1.       Company does hereby irrevocably grant, assign, transfer and convey to Shareholder, effective as of the date hereof, all of Company's right, title and interest in and to the Non-case Assets.

2.       THIS BILL OF SALE IS MADE WITHOUT REPRESENTATION OR WARRANTY.

3.       Company further covenants that it shall, upon the request of Shareholder, execute and deliver such further bills of sale, assignments and other documents consistent herewith as may be reasonably required to convey and transfer the Non-case Assets to Shareholder, as may be appropriate to confirm or otherwise to effect the transactions contemplated by this Bill of Sale.

4.       This Bill of Sale shall be binding upon Company and its successors and assigns, and shall inure to the benefit of Shareholder and its successors and assigns.

IN WITNESS WHEREOF, Company has executed and delivered this Bill of Sale as of the date written above.

LAYFIELD & BARRETT, APC, a California
professional corporation

_____

Philip J. Layfield

1273985.1

EXHIBIT "A"

Non-case Assets

Exhibit B

## MASTER ASSOCIATION AGREEMENT

This MASTER ASSOCIATION AGREEMENT ("Agreement") is made and entered into effective as of the 15th day of April, 2017, by and between Layfield & Barrett, APC ("L&B") and Maximum Legal, LLC ("ML"), hereinafter collectively referred to as the "Firms" or "Parties."

The Firms wish to work together as co-counsel, jointly representing the clients in the cases (the "Matters") listed on Exhibit A attached hereto and hereby incorporated by this reference (the "Clients"). The purpose of this Agreement is to establish the rights and responsibilities of the Firms with respect to the conduct of the Matters, handling of related tasks, expenses and fees.

The Parties hereby agree as follows:

1.      Relationship of the Parties.

ML will be designated as lead counsel in all of the Matters. ML shall be responsible for directing the course and conduct of the Matters, including all litigation, and ensuring that they are prosecuted in a timely and professional manner. ML shall also determine the assignment of specific task responsibilities to all attorneys participating in the Matters. The Firms agree to work cooperatively and to keep each other apprised of all developments in the Matters, and to include each other in all material communications with the Clients, courts and opposing counsel.

2.      Terms of Representation and Sharing of Fees.

A.      The Parties acknowledge that all of the Clients previously have executed written representation agreements with L&B, and the Parties agree that the terms and conditions governing the representation of the Clients shall be as set forth in those written representation agreements until such time as new written representation agreements can be executed by and between the Clients and ML, which shall replace and supersede the previously executed L&B representation agreements.

B.      All attorneys' fees received under such representation agreements shall be divided among the Parties, with 25% of such fees to be received by L&B and 75% of such fees to be retained by ML. The Parties shall ensure that such division fees is disclosed to, and acknowledged in writing by, all Clients in accordance with Rule 2-200 of the California Rules of Professional Conduct, or any other laws or Rules of Professional Conduct of any other jurisdictions in which any Matters are pending.

C.      Estimated total fee amounts are listed for all Matters on Exhibit A, but such estimates are not binding, and fee sharing amounts due from ML to L&B on each of the Matters shall be based on the percentages of actual fees generated set forth above.

1

3.    Identification.

Pleadings and other papers shall bear the names of any designated attorneys from ML, and shall be signed by or on behalf of the principal drafter, which shall be ML unless otherwise agreed by the Firms.

4.    Costs and Expenses.

ML and L&B agree that all costs and expenses for case investigation, analysis and work-up litigation expenses in the Matter shall be borne by ML commencing no later than July1, 2017. Prior to that date, allocation of and responsibility for costs and expenses shall be addressed by the Parties on a case-by-case basis.  At the time of resolution of any of the Matters, ML will advise L&B of the resolution, and L&B shall advise ML of its costs and expenses incurred and ML shall disburse to L&B (in addition to fees share as set forth above) reimbursement of such expenses from the proceeds of the resolution.  For purposes of this Agreement, costs and expenses shall include all costs and expenses described in the applicable representation agreement, such as filing fees, court fees, certified reporters' fees, other fees in connection with depositions, fees for service of process, photocopying costs, mailing/shipping costs, long distance telephone calls and faxes, consultant fees, witness fees, payments to expert witnesses, necessary travel costs, and any other fees or expenses arising from the Matters. Expenses do not include overhead costs such as rent, local telephone calls, secretarial time or payment of salaries or other compensation for attorneys or paralegals of the Firms working on the Matters.

5.    Handling of Funds.

In the event that any of the Matters is resolved successfully and a recovery is obtained pursuant to a settlement, verdict, judgment or other court or arbitrator award, all such funds shall be received, administered and disbursed by ML.  L&B expressly agrees that any party issuing a check in such event may make such check payable solely to ML, and that L&B need not be named an additional payee on the check.

6.    Liability for Assessment of Fees or Sanctions.

Liability for fees, costs or sanctions assessed directly against attorneys in this case shall be borne by L&B if assessed through June 30, 2017, and by ML if assessed July 1, 2017 or later. Nothing in this agreement shall be considered as acceptance of responsibility on behalf of any of individual attorneys for any fees, costs or sanctions imposed.

7.    Public Relations and Contact With Media.

The Firms shall have the opportunity to review and comment on every press release before it is released to the media, and ML shall be responsible for all such releases unless otherwise agreed by the Firms. To the extent feasible, all Firms should be consulted before any attorney working on the matter contacts or provides comment to the media.

2

8.    Professional Liability Insurance.

Each of the Firms represents that it carries and will continue to carry its own complete professional liability insurance during the pendency of the Matters.

9.    Withdrawal.

This Agreement shall terminate with respect to each of the Matters individually at the conclusion of the particular case. However, any of the Parties to this Agreement may withdraw from representation in the Matter prior to its conclusion, provided that such withdrawal is consistent with the Rules of Professional Conduct for the State Bar of California and the applicable provisions of California law, and any other applicable rules of professional conduct if the Matter encompasses jurisdictions other than the State of California. If any of the Firms withdraw as counsel of record or if any of the Clients wish to terminate the relationship with one or both of the the Firms, all other parties to this Agreement will support any application for leave to withdraw by the Firm(s), to the extent allowable by law and consistent with the best interests of the Clients affected. Any such withdrawal will be solely on a prospective basis and any information or materials exchanged or shared by the Parties prior to such time in connection with the Matters shall be deemed to be joint work product of the Firms and shall remain available to any non-withdrawing party for continued use in the Matter.

10.    Dispute Resolution.

In the event of any dispute among the Firms regarding this Agreement, the Firms shall attempt in good faith to resolve the matter through negotiation and, if unsuccessful, shall agree upon a neutral third party to assist them in attempting to resolve the matter informally. If these measures are unsuccessful, the dispute shall be referred for binding arbitration with JAMS in Orange County, California, or another mutually agreed upon alternative dispute resolution provider.

11.    Assignability.

ML shall retain the right to assign freely its rights and interests under this Agreement to any entity in which ML, or any of its members or principals, maintains a controlling interest, consistent with all laws and Rules of Professional Conduct of any jurisdictions in which any Matters are pending.

12.    Confidentiality of Terms.

The contents of this Agreement are confidential and shall not be released to any person or entity not a Party to this Agreement, except for section 5, which may be disclosed to any third party issuing a check as contemplated therein.

3

13.   Governing Law.

This Agreement shall be construed in accordance with the laws of the State of California. No provision of this Agreement is intended, nor shall any provision be interpreted, to circumvent any lawful order of any Court or of any state bar association governing any jurisdiction in which any of the Matters currently are pending.

IN WITNESS WHEREOF, the Assignor has executed this Assignment with an effective date of the 15th day of April, 2017.

**LAYFIELD & BARRETT**

By: MAXIMUM LEGAL HOLDINGS, LLC

Philip J. Layfield
Manager

**MAXIMUM LEGAL, LLC**

By:
Todd D. Wakefield
Manager

4

Exhibit A

## MASTER ASSOCIATION CASE LIST

| Case | Amount |
|---|---|
| Alfaro v. PENSKE TRUCK LEASIN | $ 106,666.67 |
| Alvarez v. Big Canyon Community Association | $ 80,000.00 |
| Alvarez v. Monter | $ 140,000.00 |
| Avila v. City Terrace Recycling, LLC | $ 108,000.00 |
| Brent v. Uber Technologies, Inc. | $ 80,000.00 |
| Bryant v. Forest Laboratories, Inc. | $ 26,668.00 |
| Calvert v. Kelly | $ 60,000.00 |
| Castillo v. Patel | $ 100,000.00 |
| Cirone v. Howard Management Group | $ 66,666.67 |
| Cramlet v. Stimac | $ 20,000.00 |
| Cruz-Hernandez v. The Dover Corporation | $ 75,000.00 |
| Economides v. Kaiser Foundation Health Plan, Inc | $ 66,666.67 |
| Fox v. Citizen's Bank | $ 120,000.00 |
| Glick v. Sande | $ 20,000.00 |
| Gravolet v. Walgreen Co. | $ 60,000.00 |
| Gray v. Antonyan | $ 125,000.00 |
| Guddoy v. Kings County Child Protective Services | $ 60,000.00 |
| Hasid v. City of Los Angeles | $ 400,000.00 |
| Johnson  v. Atkinson | $ 200,000.00 |
| Johnson v. CSX Transportation, Inc | $ 458,333.34 |
| Lamb v. Nissan North America, Inc. | $ 260,000.00 |
| Land v. Dahl | $ 40,000.00 |
| Li v. Georgiou | $ 140,000.00 |
| Linares v. Los Angeles County Metropolitan Transportation Authority | $ 22,000.00 |
| Linares v. Sales | $ 60,000.00 |
| Maloney v. Envion, LLC fka Ionic Pro, LLC | $ 50,000.00 |
| Marshall v. Danny's Trucking | $ 40,000.00 |
| Martinez v. General Motors Corporation | $ 200,000.00 |
| Maxwell v. Villamira Homeowners | $ 38,000.00 |
| Medina v. Hillenbrand, Inc. | $ 40,000.00 |
| Mendoza v. Bell | $ 60,000.00 |
| Mendoza v. Rowe Enterprises | $ 30,000.00 |
| Michaca v. Starbucks Corporation | $ 80,000.00 |
| Mora v. Hernandez, et al. | $ 225,000.00 |
| Navarro Jimenez v. Los Angeles County Metropolitan Transportation Authority | $ 40,000.00 |
| Phoa v. Food City | $ 30,000.00 |
| Pineda v. County of Riverside | $ 700,000.00 |
| Pineda v. Security Industry Specialists, Inc. | $ 78,000.00 |
| Pusateri v. Toyota Motor Sales, U.S.A., Inc. | $ 33,333.33 |
| Rosenquist v. Cornia | $ 40,000.00 |
| Sison v. City of Palm Springs | $ 300,000.00 |
| Starboard Florida IV, LLC v. Finton Construction,Inc | $ 200,000.00 |
| Stover v. Saks Fifth Avenue | $ 40,000.00 |
| Teitelbaum v. Lyft, INC. | $ 200,000.00 |
| Velasco v. LA County Metro Transit Authority | $ 39,000.00 |
| Willard et al. v. Taylor | $ 20,000.00 |

| | | |
|---|---|---|
| Winkler v. County of Santa Barbara | $ | 420,000.00 |
| Alvarez v. Kerr & Sheldon | $ | 80,000.00 |
| Avila v. City Terrace Recycling, LLC | $ | 108,000.00 |
| Bommarito v. Kaiser Permanente Hospital | $ | 100,000.00 |
| Carpenter v. All Weather Transport | $ | 72,000.00 |
| Gaskins v. Volkswagen Group of America, Inc | $ | 137,500.00 |
| Grano v. City of Bloomfield | $ | 180,000.00 |
| Horn v. Sunland RV Resorts | $ | 50,000.00 |
| Lorigo v. Pacific Coast Sightseeing Tours & Charters, Inc. | $ | 200,000.00 |
| Lozano v. Shippers Transport Express | $ | 133,340.00 |
| Pineda v. Security Industry Specialists, Inc. | $ | 78,000.00 |
| Raab v. Verde Vista Care and Rehab, Inc. | $ | 272,000.00 |
| Schellenger v. Harper | $ | 100,000.00 |
| Smale v. CarMax Auto Superstores West Coast, Inc. | $ | 106,666.67 |
| Stephens v. Peterbilt Manufacturer | $ | 200,000.00 |
| Tamayo v. Tufesa U.S.A., L.L.C. | $ | 66,670.00 |
| Thompson v. A-Throne Co., Inc. | $ | 60,000.00 |
| Velasquez v. Silver Nugget Casino | $ | 200,000.00 |
| **Davis v. Texaco** | $ | 2,333.33 |
| Walser-Coles v. Feast American Diners, LLC | $ | 3,333.33 |
| Perez v. Gonzales | $ | 5,000.00 |
| Wani v. City of Phoenix | $ | 1,333.33 |
| Whipple v. Doe | $ | 5,000.00 |
| Garcia v. Ortega | $ | 1,666.67 |
| Teagan v. Kroger | $ | 1,333.33 |
| Johnson  v. Atkinson | $ | 1,666.67 |
| Perez v. Safeway Inc. | $ | 2,000.00 |
| Lodge v. Sky Zone Indoor Trampoline Park | $ | 3,333.33 |
| Segura v. Pilot Flying J | $ | 666.67 |
| Salmon v. United States of America | $ | 2,666.67 |
| Ainsworth  v. Flowing Wells Family Health Center | $ | 2,333.33 |
| Payne  v. Hartenberger | $ | 2,333.33 |
| Stephenson v. Harvey | $ | 2,333.33 |
| Crawford v. Pinedo | $ | 2,333.33 |
| Jordan v. Boyd | $ | 2,333.33 |
| Chase v. Mitchell | $ | 1,000.00 |
| Teller v. Doe | $ | 1,000.00 |
| Gonzalez v. Samiha | $ | 1,000.00 |
| Evans v. | $ | 2,333.33 |
| Jacobson v. Doe | $ | 1,333.33 |
| Tafoya v. Sloan | $ | 2,500.00 |
| Branch-Morrison v. Baker | $ | 5,000.00 |
| Bryant v. Stennett | $ | 2,000.00 |
| Babb v. Chavez | $ | 2,333.33 |
| Heredia  v. Torres | $ | 2,333.33 |
| Thomas v. Andrews | $ | 5,000.00 |
| Barnes  v. Doe | $ | 5,000.00 |

| | |
|---|---|
| Stafford v. Giudice | $ 2,666.67 |
| Orenday v. Ilalio | $ 3,333.33 |
| Stone v. Mier | $ 5,000.00 |
| Hooks v. Hooten | $ 5,000.00 |
| Decamp v. Sison | $ 2,333.33 |
| Mendez v. Moore | $ 1,666.67 |
| Vanrozeboom v. Bruner | $ 2,333.33 |
| Romo v. Torres | $ 5,000.00 |
| Topkov v. Chowdhury | $ 5,000.00 |
| Somerville v. Sanchez | $ 5,000.00 |
| Murphy v. Vega | $ 1,666.67 |
| Clay v. Lyft, INC. | $ 2,500.00 |
| Aune v. Navarro | $ 2,666.67 |
| Nazarov v. Glasker | $ 5,000.00 |
| Robleski v. Alvarez | $ 3,333.33 |
| Vergara v. Deng | $ 3,333.33 |
| Ferrer v. Chexcancinos | $ 13,333.33 |
| Johnson v. Mendoza | $ 13,333.33 |
| Gooden v. Alfred Rogers | $ 5,000.00 |
| Thomas v. Goodwin | $ 3,333.33 |
| Decamp v. McKeown | $ 2,333.33 |
| Thibodeaux v. Westbury | $ 3,333.33 |
| Hacobian v. LA Convention Center, et al | $ 2,333.33 |
| Fong, et al v. Pace | $ 2,333.33 |
| Bushnell v. Stallworth | $ 5,000.00 |
| Hernandez v. Extra Space Storage | $ 4,666.67 |
| Fontenberry v. Wise | $ 1,666.67 |
| Diggs v. Lutes | $ 5,000.00 |
| Simmons v. Castro | $ 2,333.33 |
| Rasheed v. Hung | $ 2,333.33 |
| Hall v. Allen | $ 2,000.00 |
| Rivera v. Seckin | $ 5,000.00 |
| Martin-Franklin v. Zuniga | $ 5,000.00 |
| Sawyer v. Moreno | $ 1,666.67 |
| Dionisio v. Wilhelm | $ 2,666.67 |
| Vance v. Holliday Rock Co., Inc. | $ 2,333.33 |
| Mahoney v. Shiraki | $ 2,333.33 |
| Romo v. Ramirez | $ 1,000.00 |
| Douglas v. Inglewood Park Cemetery | $ 5,000.00 |
| Williams v. Brooks | $ 2,333.33 |
| Spearman v. Tena | $ 20,000.00 |
| Mahmoud v. Laviolette | $ 5,000.00 |
| Long v. DeClercq | $ 5,000.00 |
| Collins v. Doe | $ 1,666.67 |
| Hansen v. Six | $ 1,666.67 |
| Nguyen v. JB Carriers | $ 3,333.33 |
| Gonzales v. Wienerschnitzel | $ 3,333.33 |

| | | |
|---|---|---:|
| Butler v. Canyon View Apartments | $ | 5,000.00 |
| Mcknight v. Darby | $ | 2,666.67 |
| Lozano v. Hancey | $ | 5,000.00 |
| Pokusa v. Powell | $ | 8,000.00 |
| Rodriguez v. Work Care Orem | $ | 3,333.33 |
| Champion v. Lagoon | $ | 3,666.67 |
| Williams v. Kelly | $ | 666.67 |
| **TOTAL** | **$** | **8,235,178.01** |

## BILL OF SALE

This Bill of Sale is made as of the 15th day of April, 2017 by Layfield & Barrett, APC, a California professional corporation ("Company"), in favor of Maximum Legal, LLC, a Delaware limited liability company ("Shareholder").

Company has agreed to transfer, assign, and convey to Shareholder, all of Company's right, title and interest in those assets identified on Exhibit "A" attached hereto (the "Non-case Assets").

## BILL OF SALE

NOW THEREFORE, in consideration of the mutual covenants contained herein and for the good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1.      Company does hereby irrevocably grant, assign, transfer and convey to Shareholder, effective as of the date hereof, all of Company's right, title and interest in and to the Non-case Assets.

2.      THIS BILL OF SALE IS MADE WITHOUT REPRESENTATION OR WARRANTY.

3.      Company further covenants that it shall, upon the request of Shareholder, execute and deliver such further bills of sale, assignments and other documents consistent herewith as may be reasonably required to convey and transfer the Non-case Assets to Shareholder, as may be appropriate to confirm or otherwise to effect the transactions contemplated by this Bill of Sale.

4.      This Bill of Sale shall be binding upon Company and its successors and assigns, and shall inure to the benefit of Shareholder and its successors and assigns.

IN WITNESS WHEREOF, Company has executed and delivered this Bill of Sale as of the date written above.

LAYFIELD & BARRETT, APC, a California professional corporation

_____

Philip J. Layfield

1273985.1

EXHIBIT "A"

Non-case Assets

1273985.1

# Exhibit B

## MASTER ASSOCIATION AGREEMENT

This MASTER ASSOCIATION AGREEMENT ("Agreement") is made and entered into effective as of the 15th day of April, 2017, by and between Layfield & Barrett, APC ("L&B") and Maximum Legal, LLC ("ML"), hereinafter collectively referred to as the "Firms" or "Parties."

The Firms wish to work together as co-counsel, jointly representing the clients in the cases (the "Matters") listed on Exhibit A attached hereto and hereby incorporated by this reference (the "Clients"). The purpose of this Agreement is to establish the rights and responsibilities of the Firms with respect to the conduct of the Matters, handling of related tasks, expenses and fees.

The Parties hereby agree as follows:

1.    Relationship of the Parties.

ML will be designated as lead counsel in all of the Matters. ML shall be responsible for directing the course and conduct of the Matters, including all litigation, and ensuring that they are prosecuted in a timely and professional manner. ML shall also determine the assignment of specific task responsibilities to all attorneys participating in the Matters. The Firms agree to work cooperatively and to keep each other apprised of all developments in the Matters, and to include each other in all material communications with the Clients, courts and opposing counsel.

2.    Terms of Representation and Sharing of Fees.

A.    The Parties acknowledge that all of the Clients previously have executed written representation agreements with L&B, and the Parties agree that the terms and conditions governing the representation of the Clients shall be as set forth in those written representation agreements until such time as new written representation agreements can be executed by and between the Clients and ML, which shall replace and supersede the previously executed L&B representation agreements.

B.    All attorneys' fees received under such representation agreements shall be divided among the Parties, with 25% of such fees to be received by L&B and 75% of such fees to be retained by ML. The Parties shall ensure that such division fees is disclosed to, and acknowledged in writing by, all Clients in accordance with Rule 2-200 of the California Rules of Professional Conduct, or any other laws or Rules of Professional Conduct of any other jurisdictions in which any Matters are pending.

C.    Estimated total fee amounts are listed for all Matters on Exhibit A, but such estimates are not binding, and fee sharing amounts due from ML to L&B on each of the Matters shall be based on the percentages of actual fees generated set forth above.

1

3.    Identification.

Pleadings and other papers shall bear the names of any designated attorneys from ML, and shall be signed by or on behalf of the principal drafter, which shall be ML unless otherwise agreed by the Firms.

4.    Costs and Expenses.

ML and L&B agree that all costs and expenses for case investigation, analysis and work-up litigation expenses in the Matter shall be borne by ML commencing no later than July1, 2017. Prior to that date, allocation of and responsibility for costs and expenses shall be addressed by the Parties on a case-by-case basis. At the time of resolution of any of the Matters, ML will advise L&B of the resolution, and L&B shall advise ML of its costs and expenses incurred and ML shall disburse to L&B (in addition to fees share as set forth above) reimbursement of such expenses from the proceeds of the resolution. For purposes of this Agreement, costs and expenses shall include all costs and expenses described in the applicable representation agreement, such as filing fees, court fees, certified reporters' fees, other fees in connection with depositions, fees for service of process, photocopying costs, mailing/shipping costs, long distance telephone calls and faxes, consultant fees, witness fees, payments to expert witnesses, necessary travel costs, and any other fees or expenses arising from the Matters. Expenses do not include overhead costs such as rent, local telephone calls, secretarial time or payment of salaries or other compensation for attorneys or paralegals of the Firms working on the Matters.

5.    Handling of Funds.

In the event that any of the Matters is resolved successfully and a recovery is obtained pursuant to a settlement, verdict, judgment or other court or arbitrator award, all such funds shall be received, administered and disbursed by ML. L&B expressly agrees that any party issuing a check in such event may make such check payable solely to ML, and that L&B need not be named an additional payee on the check.

6.    Liability for Assessment of Fees or Sanctions.

Liability for fees, costs or sanctions assessed directly against attorneys in this case shall be borne by L&B if assessed through June 30, 2017, and by ML if assessed July 1, 2017 or later. Nothing in this agreement shall be considered as acceptance of responsibility on behalf of any of individual attorneys for any fees, costs or sanctions imposed.

7.    Public Relations and Contact With Media.

The Firms shall have the opportunity to review and comment on every press release before it is released to the media, and ML shall be responsible for all such releases unless otherwise agreed by the Firms. To the extent feasible, all Firms should be consulted before any attorney working on the matter contacts or provides comment to the media.

2

8.    Professional Liability Insurance.

Each of the Firms represents that it carries and will continue to carry its own complete professional liability insurance during the pendency of the Matters.

9.    Withdrawal.

This Agreement shall terminate with respect to each of the Matters individually at the conclusion of the particular case. However, any of the Parties to this Agreement may withdraw from representation in the Matter prior to its conclusion, provided that such withdrawal is consistent with the Rules of Professional Conduct for the State Bar of California and the applicable provisions of California law, and any other applicable rules of professional conduct if the Matter encompasses jurisdictions other than the State of California. If any of the Firms withdraw as counsel of record or if any of the Clients wish to terminate the relationship with one or both of the the Firms, all other parties to this Agreement will support any application for leave to withdraw by the Firm(s), to the extent allowable by law and consistent with the best interests of the Clients affected. Any such withdrawal will be solely on a prospective basis and any information or materials exchanged or shared by the Parties prior to such time in connection with the Matters shall be deemed to be joint work product of the Firms and shall remain available to any non-withdrawing party for continued use in the Matter.

10.    Dispute Resolution.

In the event of any dispute among the Firms regarding this Agreement, the Firms shall attempt in good faith to resolve the matter through negotiation and, if unsuccessful, shall agree upon a neutral third party to assist them in attempting to resolve the matter informally. If these measures are unsuccessful, the dispute shall be referred for binding arbitration with JAMS in Orange County, California, or another mutually agreed upon alternative dispute resolution provider.

11.    Assignability.

ML shall retain the right to assign freely its rights and interests under this Agreement to any entity in which ML, or any of its members or principals, maintains a controlling interest, consistent with all laws and Rules of Professional Conduct of any jurisdictions in which any Matters are pending.

12.    Confidentiality of Terms.

The contents of this Agreement are confidential and shall not be released to any person or entity not a Party to this Agreement, except for section 5, which may be disclosed to any third party issuing a check as contemplated therein.

3

13.    Governing Law.

This Agreement shall be construed in accordance with the laws of the State of California. No provision of this Agreement is intended, nor shall any provision be interpreted, to circumvent any lawful order of any Court or of any state bar association governing any jurisdiction in which any of the Matters currently are pending.

IN WITNESS WHEREOF, the Assignor has executed this Assignment with an effective date of the 15th day of April, 2017.

**LAYFIELD & BARRETT**

By: MAXIMUM LEGAL HOLDINGS, LLC

Philip J. Layfield
Manager

**MAXIMUM LEGAL, LLC**

By:
Todd D. Wakefield
Manager

4

# Exhibit A

## MASTER ASSOCIATION CASE LIST

| Case | Amount |
|---|---|
| Alfaro v. PENSKE TRUCK LEASIN | $ 106,666.67 |
| Alvarez v. Big Canyon Community Association | $ 80,000.00 |
| Alvarez v. Monter | $ 140,000.00 |
| Avila v. City Terrace Recycling, LLC | $ 108,000.00 |
| Brent v. Uber Technologies, Inc. | $ 80,000.00 |
| Bryant v. Forest Laboratories, Inc. | $ 26,668.00 |
| Calvert v. Kelly | $ 60,000.00 |
| Castillo v. Patel | $ 100,000.00 |
| Cirone v. Howard Management Group | $ 66,666.67 |
| Cramlet v. Stimac | $ 20,000.00 |
| Cruz-Hernandez v. The Dover Corporation | $ 75,000.00 |
| Economides v. Kaiser Foundation Health Plan, Inc. | $ 66,666.67 |
| Fox v. Citizen's Bank | $ 120,000.00 |
| Glick v. Sande | $ 20,000.00 |
| Gravolet v. Walgreen Co. | $ 60,000.00 |
| Gray v. Antonyan | $ 125,000.00 |
| Guddoy v. Kings County Child Protective Services | $ 60,000.00 |
| Hasid v. City of Los Angeles | $ 400,000.00 |
| Johnson  v. Atkinson | $ 200,000.00 |
| Johnson v. CSX Transportation, Inc | $ 458,333.34 |
| Lamb v. Nissan North America, Inc. | $ 260,000.00 |
| Land v. Dahl | $ 40,000.00 |
| Li v. Georgiou | $ 140,000.00 |
| Linares v. Los Angeles County Metropolitan Transportation Authority | $ 22,000.00 |
| Linares v. Sales | $ 60,000.00 |
| Maloney v. Envion, LLC fka Ionic Pro, LLC | $ 50,000.00 |
| Marshall v. Danny's Trucking | $ 40,000.00 |
| Martinez v. General Motors Corporation | $ 200,000.00 |
| Maxwell v. Villamira Homeowners | $ 38,000.00 |
| Medina v. Hillenbrand, Inc. | $ 40,000.00 |
| Mendoza v. Bell | $ 60,000.00 |
| Mendoza v. Rowe Enterprises | $ 30,000.00 |
| Michaca v. Starbucks Corporation | $ 80,000.00 |
| Mora v. Hernandez, et al. | $ 225,000.00 |
| Navarro Jimenez v. Los Angeles County Metropolitan Transportation Authority | $ 40,000.00 |
| Phoa v. Food City | $ 30,000.00 |
| Pineda v. County of Riverside | $ 700,000.00 |
| Pineda v. Security Industry Specialists, Inc. | $ 78,000.00 |
| Pusateri v. Toyota Motor Sales, U.S.A., Inc. | $ 33,333.33 |
| Rosenquist v. Cornia | $ 40,000.00 |
| Sison v. City of Palm Springs | $ 300,000.00 |
| Starboard Florida IV, LLC v. Finton Construction,Inc | $ 200,000.00 |
| Stover v. Saks Fifth Avenue | $ 40,000.00 |
| Teitelbaum v. Lyft, INC. | $ 200,000.00 |
| Velasco v. LA County Metro Transit Authority | $ 39,000.00 |
| Willard et al. v. Taylor | $ 20,000.00 |

| | |
|---|---|
| Winkler v. County of Santa Barbara | $ 420,000.00 |
| Alvarez v. Kerr & Sheldon | $ 80,000.00 |
| Avila v. City Terrace Recycling, LLC | $ 108,000.00 |
| Bommarito v. Kaiser Permanente Hospital | $ 100,000.00 |
| Carpenter v. All Weather Transport | $ 72,000.00 |
| Gaskins v. Volkswagen Group of America, Inc | $ 137,500.00 |
| Grano v. City of Bloomfield | $ 180,000.00 |
| Horn v. Sunland RV Resorts | $ 50,000.00 |
| Lorigo v. Pacific Coast Sightseeing Tours & Charters, Inc. | $ 200,000.00 |
| Lozano v. Shippers Transport Express | $ 133,340.00 |
| Pineda v. Security Industry Specialists, Inc. | $ 78,000.00 |
| Raab v. Verde Vista Care and Rehab, Inc. | $ 272,000.00 |
| Schellenger v. Harper | $ 100,000.00 |
| Smale v. CarMax Auto Superstores West Coast, Inc. | $ 106,666.67 |
| Stephens v. Peterbilt Manufacturer | $ 200,000.00 |
| Tamayo v. Tufesa U.S.A., L.L.C. | $ 66,670.00 |
| Thompson v. A-Throne Co., Inc. | $ 60,000.00 |
| Velasquez v. Silver Nugget Casino | $ 200,000.00 |
| **Davis v. Texaco** | $ 2,333.33 |
| Walser-Coles v. Feast American Diners, LLC | $ 3,333.33 |
| Perez v. Gonzales | $ 5,000.00 |
| Wani v. City of Phoenix | $ 1,333.33 |
| Whipple v. Doe | $ 5,000.00 |
| Garcia v. Ortega | $ 1,666.67 |
| Teagan v. Kroger | $ 1,333.33 |
| Johnson  v. Atkinson | $ 1,666.67 |
| Perez v. Safeway Inc. | $ 2,000.00 |
| Lodge v. Sky Zone Indoor Trampoline Park | $ 3,333.33 |
| Segura v. Pilot Flying J | $ 666.67 |
| Salmon v. United States of America | $ 2,666.67 |
| Ainsworth  v. Flowing Wells Family Health Center | $ 2,333.33 |
| Payne  v. Hartenberger | $ 2,333.33 |
| Stephenson v. Harvey | $ 2,333.33 |
| Crawford v. Pinedo | $ 2,333.33 |
| Jordan v. Boyd | $ 2,333.33 |
| Chase v. Mitchell | $ 1,000.00 |
| Teller v. Doe | $ 1,000.00 |
| Gonzalez v. Samiha | $ 1,000.00 |
| Evans v. | $ 2,333.33 |
| Jacobson v. Doe | $ 1,333.33 |
| Tafoya v. Sloan | $ 2,500.00 |
| Branch-Morrison v. Baker | $ 5,000.00 |
| Bryant v. Stennett | $ 2,000.00 |
| Babb v. Chavez | $ 2,333.33 |
| Heredia  v. Torres | $ 2,333.33 |
| Thomas v. Andrews | $ 5,000.00 |
| Barnes  v. Doe | $ 5,000.00 |

| Case | Amount |
|---|---|
| Stafford v. Giudice | $ 2,666.67 |
| Orenday v. Ilalio | $ 3,333.33 |
| Stone v. Mier | $ 5,000.00 |
| Hooks v. Hooten | $ 5,000.00 |
| Decamp v. Sison | $ 2,333.33 |
| Mendez v. Moore | $ 1,666.67 |
| Vanrozeboom v. Bruner | $ 2,333.33 |
| Romo v. Torres | $ 5,000.00 |
| Topkov v. Chowdhury | $ 5,000.00 |
| Somerville v. Sanchez | $ 5,000.00 |
| Murphy v. Vega | $ 1,666.67 |
| Clay v. Lyft, INC. | $ 2,500.00 |
| Aune v. Navarro | $ 2,666.67 |
| Nazarov v. Glasker | $ 5,000.00 |
| Robleski v. Alvarez | $ 3,333.33 |
| Vergara v. Deng | $ 3,333.33 |
| Ferrer v. Chexcancinos | $ 13,333.33 |
| Johnson v. Mendoza | $ 13,333.33 |
| Gooden v. Alfred Rogers | $ 5,000.00 |
| Thomas v. Goodwin | $ 3,333.33 |
| Decamp v. McKeown | $ 2,333.33 |
| Thibodeaux v. Westbury | $ 3,333.33 |
| Hacobian v. LA Convention Center, et al | $ 2,333.33 |
| Fong, et al v. Pace | $ 2,333.33 |
| Bushnell v. Stallworth | $ 5,000.00 |
| Hernandez v. Extra Space Storage | $ 4,666.67 |
| Fontenberry v. Wise | $ 1,666.67 |
| Diggs v. Lutes | $ 5,000.00 |
| Simmons v. Castro | $ 2,333.33 |
| Rasheed v. Hung | $ 2,333.33 |
| Hall v. Allen | $ 2,000.00 |
| Rivera v. Seckin | $ 5,000.00 |
| Martin-Franklin v. Zuniga | $ 5,000.00 |
| Sawyer v. Moreno | $ 1,666.67 |
| Dionisio v. Wilhelm | $ 2,666.67 |
| Vance v. Holliday Rock Co., Inc. | $ 2,333.33 |
| Mahoney v. Shiraki | $ 2,333.33 |
| Romo v. Ramirez | $ 1,000.00 |
| Douglas v. Inglewood Park Cemetery | $ 5,000.00 |
| Williams v. Brooks | $ 2,333.33 |
| Spearman v. Tena | $ 20,000.00 |
| Mahmoud v. Laviolette | $ 5,000.00 |
| Long v. DeClercq | $ 5,000.00 |
| Collins v. Doe | $ 1,666.67 |
| Hansen v. Six | $ 1,666.67 |
| Nguyen v. JB Carriers | $ 3,333.33 |
| Gonzales v. Wienerschnitzel | $ 3,333.33 |

| | |
|---|---|
| Butler v. Canyon View Apartments | $ 5,000.00 |
| Mcknight v. Darby | $ 2,666.67 |
| Lozano v. Hancey | $ 5,000.00 |
| Pokusa v. Powell | $ 8,000.00 |
| Rodriguez v. Work Care Orem | $ 3,333.33 |
| Champion v. Lagoon | $ 3,666.67 |
| Williams v. Kelly | $ 666.67 |
| **TOTAL** | $ **8,235,178.01** |

## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (this "Agreement") entered into effective as of June 1, 2017, by and among Maximum Legal Holdings, LLC, a Delaware limited liability company ( the "Seller"), The Barrett Law Firm, APC (the "Buyer"), and Maximum Legal, LLC, a Delaware limited liability company (the "Company").  The Buyer, the Seller, and the Company may be referred to collectively herein as the "Parties" or each a "Party."

WHEREAS, the Seller is the sole member of the Company.

WHEREAS, the Seller owns 10,000 voting units and 10,000 nonvoting units in the Company, which represent a 100% interest in the capital and profits of the Company.

WHEREAS, the Seller proposes to sell 2,500 voting units and 2,500 nonvoting units in the Company, which represent a 25% interest in the capital and profits of the Company (the "Seller's Interest"), to the Buyer.

WHEREAS, the Buyer is willing to purchase the Seller's Interest from the Seller.

WHEREAS, this Agreement contemplates a transaction in which the Buyer will purchase from the Seller, and the Seller will sell to the Buyer, the Seller's Interest.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

1.    Purchase and Sale of Seller's Interest.

    1.1    Basic Transaction.  On and subject to the terms and conditions of this Agreement, the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer, the Seller's Interest for the consideration specified below in this Section 1.

    1.2    Waiver of Right of First Refusal.  The Company and the Seller waive any applicable rights to first refusal and consent to the admission of the Buyer as a "member" of the Company under the Company's Limited Liability Company Agreement ("LLC Agreement").

    1.3    Purchase Price.  The Buyer agrees to pay $4,000,000.00 (the "Purchase Price") to the Seller by delivery at Closing (defined below) of a promissory note (substantially in the form of Exhibit "A" hereto) payable to the Seller in an amount equal the Purchase Price (the "Promissory Note").

    1.4    The Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall occur concurrently with the execution of this Agreement and shall be effective as of such date.

    1.5    Deliveries at the Closing.  At the Closing: (i) the Buyer and the Seller will deliver the signed Agreement; (ii) the Buyer will deliver the Promissory Note to the Seller; (iii) the

1263120.3

Buyer will deliver to Seller a pledge agreement in the form attached hereto as Exhibit "B" (the "Pledge Agreement"), which shall secure the performance of the Buyer under this Agreement and under the Promissory Note; and (iv) the Parties will deliver the signed LLC Agreement.

2.    Representations and Warranties Concerning the Transaction.

    2.1    Representations and Warranties of the Seller. The Seller represents and warrants to the Buyer that the statements contained in this paragraph 2.1 are correct and complete as of the date of this Agreement with respect to the Seller.

        2.1.1    Authorization of Transaction. The Seller, duly organized and in good standing, has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Seller, enforceable in accordance with its terms and conditions. The Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

        2.1.2    Noncontravention. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Seller is subject, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which the Seller is bound or to which any of its assets is subject.

        2.1.3    The Seller's Interest. The Seller holds and owns beneficially the Seller's Interest, free and clear of any restrictions on transfer (other than any restrictions under the Company Agreements, and under the Securities Act and state securities laws), taxes, Security Interests, options, warrants, purchase rights, contracts, commitments, equities, claims, and demands. The Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, or otherwise dispose of the Seller's Interest (other than this Agreement or the Company Agreements). The Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of the Seller's Interest.

        2.1.4    Liabilities. There are no outstanding audits or investigations of the Company by the IRS or any other governmental agency, no litigation or, to the knowledge of the Seller, no outstanding claims or threatened litigation.

    2.2    Representations and Warranties of the Buyer. The Buyer represents and warrants to the Seller that the statements contained in this paragraph 2.2 are correct and complete as of the date of this Agreement.

        2.2.1    Authorization of Transaction. The Buyer has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This

Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms and conditions. The Buyer need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

2.2.2 <u>Noncontravention</u>. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which the Buyer is bound or to which any of its assets is subject.

2.2.3 <u>Investment</u>. The Buyer (i) understands that the Seller's Interest has not been, and will not be, registered under the Securities Act, or under any state securities laws, and is being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering and (ii) is acquiring the Seller's Interest solely for its own account for investment purposes, and not with a view to the distribution thereof within the meaning of the Securities Act, (iii) has received certain information concerning the Company and has had the opportunity to obtain additional information as desired in order to evaluate the merits and the risks inherent in acquiring the Seller's Interest.

2.2.4 <u>Representations and Warranties Concerning the Company</u>. The Buyer represents and warrants to the Seller that Buyer is fully aware of the financial condition of the Company and activities conducted by the Company. Except as provided in paragraph 2.1.4, the Buyer has relied upon its own independent business judgment and not upon any representations or warranties of the Seller regarding the Company's financial condition or its activities.

3.    <u>Post-Closing</u>. The Parties agree as follows with respect to the period following the Closing.

3.1    <u>General</u>. In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party.

3.2    <u>Survival of Representations and Warranties</u>. All of the representations and warranties of the Parties contained in this Agreement (including the representations and warranties of the Parties contained in Section 2 above) shall survive the Closing (even if the damaged Party knew or had reason to know of any misrepresentation or breach of warranty at the time of Closing) and continue in full force and effect for a period of three (3) years thereafter.

4.    <u>Definitions</u>.

"<u>Buyer</u>" has the meaning set forth in the preface above.

"<u>Closing</u>" has the meaning set forth in paragraph 1.4 above.

"<u>Company Agreements</u>" means the Certificate of Formation filed with the State of Delaware on February 28, 2017, and the LLC Agreement dated April 1, 2017.

"<u>Party</u>" has the meaning set forth in the preface above.

"<u>Person</u>" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"<u>Purchase Price</u>" has the meaning set forth in paragraph 1.3 above.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Seller</u>" has the meaning set forth in the preface above.

5.    <u>Miscellaneous</u>.

5.1    <u>No Third-Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

5.2    <u>Entire Agreement</u>.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

5.3    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of his or its rights, interests, or obligations hereunder without the prior written approval of the other Parties.

5.4    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

5.5    <u>Headings</u>.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(a)    <u>Notices</u>.  Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile, (iii) email, (iv) by overnight courier or (v) by registered or

1263120.3                                                4

certified mail, postage pre-paid and return receipt requested, addressed to the appropriate recipient at the last known home address of such recipient.

Any notice which is personally delivered or delivered by facsimile shall be deemed effective upon the date of delivery (or refusal to accept delivery). Any notice which is mailed by overnight courier or by registered or certified mail shall be deemed delivered on the second day after mailing.

5.6    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.

5.7    <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by all the Parties hereto. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

5.8    <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

5.9    <u>Expenses</u>. Except as otherwise provided in this Agreement, each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

5.10    <u>Arbitration</u>. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

*[signature page to follow]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

**SELLER:**                                      **COMPANY:**

MAXIMUM LEGAL HOLDINGS, LLC        MAXIMUM LEGAL, LLC

By: _____        By: _____
Philip J. Layfield, Manager                    Philip J. Layfield, Manager

**BUYER:**

THE BARRETT LAW FIRM, APC

By: _____
Joseph M. Barret, President

**EXHIBIT "A"**

**SECURED NON-RECOURSE PROMISSORY NOTE**
[attach]

1263120.3

## SECURED NON-RECOURSE PROMISSORY NOTE

$4,000,000.00                                                          June 1, 2017

FOR VALUE RECEIVED, the undersigned, THE BARRETT LAW FIRM, APC (the "Buyer"), promises to pay to MAXIMUM LEGAL HOLDINGS, LLC, a Delaware limited liability company (together with its successors and assigns, the "Seller"), or order, the principal amount of FOUR MILLION DOLLARS and 00/100 CENTS ($4,000,000.00) with interest on the unpaid principal balance of the Note at EIGHT PERCENT (8%) per annum.

1.  Payments.  The principal and interest shall be paid every three (3) months ("quarterly payments") for ten (10) years (i.e. 40 total payments).  Each quarterly payment shall be in the amount of ONE HUNDRED FORTY-FIVE THOUSAND FIVE HUNDRED NINETY-THREE and 12/100 ($145,593.12).  The quarterly payments shall begin on October 1, 2017.

2.  Security.  To secure payment of this Note, Buyer has executed a Unit Pledge Agreement of even date herewith.

3.  Non-recourse Obligation.  Notwithstanding anything to the contrary stated herein, Seller agrees that for payment of this Note it will look solely to the collateral pledged in the Unit Pledge Agreement given to secure payment of this Note, and no other assets of Buyer shall be subject to levy, execution or other enforcement procedures for the satisfaction of the remedies of Buyer, or for any payment required to be made under this Note.

4.  Default.  The happening of any of the following enumerated events shall, without notice, at the option of the holder hereof, cause the entire unpaid principal of this Note, to become due and payable:

a.  Failure to pay quarterly payments within five (5) days of when due;

b.  Material default by the undersigned under this Note, the Unit Pledge Agreement, or the Unit Purchase Agreement which is not cured within five (5) days following written notice; or

c.  Buyer becomes insolvent, a receiver is appointed for any part of Buyer's property, Buyer makes an assignment for the benefit of creditors or any proceeding is commenced either by Buyer or against Buyer under any bankruptcy or insolvency laws.

5.  Prepayment.  This Note may be prepaid at any time.

6.  Waiver of Presentment, Demand, Dishonor.  All makers, endorsers, guarantors and sureties of this Note, and each of them, hereby waive diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and specifically consent to and waive notice of any renewals or extensions of this Note, whether made to or in favor of the makers or any other person or persons.

1263120.3

7.  <u>Attorney's Fees</u>.  In the event that suit is brought hereon, or any attorney is employed or expenses are incurred to compel payment of this Note or any portion of the indebtedness evidenced hereby, the undersigned promises to pay such expenses and attorney's fees.

8.  <u>Governing Law</u>.  This Note shall be construed in accordance with the laws of the State of California.

9.  <u>Arbitration</u>.  Any dispute, claim or controversy arising out of or relating to this Note or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one arbitrator.  The arbitration shall be administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction.  This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

10. <u>Miscellaneous</u>.  The unenforceability or invalidity of any provision of this Note will not affect the enforceability or validity of any other provision of this Note.  The terms of this Note will bind the undersigned and inure to the benefit of Seller and its respective heirs, successors, assigns and legal representatives.  Seller may assign all or part of Seller's interest under this Note.

**"BUYER"**

THE BARRETT LAW FIRM, APC

By: *Joseph M. Barrett*
~~Joseph M. Barrett (Apr 10, 2017)~~
    Joseph M. Barrett
    Its President

**EXHIBIT "B"**

**UNIT PLEDGE AGREEMENT**
[attach]

1263120.3

## UNIT PLEDGE AGREEMENT

THIS UNIT PLEDGE AGREEMENT ("Pledge Agreement") is made and entered into as of June 1, 2017, by and between THE BARRETT LAW FIRM, APC (the "Pledgor"), and MAXIMUM LEGAL HOLDINGS, LLC, a Delaware limited liability company (the "Secured Party").

### RECITALS:

WHEREAS, Secured Party and Pledgor have entered into a Unit Purchase Agreement of even date herewith, whereby Pledgor has purchased from Secured Party, 2,500 voting units and 2,500 nonvoting units in Maximum Legal, LLC, a Delaware limited liability company (the "Membership Interest"); and

WHEREAS, the purchase of said Membership Interest is made pursuant to the terms of a Secured Non-Recourse Promissory Note (the "Note"), issued by Pledgor to Secured Party contemporaneously herewith.

WHEREAS, the Note provides, among other things, that Pledgor's performance of its obligations to Secured Party pursuant to the Note (the "Obligation"), shall be secured by the pledge of the Membership Interest (the "Collateral"), to Secured Party.

### AGREEMENT:

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the parties hereto hereby agree as follows:

1.      The Pledge. Pledgor hereby pledges, conveys, hypothecates, mortgages, assigns, sets over, delivers and grants to Secured Party a security interest in the Collateral as security for the payment and performance of the Obligation. Secured Party shall be entitled to hold the Collateral and to exercise rights incident thereto, subject, however, to the terms and conditions set forth herein.

2.      Representations, Warranties and Covenants Regarding Collateral. Pledgor hereby represents, warrants and covenants to and with Secured Party as follows:

(a)      No Liens or Security Collateral. Pledgor does not have, has not created, will not permit to exist, and has not permitted to exist, any lien, claim, charge, security interest or encumbrance with respect to the Collateral, other than those in favor of Secured Party.

(b)      Pledge of Collateral. Upon execution and delivery of this Pledge Agreement, if required by Secured Party, Pledgor shall deliver to Secured Party the documentation evidencing the Collateral, accompanied by such executed membership interest powers in blank, irrevocable proxies with respect to the Collateral and other instruments or documents as Secured Party or its counsel may reasonably request.

1263120.3

(c)    <u>Further Acts</u>.  Pledgor agrees to perform all acts and do all things which Secured Party may reasonably request, now or hereafter, to evidence, preserve or protect the creation, attachment or perfection of the security interest herein granted to Secured Party.

(d)    <u>Secured Party's Right to Take Action</u>.  In the event that Pledgor fails or refuses to perform any of its obligations set forth herein, Secured Party shall have the right, without obligation, to do all things it deems necessary or advisable to discharge the same.

3.    <u>Events of Default; Remedies</u>.

(a)    <u>Default</u>.  A default under the Note or Unit Purchase Agreement shall constitute an Event of Default hereunder.

(b)    <u>Secured Party's Rights and Remedies</u>.  Upon the occurrence of an Event of Default, Secured Party shall have only the right to retain pro-rata ownership of the Membership Interest included in the Collateral in an amount equal to the percentage that the principal sum and accrued interest thereon which remains outstanding on the date of maturity, or in the event of an event of default, thirty (30) days after a default which is uncured by the Pledgor.  Secured Party shall promptly deliver to Pledgor the Collateral, if any, it is not entitled to retain as of the date of maturity of the Note, thirty (30) days after a default which is uncured by the Pledgor, or such earlier date that the principal sum and accrued interest of the Note is paid in full.  For example purposes only, if twenty-five percent (25%) of the principal and the accrued interest thereon remains outstanding thirty (30) days after the date of a default or the maturity date, then Secured Party shall be entitled to retain twenty-five percent (25%) of the Membership Interest included in the Collateral and seventy-five (75%) of the Membership Interest included in the Collateral shall be returned by Secured Party to Pledgor.  Secured Party shall retain any and all rights as against Pledgor upon Pledgor's breach of its underlying obligations under the Unit Purchase Agreement.

4.    <u>Voting; Dividends and Distributions</u>.  Until an Event of Default, Pledgor shall be entitled to exercise the right to vote the Membership Interest included in the Collateral as a member.  So long as Pledgor is not in default of its obligations under the Notes and its underlying obligations under the Unit Purchase Agreement, any and all Membership Interest, other distributions, returns of capital or other distributions made on or in respect of the Collateral, shall be for the sole benefit of Pledgor and shall be forwarded by Secured Party to Pledgor.

5.    <u>Power of Attorney</u>.  Pledgor appoints Secured Party, or any other person whom Secured Party may designate, as Pledgor's attorney-in-fact, to take any action that Secured Party may deem reasonably deem necessary to accomplish the purposes of this Pledge Agreement; such action shall include, but not be limited to, the power to endorse Pledgor's name on any checks, notes, acceptances, money orders, drafts or other form of payment or security.  Pledgor ratifies and approves all acts of such attorney.  Neither Secured Party nor any other person designated by Secured Party as attorney-in-fact hereunder will be liable for any acts or omissions except in the case of willful misconduct or gross negligence on the part of Secured Party or such person, nor for any errors of judgment or mistakes of fact or law.  This power, coupled with an interest, is irrevocable until the satisfaction in full of the Obligations.

1263120.3                                                    2

6.    Termination of Pledge Agreement. This Pledge Agreement shall continue in full force and effect until the termination of the Note pursuant to the terms thereof and the satisfaction in full of the Obligation. Upon termination of this Pledge Agreement, Secured Party shall surrender to Pledgor or other person legally entitled thereto, without recourse or warranty, all documents held, if any, evidencing the Collateral which are in the possession of Secured Party and have not been disposed of pursuant to the terms of this Pledge Agreement.

7.    Obligations Unaffected. The validity and enforceability of the security interest granted hereunder and the rights of Secured Party hereunder shall not be affected by (i) the failure of Secured Party to assert any claim or demand or to enforce any right or remedy he may have against Pledgor pursuant to the Note or otherwise, (ii) any extension or renewal of any of the terms of the Note, (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of the Note, or (iv) the release of any security held by Secured Party for the Obligations.

8.    Waivers, Amendments; Successors and Assigns.

(a)    Waiver of Failure or Delay. Failure by Secured Party to exercise any right, remedy or option under this Pledge Agreement or in any other agreement between the parties hereto, or delay by Secured Party in exercising the same, will not operate as a waiver.

(b)    Written Waivers, Etc. No waiver by Secured Party will be effective unless it is in a writing signed by Secured Party, and then only to the extent specifically stated, and no waiver by Secured Party on any occasion shall affect or diminish Secured Party's right thereafter to require strict performance by Pledgor with any provision of this Pledge Agreement.

(c)    No Oral Amendments. This Pledge Agreement cannot be changed or terminated orally.

(d)    Successors and Assigns. All of the rights, privileges, remedies and options given to Secured Party hereunder shall inure to the benefit of its successors and permitted assigns; and all the terms, conditions, promises, covenants, provisions and warranties of this Pledge Agreement shall inure to the benefit of and shall bind the representatives, successors and permitted assigns of Secured Party and Pledgor.

9.    General Provisions.

(a)    Further Acts, Etc. Pledgor agrees to do such further acts and things, and to execute and deliver such additional conveyances, assignments, agreements and instruments, as Secured Party may at any time request in connection with the administration and enforcement of this Pledge Agreement or relative to the Collateral or any part thereof or in order better to assure and confirm unto Secured Party its rights and remedies hereunder.

(b)    Section Headings. Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Pledge Agreement.

1263120.3                                3

(c) <u>Severability</u>. Wherever possible, each provision of this Pledge Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Pledge Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Pledge Agreement.

(d) <u>Choice of Law</u>. This Pledge Agreement shall be deemed to be a contract made under the laws of the State of California for all purposes, and the validity of this Pledge Agreement and of all transactions provided for herein shall be governed by, interpreted and construed under, and in accordance with, the internal laws (and not the law of conflicts) of the State of California.

(e) <u>Arbitration</u>. Any dispute, claim or controversy arising out of or relating to this Pledge Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

10. <u>Integration; Counterparts</u>. This Pledge Agreement, the Note and the Unit Purchase Agreement embody the entire agreement among the parties hereto with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, oral or written, with respect thereof. This Pledge Agreement may be signed in counterparts, all of which taken together shall constitute a single document.

IN WITNESS WHEREOF, the parties hereto have caused this Pledge Agreement to be executed as of the date first above written.

**"SECURED PARTY"**

MAXIMUM LEGAL HOLDINGS, LLC

By: _____
Philip Layfield (Apr 6, 2017)
Philip J. Layfield, Manager

**"PLEDGOR"**

THE BARRETT LAW FIRM, APC

By: _____
Joseph M. Barrett (Apr 10, 2017)
Joseph M. Barrett, President

1263120.3                                    4

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR GOOD AND VALUABLE CONSIDERATION, MAXIMUM LEGAL HOLDINGS, LLC, a Delaware limited liability company ("Assignor"), hereby irrevocably assigns, transfers, conveys and sets over to THE BARRETT LAW FIRM, APC, ("Assignee") 2,500 voting units and 2,500 nonvoting units of MAXIMUM LEGAL, LLC, a Delaware limited liability company ("Membership Interest"). Assignee shall hereafter be entitled to all rights and be subject to all duties of ownership and the capital account of the Assignee shall be credited with all capital contributions associated with the interest herein transferred.

Assignor warrants that Assignor is the sole owner of the Membership Interest and that such interest is being transferred free and clear of any liens or claims of any third party.

Furthermore, MAXIMUM LEGAL, LLC shall issue Unit Certificates to Assignee consistent with this Assignment.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 1st day of June, 2017.

"ASSIGNOR"

MAXIMUM LEGAL HOLDINGS, LLC

By: _Philip Layfield (Apr 8, 2017)_ _____

Philip J. Layfield, Manager

"ASSIGNEE"

THE BARRETT LAW FIRM, APC

By: _Joseph M. Barrett (Apr 10, 2017)_ _____

Joseph M. Barrett, President

1263120.3

## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (this "Agreement") entered into effective as of June 1, 2017, by and among Maximum Legal Holdings, LLC, a Delaware limited liability company ( the "Seller"), Todd D. Wakefield, an individual (the "Buyer"), and Maximum Legal, LLC, a Delaware limited liability company (the "Company"). The Buyer, the Seller, and the Company may be referred to collectively herein as the "Parties" or each a "Party."

WHEREAS, the Seller is the sole member of the Company.

WHEREAS, the Seller owns 10,000 voting units and 10,000 nonvoting units in the Company, which represent a 100% interest in the capital and profits of the Company.

WHEREAS, the Seller proposes to sell 2,000 voting units and 2,000 nonvoting units in the Company, which represent a 20% interest in the capital and profits of the Company (the "Seller's Interest"), to the Buyer.

WHEREAS, the Buyer is willing to purchase the Seller's Interest from the Seller.

WHEREAS, this Agreement contemplates a transaction in which the Buyer will purchase from the Seller, and the Seller will sell to the Buyer, the Seller's Interest.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

1.    Purchase and Sale of Seller's Interest.

    1.1    Basic Transaction. On and subject to the terms and conditions of this Agreement, the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer, the Seller's Interest for the consideration specified below in this Section 1.

    1.2    Waiver of Right of First Refusal. The Company and the Seller waive any applicable rights to first refusal and consent to the admission of the Buyer as a "member" of the Company under the Company's Limited Liability Company Agreement ("LLC Agreement").

    1.3    Purchase Price. The Buyer agrees to pay $4,000,000.00 (the "Purchase Price") to the Seller by delivery at Closing (defined below) of a promissory note (substantially in the form of Exhibit "A" hereto) payable to the Seller in an amount equal the Purchase Price (the "Promissory Note").

    1.4    The Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall occur concurrently with the execution of this Agreement and shall be effective as of such date.

    1.5    Deliveries at the Closing. At the Closing: (i) the Buyer and the Seller will deliver the signed Agreement; (ii) the Buyer will deliver the Promissory Note to the Seller; (iii) the

1267966.1

Buyer will deliver to Seller a pledge agreement in the form attached hereto as Exhibit "B" (the "Pledge Agreement"), which shall secure the performance of the Buyer under this Agreement and under the Promissory Note; and (iv) the Parties will deliver the signed LLC Agreement.

2.      Representations and Warranties Concerning the Transaction.

2.1     Representations and Warranties of the Seller. The Seller represents and warrants to the Buyer that the statements contained in this paragraph 2.1 are correct and complete as of the date of this Agreement with respect to the Seller.

2.1.1   Authorization of Transaction. The Seller, duly organized and in good standing, has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Seller, enforceable in accordance with its terms and conditions. The Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

2.1.2   Noncontravention. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Seller is subject, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which the Seller is bound or to which any of its assets is subject.

2.1.3   The Seller's Interest. The Seller holds and owns beneficially the Seller's Interest, free and clear of any restrictions on transfer (other than any restrictions under the Company Agreements, and under the Securities Act and state securities laws), taxes, Security Interests, options, warrants, purchase rights, contracts, commitments, equities, claims, and demands. The Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, or otherwise dispose of the Seller's Interest (other than this Agreement or the Company Agreements). The Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of the Seller's Interest.

2.1.4   Liabilities. There are no outstanding audits or investigations of the Company by the IRS or any other governmental agency, no litigation or, to the knowledge of the Seller, no outstanding claims or threatened litigation.

2.2     Representations and Warranties of the Buyer. The Buyer represents and warrants to the Seller that the statements contained in this paragraph 2.2 are correct and complete as of the date of this Agreement.

2.2.1   Authorization of Transaction. The Buyer has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This

Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms and conditions. The Buyer need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

2.2.2    Noncontravention. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which the Buyer is bound or to which any of its assets is subject.

2.2.3    Investment. The Buyer (i) understands that the Seller's Interest has not been, and will not be, registered under the Securities Act, or under any state securities laws, and is being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering and (ii) is acquiring the Seller's Interest solely for its own account for investment purposes, and not with a view to the distribution thereof within the meaning of the Securities Act, (iii) has received certain information concerning the Company and has had the opportunity to obtain additional information as desired in order to evaluate the merits and the risks inherent in acquiring the Seller's Interest.

2.2.4    Representations and Warranties Concerning the Company. The Buyer represents and warrants to the Seller that Buyer is fully aware of the financial condition of the Company and activities conducted by the Company. Except as provided in paragraph 2.1.4, the Buyer has relied upon its own independent business judgment and not upon any representations or warranties of the Seller regarding the Company's financial condition or its activities.

3.    Post-Closing. The Parties agree as follows with respect to the period following the Closing.

3.1    General. In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party.

3.2    Survival of Representations and Warranties. All of the representations and warranties of the Parties contained in this Agreement (including the representations and warranties of the Parties contained in Section 2 above) shall survive the Closing (even if the damaged Party knew or had reason to know of any misrepresentation or breach of warranty at the time of Closing) and continue in full force and effect for a period of three (3) years thereafter.

4.    <u>Definitions</u>.

"<u>Buyer</u>" has the meaning set forth in the preface above.

"<u>Closing</u>" has the meaning set forth in paragraph 1.4 above.

"<u>Company Agreements</u>" means the Certificate of Formation filed with the State of Delaware on February 28, 2017, and the LLC Agreement dated April 1, 2017.

"<u>Party</u>" has the meaning set forth in the preface above.

"<u>Person</u>" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"<u>Purchase Price</u>" has the meaning set forth in paragraph 1.3 above.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Seller</u>" has the meaning set forth in the preface above.

5.    <u>Miscellaneous</u>.

5.1    <u>No Third-Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

5.2    <u>Entire Agreement</u>.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

5.3    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of his or its rights, interests, or obligations hereunder without the prior written approval of the other Parties.

5.4    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

5.5    <u>Headings</u>.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(a)    <u>Notices</u>.  Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile, (iii) email, (iv) by overnight courier or (v) by registered or

certified mail, postage pre-paid and return receipt requested, addressed to the appropriate recipient at the last known home address of such recipient.

Any notice which is personally delivered or delivered by facsimile shall be deemed effective upon the date of delivery (or refusal to accept delivery). Any notice which is mailed by overnight courier or by registered or certified mail shall be deemed delivered on the second day after mailing.

5.6    Governing Law. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.

5.7    Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by all the Parties hereto. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

5.8    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

5.9    Expenses. Except as otherwise provided in this Agreement, each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

5.10    Arbitration. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

*[signature page to follow]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

SELLER:                                COMPANY:

MAXIMUM LEGAL HOLDINGS, LLC             MAXIMUM LEGAL, LLC

By: _____          By: _____
Philip J. Layfield, Manager               Philip J. Layfield, Manager

BUYER:

TODD D. WAKEFIELD

_____
Todd D. Wakefield

1267966.1                            6

**EXHIBIT "A"**

**SECURED NON-RECOURSE PROMISSORY NOTE**
[attach]

1267966.1

## SECURED NON-RECOURSE PROMISSORY NOTE

$4,000,000.00                                                                                          June 1, 2017

FOR VALUE RECEIVED, the undersigned, TODD D. WAKEFIELD (the "Buyer"), promises to pay to MAXIMUM LEGAL HOLDINGS, LLC, a Delaware limited liability company (together with its successors and assigns, the "Seller"), or order, the principal amount of FOUR MILLION DOLLARS and 00/100 CENTS ($4,000,000.00) with interest on the unpaid principal balance of the Note at EIGHT PERCENT (8%) per annum.

1. Payments. The principal and interest shall be paid every three (3) months ("quarterly payments") for ten (10) years (i.e. 40 total payments). Each quarterly payment shall be in the amount of ONE HUNDRED FORTY-FIVE THOUSAND FIVE HUNDRED NINETY-THREE and 12/100 ($145,593.12). The quarterly payments shall begin on October 1, 2017.

2. Security. To secure payment of this Note, Buyer has executed a Unit Pledge Agreement of even date herewith.

3. Non-recourse Obligation. Notwithstanding anything to the contrary stated herein, Seller agrees that for payment of this Note it will look solely to the collateral pledged in the Unit Pledge Agreement given to secure payment of this Note, and no other assets of Buyer shall be subject to levy, execution or other enforcement procedures for the satisfaction of the remedies of Buyer, or for any payment required to be made under this Note.

4. Default. The happening of any of the following enumerated events shall, without notice, at the option of the holder hereof, cause the entire unpaid principal of this Note, to become due and payable:

    a.    Failure to pay quarterly payments within five (5) days of when due;

    b.    Material default by the undersigned under this Note, the Unit Pledge Agreement, or the Unit Purchase Agreement which is not cured within five (5) days following written notice; or

    c.    Buyer becomes insolvent, a receiver is appointed for any part of Buyer's property, Buyer makes an assignment for the benefit of creditors or any proceeding is commenced either by Buyer or against Buyer under any bankruptcy or insolvency laws.

5. Prepayment. This Note may be prepaid at any time.

6. Waiver of Presentment, Demand, Dishonor. All makers, endorsers, guarantors and sureties of this Note, and each of them, hereby waive diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and specifically consent to and waive notice of any renewals or extensions of this Note, whether made to or in favor of the makers or any other person or persons.

1267966.1

7. <u>Attorney's Fees</u>. In the event that suit is brought hereon, or any attorney is employed or expenses are incurred to compel payment of this Note or any portion of the indebtedness evidenced hereby, the undersigned promises to pay such expenses and attorney's fees.

8. <u>Governing Law</u>. This Note shall be construed in accordance with the laws of the State of California.

9. <u>Arbitration</u>. Any dispute, claim or controversy arising out of or relating to this Note or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

10. <u>Miscellaneous</u>. The unenforceability or invalidity of any provision of this Note will not affect the enforceability or validity of any other provision of this Note. The terms of this Note will bind the undersigned and inure to the benefit of Seller and its respective heirs, successors, assigns and legal representatives. Seller may assign all or part of Seller's interest under this Note.

"BUYER"

*Todd Wakefield (Apr 10, 2017)*

TODD D. WAKEFIELD

1267966.1                           2

EXHIBIT "B"

UNIT PLEDGE AGREEMENT
[attach]

1267966.1

## UNIT PLEDGE AGREEMENT

THIS UNIT PLEDGE AGREEMENT ("Pledge Agreement") is made and entered into as of June 1, 2017, by and between TODD D. WAKEFIELD, an individual (the "Pledgor"), and MAXIMUM LEGAL HOLDINGS, LLC, a Delaware limited liability company (the "Secured Party").

### RECITALS:

WHEREAS, Secured Party and Pledgor have entered into a Unit Purchase Agreement of even date herewith, whereby Pledgor has purchased from Secured Party, 2,000 voting units and 2,000 nonvoting units in Maximum Legal, LLC, a Delaware limited liability company (the "Membership Interest"); and

WHEREAS, the purchase of said Membership Interest is made pursuant to the terms of a Secured Non-Recourse Promissory Note (the "Note"), issued by Pledgor to Secured Party contemporaneously herewith.

WHEREAS, the Note provides, among other things, that Pledgor's performance of its obligations to Secured Party pursuant to the Note (the "Obligation"), shall be secured by the pledge of the Membership Interest (the "Collateral"), to Secured Party.

### AGREEMENT:

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the parties hereto hereby agree as follows:

1.    The Pledge. Pledgor hereby pledges, conveys, hypothecates, mortgages, assigns, sets over, delivers and grants to Secured Party a security interest in the Collateral as security for the payment and performance of the Obligation.  Secured Party shall be entitled to hold the Collateral and to exercise rights incident thereto, subject, however, to the terms and conditions set forth herein.

2.    Representations, Warranties and Covenants Regarding Collateral. Pledgor hereby represents, warrants and covenants to and with Secured Party as follows:

(a)    No Liens or Security Collateral.  Pledgor does not have, has not created, will not permit to exist, and has not permitted to exist, any lien, claim, charge, security interest or encumbrance with respect to the Collateral, other than those in favor of Secured Party.

(b)    Pledge of Collateral. Upon execution and delivery of this Pledge Agreement, if required by Secured Party, Pledgor shall deliver to Secured Party the documentation evidencing the Collateral, accompanied by such executed membership interest powers in blank, irrevocable proxies with respect to the Collateral and other instruments or documents as Secured Party or its counsel may reasonably request.

1267966.1

(c)　　Further Acts. Pledgor agrees to perform all acts and do all things which Secured Party may reasonably request, now or hereafter, to evidence, preserve or protect the creation, attachment or perfection of the security interest herein granted to Secured Party.

(d)　　Secured Party's Right to Take Action. In the event that Pledgor fails or refuses to perform any of its obligations set forth herein, Secured Party shall have the right, without obligation, to do all things it deems necessary or advisable to discharge the same.

3.　　Events of Default; Remedies.

(a)　　Default. A default under the Note or Unit Purchase Agreement shall constitute an Event of Default hereunder.

(b)　　Secured Party's Rights and Remedies. Upon the occurrence of an Event of Default, Secured Party shall have only the right to retain pro-rata ownership of the Membership Interest included in the Collateral in an amount equal to the percentage that the principal sum and accrued interest thereon which remains outstanding on the date of maturity, or in the event of an event of default, thirty (30) days after a default which is uncured by the Pledgor. Secured Party shall promptly deliver to Pledgor the Collateral, if any, it is not entitled to retain as of the date of maturity of the Note, thirty (30) days after a default which is uncured by the Pledgor, or such earlier date that the principal sum and accrued interest of the Note is paid in full. For example purposes only, if twenty-five percent (25%) of the principal and the accrued interest thereon remains outstanding thirty (30) days after the date of a default or the maturity date, then Secured Party shall be entitled to retain twenty-five percent (25%) of the Membership Interest included in the Collateral and seventy-five (75%) of the Membership Interest included in the Collateral shall be returned by Secured Party to Pledgor. Secured Party shall retain any and all rights as against Pledgor upon Pledgor's breach of his underlying obligations under the Unit Purchase Agreement.

4.　　Voting; Dividends and Distributions. Until an Event of Default, Pledgor shall be entitled to exercise the right to vote the Membership Interest included in the Collateral as a member. So long as Pledgor is not in default of his obligations under the Notes and his underlying obligations under the Unit Purchase Agreement, any and all Membership Interest, other distributions, returns of capital or other distributions made on or in respect of the Collateral, shall be for the sole benefit of Pledgor and shall be forwarded by Secured Party to Pledgor.

5.　　Power of Attorney. Pledgor appoints Secured Party, or any other person whom Secured Party may designate, as Pledgor's attorney-in-fact, to take any action that Secured Party may deem reasonably deem necessary to accomplish the purposes of this Pledge Agreement; such action shall include, but not be limited to, the power to endorse Pledgor's name on any checks, notes, acceptances, money orders, drafts or other form of payment or security. Pledgor ratifies and approves all acts of such attorney. Neither Secured Party nor any other person designated by Secured Party as attorney-in-fact hereunder will be liable for any acts or omissions except in the case of willful misconduct or gross negligence on the part of Secured Party or such person, nor for any errors of judgment or mistakes of fact or law. This power, coupled with an interest, is irrevocable until the satisfaction in full of the Obligations.

6.    <u>Termination of Pledge Agreement</u>.  This Pledge Agreement shall continue in full force and effect until the termination of the Note pursuant to the terms thereof and the satisfaction in full of the Obligation.  Upon termination of this Pledge Agreement, Secured Party shall surrender to Pledgor or other person legally entitled thereto, without recourse or warranty, all documents held, if any, evidencing the Collateral which are in the possession of Secured Party and have not been disposed of pursuant to the terms of this Pledge Agreement.

7.    <u>Obligations Unaffected</u>.  The validity and enforceability of the security interest granted hereunder and the rights of Secured Party hereunder shall not be affected by (i) the failure of Secured Party to assert any claim or demand or to enforce any right or remedy he may have against Pledgor pursuant to the Note or otherwise, (ii) any extension or renewal of any of the terms of the Note, (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of the Note, or (iv) the release of any security held by Secured Party for the Obligations.

8.    <u>Waivers, Amendments; Successors and Assigns</u>.

(a)    <u>Waiver of Failure or Delay</u>.  Failure by Secured Party to exercise any right, remedy or option under this Pledge Agreement or in any other agreement between the parties hereto, or delay by Secured Party in exercising the same, will not operate as a waiver.

(b)    <u>Written Waivers, Etc</u>.  No waiver by Secured Party will be effective unless it is in a writing signed by Secured Party, and then only to the extent specifically stated, and no waiver by Secured Party on any occasion shall affect or diminish Secured Party's right thereafter to require strict performance by Pledgor with any provision of this Pledge Agreement.

(c)    <u>No Oral Amendments</u>.  This Pledge Agreement cannot be changed or terminated orally.

(d)    <u>Successors and Assigns</u>.  All of the rights, privileges, remedies and options given to Secured Party hereunder shall inure to the benefit of its successors and permitted assigns; and all the terms, conditions, promises, covenants, provisions and warranties of this Pledge Agreement shall inure to the benefit of and shall bind the representatives, successors and permitted assigns of Secured Party and Pledgor.

9.    <u>General Provisions</u>.

(a)    <u>Further Acts, Etc</u>.  Pledgor agrees to do such further acts and things, and to execute and deliver such additional conveyances, assignments, agreements and instruments, as Secured Party may at any time request in connection with the administration and enforcement of this Pledge Agreement or relative to the Collateral or any part thereof or in order better to assure and confirm unto Secured Party its rights and remedies hereunder.

(b)    <u>Section Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Pledge Agreement.

1267966.1                                    3

(c)    Severability.  Wherever possible, each provision of this Pledge Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Pledge Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Pledge Agreement.

(d)    Choice of Law.  This Pledge Agreement shall be deemed to be a contract made under the laws of the State of California for all purposes, and the validity of this Pledge Agreement and of all transactions provided for herein shall be governed by, interpreted and construed under, and in accordance with, the internal laws (and not the law of conflicts) of the State of California.

(e)    Arbitration.  Any dispute, claim or controversy arising out of or relating to this Pledge Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one arbitrator.  The arbitration shall be administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures.  Judgment on the award may be entered in any court having jurisdiction.  This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

10.    Integration; Counterparts.    This Pledge Agreement, the Note and the Unit Purchase Agreement embody the entire agreement among the parties hereto with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, oral or written, with respect thereof.  This Pledge Agreement may be signed in counterparts, all of which taken together shall constitute a single document.

IN WITNESS WHEREOF, the parties hereto have caused this Pledge Agreement to be executed as of the date first above written.

"SECURED PARTY"

MAXIMUM LEGAL HOLDINGS, LLC


By: _____
Philip J. Layfield, Manager


"PLEDGOR"

_____
TODD D. WAKEFIELD


1267966.1                                   4

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR GOOD AND VALUABLE CONSIDERATION, MAXIMUM LEGAL HOLDINGS, LLC, a Delaware limited liability company ("Assignor"), hereby irrevocably assign, transfer, convey and set over to TODD D. WAKEFIELD ("Assignee") 2,000 voting units and 2,000 nonvoting units of MAXIMUM LEGAL, LLC, a Delaware limited liability company ("Membership Interest"). Assignee shall hereafter be entitled to all rights and be subject to all duties of ownership and the capital account of the Assignee shall be credited with all capital contributions associated with the interest herein transferred.

Assignor warrants that Assignor is the sole owner of the Membership Interest and that such interest is being transferred free and clear of any liens or claims of any third party.

Furthermore, MAXIMUM LEGAL, LLC shall issue Unit Certificates to Assignee consistent with this Assignment.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 1st day of June, 2017.

"ASSIGNOR"

MAXIMUM LEGAL HOLDINGS, LLC

By: Philip Layfield (Apr 8, 2017)

Philip J. Layfield, Manager

"ASSIGNEE"

Todd Wakefield (Apr 10, 2017)

TODD D. WAKEFIELD

1267966.1

# Unit Purchase Agreement Package

Adobe Sign Document History                         04/10/2017

| | |
|---|---|
| Created: | 04/08/2017 |
| By: | Todd Wakefield (T.wakefield@layfieldbarrett.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAP6uM5x-8G2CuZx-MegTv7DdBj07qTQd3 |

## "Unit Purchase Agreement Package" History

📄 Document created by Todd Wakefield (T.wakefield@layfieldbarrett.com)
04/08/2017 - 12:29:58 PM PDT- IP address: 107.191.0.140

📧 Document emailed to Philip Layfield (p@layfieldbarrett.com) for signature
04/08/2017 - 12:34:34 PM PDT

📄 Document viewed by Philip Layfield (p@layfieldbarrett.com)
04/08/2017 - 12:36:28 PM PDT- IP address: 68.225.252.76

✏️ Document e-signed by Philip Layfield (p@layfieldbarrett.com)
Signature Date: 04/08/2017 - 12:37:14 PM PDT - Time Source: server- IP address: 68.225.252.76

📧 Document emailed to Joseph M. Barrett (joe@layfieldbarrett.com) for signature
04/08/2017 - 12:37:15 PM PDT

📄 Document viewed by Joseph M. Barrett (joe@layfieldbarrett.com)
04/08/2017 - 1:13:13 PM PDT- IP address: 12.9.159.18

📄 Document viewed by Joseph M. Barrett (joe@layfieldbarrett.com)
04/10/2017 - 3:42:54 PM PDT- IP address: 12.9.159.18

✏️ Document e-signed by Joseph M. Barrett (joe@layfieldbarrett.com)
Signature Date: 04/10/2017 - 4:31:13 PM PDT - Time Source: server- IP address: 12.9.159.18

📧 Document emailed to Todd Wakefield (T.wakefield@layfieldbarrett.com) for signature
04/10/2017 - 4:31:14 PM PDT

📄 Document viewed by Todd Wakefield (T.wakefield@layfieldbarrett.com)
04/10/2017 - 5:07:14 PM PDT- IP address: 50.232.165.98


POWERED BY
Adobe Sign

Document e-signed by Todd Wakefield (T.wakefield@layfieldbarrett.com)
Signature Date: 04/10/2017 - 5:07:48 PM PDT - Time Source: server- IP address: 50.232.165.98

Signed document emailed to Joseph M. Barrett (joe@layfieldbarrett.com), Todd Wakefield
(T.wakefield@layfieldbarrett.com) and Philip Layfield (p@layfieldbarrett.com)
04/10/2017 - 5:07:48 PM PDT

L&B
LAYFIELD
BARRETT

POWERED BY
Adobe Sign

FILED

SEP 26 2017

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

1    STATE BAR OF CALIFORNIA
     OFFICE OF CHIEF TRIAL COUNSEL
2    STEVEN J. MOAWAD, No. 190358
     CHIEF TRIAL COUNSEL
3    MELANIE LAWRENCE, No. 230102
     DEPUTY CHIEF TRIAL COUNSEL
4    JOHN T. KELLEY, No. 193646
     ASSISTANT CHIEF TRIAL COUNSEL
5    MICHAEL J. GLASS, No. 102700
     SUPERVISING ATTORNEY
6    ELI D. MORGENSTERN, No. 190560
     SENIOR TRIAL COUNSEL
7    845 South Figueroa Street
     Los Angeles, California 90017-2515
8    Telephone: (213) 765-1334

9

10                          STATE BAR COURT

11                  HEARING DEPARTMENT - LOS ANGELES

12

13   In the Matter of:                )   Case No.  17-O-04140; 17-O-04198;
                                       )             17-O-04754
14   PHILIP JAMES LAYFIELD,            )
     No. 204836,                       )   FIRST AMENDED NOTICE OF
15                                     )   DISCIPLINARY CHARGES
                                       )
16   A Member of the State Bar.        )
                                       )
17                    **NOTICE - FAILURE TO RESPOND!**

18       **IF YOU FAIL TO FILE A WRITTEN ANSWER TO THIS NOTICE
     WITHIN 20 DAYS AFTER SERVICE, OR IF YOU FAIL TO APPEAR AT
19   THE STATE BAR COURT TRIAL:**

20       **(1)  YOUR DEFAULT WILL BE ENTERED;**
         **(2)  YOUR STATUS WILL BE CHANGED TO INACTIVE AND YOU
21              WILL NOT BE PERMITTED TO PRACTICE LAW;**
         **(3)  YOU WILL NOT BE PERMITTED TO PARTICIPATE FURTHER IN
22              THESE PROCEEDINGS UNLESS YOU MAKE A TIMELY MOTION
                AND THE DEFAULT IS SET ASIDE, AND;**
23       **(4)  YOU SHALL BE SUBJECT TO ADDITIONAL DISCIPLINE.
                SPECIFICALLY, IF YOU FAIL TO TIMELY MOVE TO SET ASIDE
24              OR VACATE YOUR DEFAULT, THIS COURT WILL ENTER AN
                ORDER RECOMMENDING YOUR DISBARMENT WITHOUT
25              FURTHER HEARING OR PROCEEDING. SEE RULE 5.80 ET SEQ.,
                RULES OF PROCEDURE OF THE STATE BAR OF CALIFORNIA.**

26

27   ///

28
                                -1-

kwiktag®     226 153 331

The State Bar of California alleges:

JURISDICTION

   1.  Philip James Layfield ("respondent") was admitted to the practice of law in the State of California on December 7, 1999, was a member at all times pertinent to these charges, and is currently a member of the State Bar of California.

COUNT ONE

Case No. 17-O-04140<br>Rules of Professional Conduct, rule 4-100(A)<br>[Failure to Maintain Client Funds in Trust Account]

   2.  Between in or about 2016, and in or about May 2017, respondent was the President and 90% owner of Layfield & Barrett, APC ("L&B"). From in or about May 2017 to the present, respondent has been the President and sole beneficial owner of L&B. At all times relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at Esquire Bank, account no. 401200xxxx[1] ("L&B's client trust account").

   3.  On or about February 23, 2017, respondent, or an employee of L&B, received on behalf of L&B's client, Patricia Casas, a settlement check in the amount of $595,001. On or about February 23, 2017, respondent, or an employee of L&B, also received a settlement check on behalf of L&B's client, Issac Casas, Ms. Casas' son, a settlement check in the amount of $4,999. On or about February 23, 2017, respondent deposited, or caused to be deposited, the $600,000 ($595,001+$4,999) into L&B's client trust account on behalf of Ms. Casas and her son. Of this amount, Ms. Casas, her son, and their lienholders were entitled to receive $360,000. Respondent failed to maintain a balance of $360,000 on behalf of Ms. Casas, her son, and their lienholders in L&B's client trust account, in willful violation of Rules of Professional Conduct, rule 4-100(A).

/ / /

/ / /

/ / /

---

[1] The full account number is omitted for privacy reasons.

-2-

<u>COUNT TWO</u>

Case No. 17-O-04140
Business and Professions Code, section 6106
[Moral Turpitude – Misappropriation]

4.   Between in or about 2016, and in or about May 2017, respondent was the President and 90% owner of Layfield & Barrett, APC ("L&B"). From in or about May 2017 to the present, respondent has been the President and sole beneficial owner of L&B. At all times relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at Esquire Bank, account no. 401200xxxx[2] ("L&B's client trust account").

5.   On or about February 23, 2017, respondent, or an employee of L&B, received on behalf of L&B's client, Patricia Casas, a settlement check in the amount of $595,001. On or about February 23, 2017, respondent, or an employee of L&B, also received a settlement check on behalf of L&B's client, Issac Casas, Ms. Casas' son, a settlement check in the amount of $4,999.

6.   On or about February 23, 2017, respondent deposited, or caused to be deposited, the $600,000 ($595,001+$4,999) into L&B's client trust account on behalf of Ms. Casas and her son. Of this amount, Ms. Casas, her son, and their lienholders were entitled to receive $360,000.

7.   Between on or about February 23, 2017, and on or about June 20, 2017, respondent willfully and intentionally misappropriated at least $359,942.15 ($360,000-$57.85) that Ms. Casas, her son, and their lienholders were entitled to receive. Respondent thereby committed an act involving moral turpitude, dishonesty or corruption in violation of Business and Professions Code, section 6106.

8.   A violation of section 6106 may result from intentional conduct or grossly negligent conduct. Respondent is charged with committing an intentional misappropriation. However, should the evidence at trial demonstrate that respondent misappropriated funds as a result of grossly negligent conduct, respondent must still be found culpable of violating section 6106

---

[2] The full account number is omitted for privacy reasons.

-3-

1  because misappropriation through gross negligence is a lesser included offense of intentional

2  misappropriation.

3                                    COUNT THREE

4                                Case No. 17-O-04140
                        Rules of Professional Conduct, rule 4-100(B)(3)
5                          [Failure to Render Accounts of Client Funds]

6      9.  Between in or about 2016, and in or about May 2017, respondent was the President

7  and 90% owner of Layfield & Barrett, APC ("L&B").  From in or about May 2017 to the

8  present, respondent has been the President and sole beneficial owner of L&B.  At all times

9  relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at

10  Esquire Bank, account no. 401200xxxx[3] ("L&B's client trust account").

11     10.  On or about February 23, 2017, respondent, or an employee of L&B, received on

12  behalf of L&B's client, Patricia Casas, a settlement check in the amount of $595,001.  On or

13  about February 23, 2017, respondent, or an employee of L&B, also received a settlement check

14  on behalf of L&B's client, Issac Casas, Ms. Casas' son, a settlement check in the amount of

15  $4,999.  On or about February 23, 2017, respondent deposited, or caused to be deposited, the

16  $600,000 ($595,001+$4,999) into L&B's client trust account on behalf of Ms. Casas and her son.

17  Respondent thereafter failed to render an appropriate accounting to Ms. Casas and her son

18  regarding those funds upon their termination of L&B's employment on or about March 30, 2017,

19  in willful violation of the Rules of Professional Conduct, rule 4-100(B)(3).

20

21                                    COUNT FOUR

22                                Case No. 17-O-04140
                        Rules of Professional Conduct, rule 4-100(B)(4)
23                          [Failure to Pay Client Funds Promptly]

24     11. Between in or about 2016, and in or about May 2017, respondent was the President

25  and 90% owner of Layfield & Barrett, APC ("L&B").  From in or about May 2017 to the

26  present, respondent has been the President and sole beneficial owner of L&B.  At all times

27  ─────────────────────
   [3] The full account number is omitted for privacy reasons.
28
                                        -4-

1    relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at

2    Esquire Bank, account no. 401200xxxx[4] ("L&B's client trust account").

3         12. On or about February 23, 2017, respondent, or an employee of L&B, received on

4    behalf of L&B's client, Patricia Casas, a settlement check in the amount of $595,001.  On or

5    about February 23, 2017, respondent, or an employee of L&B, also received a settlement check

6    on behalf of L&B's client, Issac Casas, Ms. Casas' son, a settlement check in the amount of

7    $4,999.  On or about February 23, 2017, respondent deposited, or caused to be deposited, the

8    $600,000 ($595,001+$4,999)  into L&B's client trust account on behalf of Ms. Casas and her

9    son.  Of this amount, Ms. Casas, her son, and their lienholders were entitled to receive $360,000.

10   On or about March 30, 2017, Ms. Casas and her son terminated L&B's employment and

11   requested that respondent turn-over their settlement funds to an attorney that Ms. Casas and her

12   son identified in their letter of March 30, 2017, so that this new attorney would be able to pay the

13   Casases' respective lienholders and disburse any remaining amounts to them.  To date,

14   respondent has failed to pay promptly, as requested by Ms. Casas and her son, any portion of the

15   $360,000 to Ms. Casas, her son, their attorney, or their respective lienholders, in willful violation

16   of Rules of Professional Conduct, rule 4-100(B)(4).

17                                   COUNT FIVE

18                                Case No. 17-O-04198
                          Rules of Professional Conduct, rule 4-100(A)
19                       [Failure to Maintain Client Funds in Trust Account]

20        13. Between in or about 2016, and in or about May 2017, respondent was the President

21   and 90% owner of Layfield & Barrett, APC ("L&B").  From in or about May 2017 to the

22   present, respondent has been the President and sole beneficial owner of L&B.  At all times

23   relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at

24   Esquire Bank, account no. 401200xxxx[5] ("L&B's client trust account").

25

26   _____
     [4] The full account number is omitted for privacy reasons.
27
     [5] The full account number is omitted for privacy reasons.
28

                                        -5-

1    14. On or about February 24, 2017, respondent, or an employee of L&B, received on

2 behalf of L&B's client, Rodney A. Pimentel, a settlement check in the amount of $1,350,000.

3 On or about February 24, 2017, respondent deposited, or caused to be deposited, the $1,350,000

4 into L&B's client trust account on behalf of Mr. Pimentel. Of this amount, Mr. Pimentel and his

5 lienholders were entitled to receive $742,500. Respondent failed to maintain a balance of

6 $742,500 on behalf of Mr. Pimentel and the lienholders in L&B's client trust account, in willful

7 violation of Rules of Professional Conduct, rule 4-100(A).

8

9            <u>COUNT SIX</u>

10          Case No. 17-O-04198
      Business and Professions Code, section 6106
11       [Moral Turpitude – Misappropriation]

12    15.  Between in or about 2016, and in or about May 2017, respondent was the President

13 and 90% owner of Layfield & Barrett, APC ("L&B"). From in or about May 2017 to the

14 present, respondent has been the President and sole beneficial owner of L&B. At all times

15 relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at

16 Esquire Bank, account no. 401200xxxx[6] ("L&B's client trust account").

17    16. On or about February 24, 2017, respondent , or an employee of L&B, received on

18 behalf of L&B's client, Rodney A. Pimentel, a settlement check in the amount of $1,350,000.

19    17. On or about February 24, 2017, respondent deposited, or caused to be deposited, the

20 $1,350,000 into L&B's client trust account on behalf of Mr. Pimentel. Of this amount,

21 Mr. Pimentel and his lienholders were entitled to receive $742,500.

22    18. Between on or about February 24, 2017, and on or about June 20, 2017, respondent

23 willfully and intentionally misappropriated at least $742,442.15 ($742,500-$57.85)  that Mr.

24 Pimentel and his lienholders were entitled to receive.  Respondent thereby committed an act

25 involving moral turpitude, dishonesty or corruption in violation of Business and Professions

26 Code, section 6106.

27 ―――――――――――
 [6] The full account number is omitted for privacy reasons.
28

           -6-

1    19. A violation of section 6106 may result from intentional conduct or grossly negligent

2 conduct.   Respondent is charged with committing an intentional misappropriation.   However,

3 should the evidence at trial demonstrate that respondent  misappropriated funds as a result of

4 grossly negligent conduct, respondent must still be found culpable of violating section 6106

5 because misappropriation through gross negligence is a lesser included offense of intentional

6 misappropriation.

7                                        COUNT SEVEN

8                                   Case No. 17-O-04198
                           Rules of Professional Conduct, rule 4-100(B)(3)
9                            [Failure to Render Accounts of Client Funds]

10    20. Between in or about 2016, and in or about May 2017, respondent was the President

11 and 90% owner of Layfield & Barrett, APC ("L&B").  From in or about May 2017 to the

12 present, respondent has been the President and sole beneficial owner of L&B.  At all times

13 relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at

14 Esquire Bank, account no. 401200xxxx[7] ("L&B's client trust account").

15    21.  On or about February 24, 2017, respondent, or an employee of L&B, received on

16 behalf of L&B's client, Rodney A. Pimentel, a settlement check in the amount of $1,350,000.

17 On or about February 24, 2017, respondent deposited, or caused to be deposited, the $1,350,000

18 into L&B's client trust account on behalf of Mr. Pimentel.  Respondent thereafter failed to render

19 an appropriate accounting to Mr. Pimentel regarding those funds following several written

20 demands made by an attorney, on behalf of Mr. Pimentel, between in or about April 2017 and in

21 or about June 2017, in willful violation of the Rules of Professional Conduct, rule 4-100(B)(3).

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 _____
[7] The full account number is omitted for privacy reasons.
28

-7-

## COUNT EIGHT

Case No. 17-O-04198
Rules of Professional Conduct, rule 4-100(B)(4)
[Failure to Pay Client Funds Promptly]

22.   Between in or about 2016, and in or about May 2017, respondent was the President and 90% owner of Layfield & Barrett, APC ("L&B").  From in or about May 2017 to the present, respondent has been the President and sole beneficial owner of L&B.  At all times relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at Esquire Bank, account no. 401200xxxx[8] ("L&B's client trust account").

23.   On or about February 24, 2017, respondent, or an employee of L&B, received on behalf of L&B's client, Rodney A. Pimentel, a settlement check in the amount of $1,350,000. On or about February 24, 2017, respondent deposited the $1,350,000 into L&B's client trust account on behalf of Mr. Pimentel.  Of this amount, Mr. Pimentel and his lienholders were entitled to receive $742,500.  Between in or about April 2017, and in or about June 2017, an attorney, on behalf of Mr. Pimentel, made several written requests that respondent pay : (1) Mr. Pimentel's lienholders; and (2) Mr. Pimentel his portion of the remaining $742,500 after payment of the liens.  To date, respondent has failed to pay promptly, as requested by Mr. Pimentel, any portion of the $742,500 to Mr. Pimentel or his lienholders, in willful violation of Rules of Professional Conduct, rule 4-100(B)(4).

## COUNT NINE

Case No. 17-O-04754
Rules of Professional Conduct, rule 4-100(A)
[Failure to Maintain Client Funds in Trust Account]

24.   Between in or about 2016, and in or about May 2017, respondent was the President and 90% owner of Layfield & Barrett, APC ("L&B").  From in or about May 2017 to the present, respondent has been the President and sole beneficial owner of L&B.  At all times

---

[8] The full account number is omitted for privacy reasons.

1  relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at

2  Esquire Bank, account no. 401200xxxx[9] ("L&B's client trust account").

3      25.  On or about August 29, 2016, respondent, or an employee of L&B, received on

4  behalf of L&B's client, Josephine Nguyen, two settlement checks in the aggregate amount of

5  $3,900,000.  On or about August 29, 2016, respondent deposited, or caused to be deposited, the

6  $3,900,000 into L&B's client trust account on behalf of Ms. Nguyen.  Of this amount,

7  Ms. Nguyen and her lienholders were entitled to receive $2,315,000.  Respondent failed to

8  maintain a balance of $2,315,000 on behalf of Ms. Nguyen and her lienholders in L&B's client

9  trust account, in willful violation of Rules of Professional Conduct, rule 4-100(A).

10                                    COUNT TEN

11                               Case No. 17-O-04754
                           Business and Professions Code, section 6106
12                              [Moral Turpitude – Misappropriation]

13      26.  Between in or about 2016, and in or about May 2017, respondent was the President

14  and 90% owner of Layfield & Barrett, APC ("L&B").  From in or about May 2017 to the

15  present, respondent has been the President and sole beneficial owner of L&B.  At all times

16  relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at

17  Esquire Bank, account no. 401200xxxx[10] ("L&B's client trust account").

18      27.  On or about August 29, 2016, respondent, or an employee of L&B, received on

19  behalf of L&B's client, Josephine Nguyen, two settlement checks in the aggregate amount of

20  $3,900,000.

21      28.  On or about August 29, 2016, respondent deposited, or caused to be deposited, the

22  $3,900,000 into L&B's client trust account at on behalf of Ms. Nguyen.  Of this amount,

23  Ms. Nguyen and her lienholders were entitled to receive $2,315,000.

24      29.  Between on or about August 29, 2016, and on or about June 20, 2017, respondent

25  willfully and intentionally misappropriated at least $2,314,942.20 ($2,315,000-$57.85) that

26  _____
   [9] The full account number is omitted for privacy reasons.

27  [10] The full account number is omitted for privacy reasons.

28

                                        -9-

1   Ms. Nguyen and her lienholders were entitled to receive.  Respondent thereby committed an act

2   involving moral turpitude, dishonesty or corruption in violation of Business and Professions

3   Code, section 6106.

4       30. A violation of section 6106 may result from intentional conduct or grossly negligent

5   conduct.  Respondent is charged with committing an intentional misappropriation.  However,

6   should the evidence at trial demonstrate that respondent  misappropriated funds as a result of

7   grossly negligent conduct, respondent must still be found culpable of violating section 6106

8   because misappropriation through gross negligence is a lesser included offense of intentional

9   misappropriation.

10                          COUNT ELEVEN
11                      Case No. 17-O-04754
                Rules of Professional Conduct, rule 4-100(B)(3)
12              [Failure to Render Accounts of Client Funds]

13      31. Between in or about 2016, and in or about May 2017, respondent was the President

14  and 90% owner of Layfield & Barrett, APC ("L&B").  From in or about May 2017 to the

15  present, respondent has been the President and sole beneficial owner of L&B.  At all times

16  relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at

17  Esquire Bank, account no. 401200xxxx[11] ("L&B's client trust account").

18      32. On or about August 29, 2016, respondent, or an employee of L&B, received on

19  behalf of L&B's client, Josephine Nguyen, two settlement checks in the aggregate amount of

20  $3,900,000.  On or about August 29, 2016, respondent deposited, or caused to be deposited, the

21  $3,900,000 into L&B's client trust account on behalf of Ms. Nguyen.  Respondent thereafter

22  failed to render an appropriate accounting to Ms. Nguyen regarding those funds following Ms.

23  Nguyen's termination of L&B on or about June 22, 2017, in willful violation of the Rules of

24  Professional Conduct, rule 4-100(B)(3).

25  / / /

26

27  _____
    [11] The full account number is omitted for privacy reasons.
28
                                -10-

## COUNT TWELVE

Case No. 17-O-04754
Rules of Professional Conduct, rule 4-100(B)(4)
[Failure to Pay Client Funds Promptly]

33.  Between in or about 2016, and in or about May 2017, respondent was the President and 90% owner of Layfield & Barrett, APC ("L&B").  From in or about May 2017 to the present, respondent has been the President and sole beneficial owner of L&B.  At all times relevant to the charges herein, respondent was the sole signatory on L&B's client trust account at Esquire Bank, account no. 401200xxxx[12] ("L&B's client trust account").

34.  On or about August 26, 2016, respondent, or an employee of L&B, received on behalf of L&B's client, Josephine Nguyen, two settlement checks in the aggregate amount of $3,900,000.  On or about August 26, 2016, respondent deposited, or caused to be deposited, the $3,900,000 into L&B's client trust account on behalf of Ms. Nguyen.  Of this amount, Ms. Nguyen and her lienholders were entitled to receive $2,315,000.  On or about June 22, 2017, an attorney wrote a letter to respondent on behalf of Ms. Nguyen terminating L&B's employment, and demanding that respondent disburse to the attorney the $2,315,000 that respondent was required to maintain in L&B's client trust account on behalf of Ms. Nguyen and her lienholders.  To date, respondent has failed to pay promptly, as requested by Ms. Nguyen, any portion of the $2,315,000 to Ms. Nguyen, her new attorney, or her lienholders, in willful violation of Rules of Professional Conduct, rule 4-100(B)(4).

## NOTICE - INACTIVE ENROLLMENT!

**YOU ARE HEREBY FURTHER NOTIFIED THAT IF THE STATE BAR COURT FINDS, PURSUANT TO BUSINESS AND PROFESSIONS CODE SECTION 6007(c), THAT YOUR CONDUCT POSES A SUBSTANTIAL THREAT OF HARM TO THE INTERESTS OF YOUR CLIENTS OR TO THE PUBLIC, YOU MAY BE INVOLUNTARILY ENROLLED AS AN INACTIVE MEMBER OF THE STATE BAR.  YOUR INACTIVE ENROLLMENT WOULD BE IN ADDITION TO ANY DISCIPLINE RECOMMENDED BY THE COURT.**

---

[12] The full account number is omitted for privacy reasons.

-11-

1

## NOTICE - COST ASSESSMENT!

IN THE EVENT THESE PROCEDURES RESULT IN PUBLIC
DISCIPLINE, YOU MAY BE SUBJECT TO THE PAYMENT OF COSTS
INCURRED BY THE STATE BAR IN THE INVESTIGATION, HEARING
AND REVIEW OF THIS MATTER PURSUANT TO BUSINESS AND
PROFESSIONS CODE SECTION 6086.10.

Respectfully submitted,

THE STATE BAR OF CALIFORNIA
OFFICE OF CHIEF TRIAL COUNSEL

DATED:  September 26, 2017            By:

Eli D. Morgenstern
Senior Trial Counsel

-12-

# DECLARATION OF SERVICE
by
U.S. FIRST-CLASS MAIL / U.S. CERTIFIED MAIL / OVERNIGHT DELIVERY / FACSIMILE–ELECTRONIC TRANSMISSION

CASE NUMBER(s): **17-O-04140; 17-O-04198; 17-O-04754**

I, the undersigned, am over the age of eighteen (18) years and not a party to the within action, whose business address and place of employment is the State Bar of California, 845 South Figueroa Street, Los Angeles, California 90017, declare that:

- on the date shown below, I caused to be served a true copy of the within document described as follows:

## FIRST AMENDED NOTICE OF DISCIPLINARY CHARGES

☐ **By U.S. First-Class Mail: (CCP 1013 and 1013(a))**            ☒ **By U.S. Certified Mail: (CCP §§ 1013 and 1013(a))**
- in accordance with the practice of the State Bar of California for collection and processing of mail, I deposited or placed for collection and mailing in the City and County
- of Los Angeles.

☐ **By Overnight Delivery: (CCP §§ 1013(c) and 1013(d))**
- I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for overnight delivery by the United Parcel Service ('UPS').

☐ **By Fax Transmission: (CCP §§ 1013(e) and 1013(f))**
Based on agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed herein below.  No error was reported by the fax machine that I used.  The original record of the fax transmission is retained on file and available upon request.

☐ **By Electronic Service: (CCP § 1010.6)**
Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the person(s) at the electronic addresses listed herein below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ *(for U.S. First-Class Mail)* in a sealed envelope placed for collection and mailing at Los Angeles, addressed to: *(see below)*

☒ *(for Certified Mail)* in a sealed envelope placed for collection and mailing as certified mail, return receipt requested,
Article No.:      7196 9008 9111 6409 9192            at Los Angeles, addressed to: *(see below)*

☐ *(for Overnight Delivery)* together with a copy of this declaration, in an envelope, or package designated by UPS,
Tracking No.:                  addressed to: *(see below)*

| Person Served | Business-Residential Address | Fax Number | Courtesy Copy to: |
|---|---|---|---|
| PHILIP JAMES LAYFIELD | 382 NE 191st St, #42308 MIAMI, FL 33179-3899 | **Electronic Address** | |

☐ **via inter-office mail regularly processed and maintained by the State Bar of California addressed to:**

**N/A**

I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for mailing with the United States Postal Service, and overnight delivery by the United Parcel Service ('UPS').  In the ordinary course of the State Bar of California's practice, correspondence collected and processed by the State Bar of California would be deposited with the United States Postal Service that same day, and for overnight delivery, deposited with delivery fees paid or provided for, with UPS that same day.

I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date on the envelope or package is more than one day after date of deposit for mailing contained in the affidavit.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.  Executed at Los Angeles, California, on the date shown below.

DATED:  **September 26, 2017**            SIGNED: _____
                                                         NATALIE FLORES
                                                         Declarant

State Bar of California
DECLARATION OF SERVICE

1  **LAYFIELD & BARRETT, APC**
   Philip Layfield, Esq. (SBN 204836)
2  382 NE 191st St. #42308
   Miami, FL 33179-3899
3  Telephone: (844) 993-3743
   Facsimile: (800) 644-9861
4
   Attorneys for Plaintiff,
5  *Skyler W. Teitelbaum*

6

7

**FILED**
Superior Court of California
County of Los Angeles

JUN 30 2017

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
Raul Sanchez

8          **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                        **COUNTY OF LOS ANGELES**

10

11  SKYLER TEITELBAUM, an individual,   | Case No: BC596036
                                          Assigned to: Ruth A. Kwan
12        Plaintiff,                      Dept. 72

13        v.                            **NOTICE OF CHANGE OF ADDRESS; AND
                                        NOTICE OF ASSOCIATION**
14  LYFT, INC., a Delaware corporation; SRC
    ENTERTAINMENT LLC, a California
15  limited liability corporation; SBE     Complaint Filed: September 28, 2015
    RESTAURANT GROUP, LLC, a Nevada       Trial Date: September 5, 2017
16  limited liability corporation; SBEEG
    HOLDINGS, LLC, a Delaware limited
17  liability corporation; and DOES 1 through
    21 Inclusive
18
          Defendants.
19

20

21  **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

22       PLEASE TAKE NOTICE THAT, effective immediately, LAYFIELD & BARRETT, APC

23  has changed its address from 633 West 5th Street, Suite 3300, Los Angeles, CA 90071, to:

24                        382 NE 191st St. #42308
                          Miami, FL 33179-3899
25
         PLEASE TAKE FURTHER NOTICE that Philip Layfield, attorney of record for Skyler
26
    Teitelbaum, hereby associates MAXIMUM LEGAL (CALIFORNIA), LLP as co-counsel for
27
    SKYLER TEITELBAUM.  **It is not necessary for LAYFIELD & BARRETT, APC to receive**
28

                                          1
    ──────────────────────────────────────────────────────────
       NOTICE OF CHANGE OF ADDRESS; AND NOTICE OF ASSOCIATION OF COUNSEL

EXHIBIT I  PAGE  105

LAYFIELD & BARRETT, APC
382 NE 191st ST. #42308, MIAMI, FL 33179-3899
Telephone: (844) 993-3743; Facsimile: (800) 644-9861

1  service of any documents in this case.  **It is sufficient to serve documents only on MAXIMUM**

2  **LEGAL (CALIFORNIA), LLP.**

3      The name, office address, telephone number, and facsimile number of the associated

4  counsel are as follows:

5                        **MAXIMUM LEGAL (CALIFORNIA), LLP**
                            Joe Barrett, Esq. (SBN 143974)
6                             joe@maximum-legal.com
                            Aaron Lavine, Esq. (SBN 260277)
7                            a.lavine@maximum-legal.com
                            Te'Aira Law, Esq. (SBN 289118)
8                             t.law@maximum-legal.com
                            633 West 5th Street, Suite 3300
9                              Los Angeles, CA 90071
                              Telephone: (844) 993-3743
10                             Facsimile: (800) 644-9861

11

12      Joe Barrett of MAXIMUM LEGAL (CALIFORNIA), LLP concurs in the filing of this

13  Notice of Association of Counsel.

14

15  Dated: June 29, 2017                    MAXIMUM LEGAL (CALIFORNIA), LLP

16

17                                    By:  _____
                                           Joe Barrett, Esq.
18                                         Attorney for Plaintiff, *Skyler Teitelbaum*

19

20      Philip Layfield of LAYFIELD & BARRETT, APC hereby accepts the above Association.

21

22  Dated: June 29, 2017                    LAYFIELD & BARRETT, APC

23

24                                    By:  _____
                                           Philip Layfield, Esq.
25                                         Attorney for Plaintiff, *Skyler Teitelbaum*

26

27

28

LAYFIELD & BARRETT, APC
382 NE 191ST ST. #42308, MIAMI, FL 33179-3899
Telephone: (844) 993-3743; Facsimile: (800) 644-9861

07/03/2017

                                         2
                NOTICE OF CHANGE OF ADDRESS; AND NOTICE OF ASSOCIATION OF COUNSEL

EXHIBIT I PAGE 106

LAYFIELD & BARRETT, APC
382 NE 191ST ST, #42208, MIAMI, FL 33179-3899
Telephone: (844) 993-3743; Facsimile: (800) 644-9861

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

C.C.P. Sections 1013

I, the undersigned, hereby certify that I am a citizen of the United States and over the age of eighteen; I work in the County of Los Angeles, California, in which County the within mailing took place; and I am not a party to the subject case. My business address is 633 West 5th Street, Suite 3300, Los Angeles, CA 90071.

I am familiar with the practice of this law firm for the collection and processing of documents for mailing with the United States Postal Service, that the documents would be deposited with the United States Postal Service that same day in the ordinary course of business.

On June 29, 2017, I placed the within document(s) described as:

**NOTICE OF CHANGE OF ADDRESS; AND NOTICE OF ASSOCIATION OF COUNSEL**

on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages with postage thereon fully prepaid, and following the ordinary business practices of this law firm, placed said envelope(s) for collection and mailing to the parties to the within action, at El Segundo, California, addressed as follows:

### SEE ATTACHED SERVICE LIST

☒    BY MAIL: I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon full prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐    VIA FACSIMILE TRANSMISSION [Complying with Code of Civil Procedure § 1013(e) and (f)]: from Fax number (800) 644-9861 to the fax number.

☐    BY UPS: I served such envelope or package to be delivered by UPS overnight service in an envelope or package designated by the UPS carrier.

☐    BY PERSONAL SERVICE: I personally delivered the documents listed above.

☒    BY ELECTRONIC SERVICE [Complying with Code of Civil Procedure § 1010]: I served the documents listed above to the email addresses in the attached Service List.

Executed on June 29, 2017, at Los Angeles, California 90071.

_____
Christina Hicklin

1
PROOF OF SERVICE

EXHIBIT I  PAGE  107

1

**SERVICE LIST**

2

3   Warren Metlitzky, Esq.
    wmetlitzky@conradmetlitzky.com
    Mark Conrad, Esq.

4   mconrad@conradmetlitzky.com
    CONRAD & METLITZKY LLP

5   Four Embarcadero Center, Suite 1400
    San Francisco, CA 94111

6   (415) 343-7100

7   Attorneys for Defendant
    Lyft, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAYFIELD & BARRETT, APC
382 NE 191ST ST. #42308, MIAMI, FL 33179-3899
Telephone: (844) 993-3743; Facsimile: (800) 644-9861

EXHIBIT I  PAGE  108



**CM-200**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Joe Barrett, Esq.                                                    SBN: 143974<br>MAXIMUM LEGAL (CALIFORNIA), LLP<br>633 West 5th Street, Suite 3300, Los Angeles, CA 90071<br>TELEPHONE NO.:(844) 993-3743      FAX NO. *(Optional):*(800) 644-9861<br>E-MAIL ADDRESS *(Optional):*joe@maximum-legal.com<br>ATTORNEY FOR *(Name):*Skyler Teitelbaum | FOR COURT USE ONLY<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>JUN 3 0 2017<br><br>Sherri R. Carter, Executive Officer/Clerk<br>By_____ Deputy<br>Raul Sanchez |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles 90012
BRANCH NAME: Stanley Mosk Courthouse

PLAINTIFF/PETITIONER:SKYLER TEITELBAUM

DEFENDANT/RESPONDENT:LYFT, INC., et al.

| | |
|---|---|
| **NOTICE OF SETTLEMENT OF ENTIRE CASE** | CASE NUMBER:<br>BC596036 |
| | JUDGE:Ruth A. Kwan |
| | DEPT.:72 |

---

**NOTICE TO PLAINTIFF OR OTHER PARTY SEEKING RELIEF**
You must file a request for dismissal of the entire case within 45 days after the date of the settlement if the settlement is **unconditional.** You must file a dismissal of the entire case within 45 days after the date specified in item 1b below if the settlement is **conditional.** Unless you file a dismissal within the required time or have shown good cause before the time for dismissal has expired why the case should not be dismissed, the court will dismiss the entire case.

---

**To the court, all parties, and any arbitrator or other court-connected ADR neutral involved in this case:**

1. This entire case has been settled.  The settlement is:

   a. [X]  **Unconditional.**  A request for dismissal will be filed within 45 days after the date of the settlement.
   Date of settlement:6/26/17

   b. [ ]  **Conditional.**  The settlement agreement conditions dismissal of this matter on the satisfactory completion of specified terms that are not to be performed within 45 days of the date of the settlement.  A request for dismissal will be filed no later than *(date):*

2. Date initial pleading filed:September 28, 2015

3. Next scheduled hearing or conference:

   a. Purpose:FSC

   b. [X]  (1) Date: 8/25/17

       (2) Time:8:30 a.m.

       (3) Department:72

4. Trial date:

   a. [ ]  No trial date set.

   b. [X]  (1) Date:9/5/17

       (2) Time:10:00 a.m.

       (3) Department:72

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:June 29, 2017

Joe Barrett, Esq.
_____
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

▶ _Joseph M Barrett_ _____
                                    (SIGNATURE)

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-200 [Rev. January 1, 2007] | **NOTICE OF SETTLEMENT OF ENTIRE CASE** | Cal. Rules of Court, rule 3.1385<br>www.courtinfo.ca.gov<br>Westlaw Doc & Form Builder™ |

**CM-200**

| PLAINTIFF/PETITIONER: SKYLER TEITELBAUM | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: LYFT, INC., et al. | BC596036 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF SETTLEMENT OF ENTIRE CASE

*(NOTE: You cannot serve the Notice of Settlement of Entire Case if you are a party in the action. The person who served the notice must complete this proof of service.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):* 633 West 5th Street, Suite 3300, Los Angeles, CA 90071

2. I served a copy of the *Notice of Settlement of Entire Case* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*
   a. ☐ deposited the sealed envelope with the United States Postal Service.
   b. ☒ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Settlement of Entire Case* was mailed:
   a. on *(date):* June 29, 2017
   b. from *(city and state):* Los Angeles, CA

4. The envelope was addressed and mailed as follows:
   a. Name of person served:
   Warren Metlitzky, CONRAD & METLITZKY LLP
   Street address: Four Embarcadero Center, Ste. 1400
   City: San Francisco
   State and zip code: CA 94111

   c. Name of person served:

   Street address:
   City:
   State and zip code:

   b. Name of person served:

   Street address:
   City:
   State and zip code:

   d. Name of person served:

   Street address:
   City:
   State and zip code:

   ☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

5. Number of pages attached _____.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: June 29, 2017

Christina Hicklin
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>ADVOCATE CAPITAL, INC., | DEFENDANTS  MAXIMUM LEGAL (CALIFORNIA), LLP,<br>CALIFORNIA ATTORNEY LENDING II, INC., MAXIMUM LEGAL, LLC,<br>TODD D. WAKEFIELD, JOSEPH MARTIN BARRETT AND RICHARD<br>M. PACHULSKI, TRUSTEE |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>JEFFREY I. GOLDEN<br>LOBEL WEILAND GOLDEN FRIEDMAN LLP<br>650 TOWN CENTER DRIVE, STE 950<br>COSTA MESA, CA  92626          PHONE: 714-966-1000 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor        ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor        ☒ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) DECLARATORY RELIEF; AND (2) TURNOVER OF PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. SECTION 542

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
   actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
   (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court
   if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $  3,995,992.39 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>LAYFIELD & BARRETT, APC | BANKRUPTCY CASE NO.<br>2:17-bk-19548-NB | |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL | DIVISION OFFICE<br>LOS ANGELES | NAME OF JUDGE<br>BASON |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/S/ JEFFREY I. GOLDEN | |
|---|---|
| DATE<br><br>OCTOBER 17, 2017 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>JEFFREY I. GOLDEN |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

| | |
|---|---|
| **Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address**<br><br>Jeffrey I. Golden, State Bar No. 133040<br>jgolden@lwgfllp.com<br>Lobel Weiland Golden Friedman LLP<br>650 Town Center Drive, Suite 950<br>Costa Mesa, CA  92626<br>Phone: 714-966-1000<br>Fax: 714-966-1002<br><br><br>*Attorney for Plaintiff* | **FOR COURT USE ONLY** |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br>LAYFIELD & BARRETT, APC,<br><br><br><br><br>Debtor(s). | CASE NO.: 2:17-bk-19548-NB<br><br>CHAPTER: 11<br><br>ADVERSARY NO.: |
| ADVOCATE CAPITAL, INC.,<br><br><br><br>Plaintiff(s)<br>Versus<br>MAXIMUM LEGAL (CALIFORNIA), LLP, CALIFORNIA ATTORNEY LENDING II, INC., MAXIMUM LEGAL, LLC, TODD D. WAKEFIELD, JOSEPH MARTIN BARRETT AND RICHARD M. PACHULSKI, TRUSTEE<br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING**<br>**[LBR 7004-1]** |

**TO THE DEFENDANT:**  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| |
|---|
| **Hearing Date:** _____    **Address:**<br>**Time:** _____      ☐ 255 East Temple Street, Los Angeles, CA 90012<br>**Courtroom:** _____    ☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.**  All parties must read and comply with the rule, even if you are representing yourself.  You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference.  A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH).  If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference.  **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

**KATHLEEN J. CAMPBELL**
**CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
Deputy Clerk

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

_____

_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____  _____  _____
*Date*           *Printed Name*              *Signature*

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                    Page 3                    **F 7004-1.SUMMONS.ADV.PROC**