Philip J. Layfield, Pro Se
1875 K Street N.W.
Washington, DC 20006
Telephone: (202) 904-4409
phil@maximum.global

Claimant in Pro Se

FILED
AUG 20 2018
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br>        v.<br>Layfield & Barrett, APC<br>    Debtor | Case No.: 2:17-bk-19448-NB<br><br>Chapter 11<br><br>Assigned to: Hon. Neil Bason<br><br>**EX PARTE MOTION TO SET STATUS CONFERENCE TO ESTABLISH PROTOCOL FOR RESOLVING OPEN ISSUES, SET BRIEFING SCHEDULES AND TO STAY ALL OTHER PROCEEDINGS, PAYMENTS AND FINAL ORDERS PENDING RESOLUTION OF CRITICAL ISSUES.** |

**TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY JUDGE; RICHARD M. PACHULSKI, CHAPTER 11 TRUSTEE; AND THE OFFICE OF THE UNITED STATES TRUSTEE:**

Philip J. Layfield (hereinafter "Layfield" or "Creditor"), the single largest creditor of Layfield & Barrett, APC (the "Debtor" or "L&B"), hereby files the *Ex Parte Motion to Establish Protocol for Resolving Open Issues and Set Briefing Schedules and to Stay All Other Proceedings, Payments and Final Orders Pending Resolution of Critical Issues (the "Motion")* as described herein.

This Motion is made pursuant to section 105 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et. seq.*(the "Bankruptcy Code"), Federal Rule of Civil Procedure 60(b)(6), made applicable in the

1

above-captioned bankruptcy case pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Bankruptcy Rule 3003(c)(3). The proposed agenda for the Status Conference is as follows:

1. Establish briefing schedule for Motion to Convert Case to Chapter 7 and Consolidate with Maximum Legal (California), LLP C (hereinafter "MLC") Case No. 2:17-bk-18433 and appoint the Trustee for Maximum Legal (California), LLP to oversee the consolidated cases;

2. Establish briefing schedule to establish that all unpaid client claims and unpaid liens related to client claims must be given priority over any secured creditors or Trustee compensation. In essence, unless and until all client claims have been paid, no commercial for-profit party should benefit from whatever assets may be recovered. Allow for the newly appointed Trustee to establish a heirarchy of claims setting forth that any and all funds that came through L&B during the pre-petition period first belong to unpaid clients, then belong to lien claims impacting clients, then to a class of claims related to unpaid wages, withholding taxes and benefit plan contributions, followed by secured lienholders and finally unsecured creditors;

3. Establish a Chapter 7 Creditors Committee pursuant to section 705 of the Bankruptcy Code to protect client interests and former employees as well as other unsecured creditors;

4. Establish a briefing schedule to address issues surrounding lawsuits against former officers, directors, principals and employees that should be subject to indemnification under California Corporations Code section 204. More specifically, establish a briefing schedule to obtain an Order staying all civil proceedings where claimants that should be seeking to resolve their claims through this bankruptcy procedure are intentionally not naming L&B as a defendant in order to circumvent the automatic stay provisions of the bankruptcy code. More specifically, it is undisputed that L&B is considered an "indispensible party" in those lawsuits and the purpose of seeking bankruptcy protecting is being circumvented by these ancillary lawsuits being litigated

outside of this forum;

5. Establish a briefing schedule to set aside default judgments entered against Philip Layfield and Layfield V which were specifically timed to occur while Layfield was incarcerated and unable to respond to those lawsuits. These defaults include default judgments obtained by Richard Pachulski (hereinafter "Pachulski), the current Ch. 11 Trustee of L&B, Advocate Capital and a former client of L&B. Since these judgments exceed $30 million and ultimately form the basis for indemnity claims against debtor, it is imperative that these be set aside. Information exists that will establish that Pachulski was aware that law enforcement was actively working during the period of February 20, 2018 through February 23, 2018 to feverishly file a Criminal Complaint, prior to completing an appropriate and thorough investigation, in order to obtain a Warrant for Arrest for Layfield while Layfield was in New York City on the false premise that Layfield had fled to Costa Rica, stole millions of dollars and stashed those funds in foreign bank accounts, and was only briefly in the United States, when the reality was that Layfield held the position of Vice President at Hype Energy USA www.hype.com which is based in Knoxville, Tennessee. In fact Layfield was in New York during that time attending depositions in connection with an arbitration matter where he was taking and defending depositions on behalf of Hype. Layfield was also meeting with securities attorneys, attending mediations and meeting with brand management attorneys. Furthermore, Layfield was hardly fleeing to Costa Rica since he was scheduled to return to Miami the following Tuesday for 5 days of additional depositions and had recently accepted an offer to relocate to New York City in connection with his position at Hype.

6. Establish a briefing schedule to address the improper application of fees earned by L&B and Maximum Legal Holdings, LLC in connection with the Pineda $3.5 million settlement. The contractual relationships of the parties, the quantum meruit rules in connection with the well-established California law regarding the treatment of 2-200 referral fees must be followed to properly account for those earned fees;

7. Allow for the submission of Proofs of Claim on behalf of Philip Layfield and Maximum

3

Legal Holdings, LLC as attached herewith;

8. Set aside funds for the appointment of a financial advisor to properly assess the assets of the estate, including but not limited to the quantum meruit claims of the estate relating to the hundreds of cases that were abruptly terminated by the Trustee and establish a protocol to monitor the progress of those claims. These function are more appropriately handled by skilled professionals as opposed to untrained paralegals and attorneys employed by Pachulski at exorbitant hourly rates designed to further squander estate funds. Additionally, set aside monies to file the June 30, 2017 payroll tax returns, make payroll tax payments and file the appropriate tax returns to seek refunds that are due in connection with loss carry-back rules;

9. Issue an Order *Nunc Pro* Tunc to extend the automatic stay to former officers, directors and employees to the date of commencement of these proceedings to put a halt on the assault of litigation occurring throughout the country against former officers, directors and employees subject to indemnification; and

10. All other issues that may arise in connection with the Status Conference that are deemed appropriate for resolution.

## INTRODUCTION

On or about August 3, 2017, a Chapter 7 Involuntary Petition was filed against Layfield & Barrett, APC (hereinafter "L&B" or "debtor") with the assistance of its former Officer, Director and Partner Joseph M. Barrett (hereinafter "Barrett") and its former Officer, General Counsel and Director of Litigation Todd Wakefield [Docket No. 3]. At the time, unbeknownst to Layfield, Messr's Wakefield and Barrett were conspiring to force L&B into an involuntary bankruptcy while they were concurrently pursuing their own deceptive bankruptcy strategy designed and executed with the assistance of their bankruptcy counsel, Martin Brill ("Brill"). This conspiracy was designed to allow Wakefield and Barrett to abscond with high value cases from L&B, avoid paying the $8 million loan owed to Layfield, while shifting blame and attention exclusively to Layfield for

1 the financial difficulties being experienced by L&B. As set forth in more detail below, it will be
2 demonstrated that neither Wakefield nor Barrett had the requisite corporate authority to file a stand-
3 alone corporate bankruptcy for MLC and their purported ownership of Maximum Legal
4 (California), LLP (hereinafter "MLC"), the purported debtor in a related bankruptcy proceeding,
5 was fictitious at best. Although no mention has been made of these well established facts by
6 Pachulski or his lawyers regarding the fraudulent conduct of Wakefield and Barrett in connection
7 with the fictitious bankruptcy, the secured lender for L&B has filed a fraud lawsuit against
8 Wakefield and Barrett, which clearly sets forth the elements of the scheme attempted by Wakefield
9 and Barrett. This lawsuit is ongoing and is currently active in The Middle District of Tennessee
10 Case No. 3:18-cv-00275.
11      On August 11, 2017, the L&B Chapter 7 case was converted to a Chapter 11, debtor-in-
12 possession case [Docket No. 25]. On August 21, 2017, over objection by creditor, Philip James
13 Layfield (hereinafter "Layfield"), an Order was issued appointing a Ch. 11 Trustee [Docket No.
14 56]. On August 28, 2017, Pachulski filed a Notice of Acceptance of Appointment of Chapter 11
15 Trustee [Docket No. 63]. Between August 28, 2017 and September 5, 2017, Pachulski made the
16 decision to liquidate L&B (the "Debtor") rather than attempt to reorganize the Debtor. Without
17 interviewing Layfield, the COO or any other key employee and without having sufficient
18 knowledge of the assets, liabilities, case lists, status of cases, or likelihood of maximizing recovery
19 of quantum meruit claims on cases that had substantial value, Pachulski made the decision to
20 abruptly terminate all client relationships of L&B by operation of an Emergency Motion to
21 Implement Client Transition Protocol (hereinafter the "CTP") filed on September 5, 2017 [Docket
22 No. 74]. At the time of implementing the CTP, Pachulski also applied to have his law firm
23 employed as counsel and assigned a team of lawyers and paralegals with hourly billing rates
24 ranging from $250 per hour for paralegals to as much as $1,000 per hour for run of the mill
25 attorneys. At the time Pachulski decided to hire his own law firm, Creditor, Philip Layfield already
26 had a team of professionals, including accountants, paralegals, IT professionals and others who
27 could have assisted in the operation of the law firm for approximately $50,000 per month and could
28 have worked to maximize the recovery to the creditors over the life of the Ch. 11 proceedings. The

5

offers by Layfield are well documented in emails and communications with the Trustee and Layfield's attorneys and clearly demonstrate that Layfield had no intention of remaining in Costa Rica to avoid creditors, prosecution or extradition. Instead, Pachulski chose to use the most expensive and inefficient resources to accomplish virtually nothing more than administrative functions while incurring legal fees which appear to exceed $1 million as of the date of this filing. Pachulski has previously made applications to approve fees for himself in excess of $600,000 in the face of not one client or creditor receiving even one dollar. Clearly something is wrong with this picture.

At the time, Pachulski failed to investigate the entities owned by L&B, which included Maximum Legal, LLC, a Delaware limited liability company (hereinafter "ML), which in turn owned 100% of several other entities, including law firms located in Utah, Arizona, Florida and most notably California. In fact, Pachulski was provided with complete and unfettered access to the L&B case management systems, client lists and other data. Creditor Layfield was available to answer any questions the Trustee or his counsel had, provide whatever documents may have been requested and would have provided assistance during the transition. The reality is that Pachulski never once reached out to Layfield or his counsel to obtain information. Instead, Pachulski created the illusion that Layfield was not cooperating, that Layfield refused to provide information and that Layfield had absconded with critical client data. This is belied by the fact that Pachulski's lawyers and paralegals were issued usernames and passwords to log into the L&B virtual servers that were being housed in multiple locations, including Costa Rica and Amazon Web Services ("AWS"). Pachulski was aware that it was Wakefield who had attempted to destroy evidence by deleting hundreds of files from L&B's box.com account and it was Wakefield who illegally entered L&B's Park City office in the summer of 2017 and attempted to wipe the servers located in that office. Ultimately, it was the former COO of debtor, Rita Mims, who ultimately filed a police report with the Summit County Sheriff in August 2017 regarding Wakefield's theft and destruction of property. All of these actions were ignored by Pachulski in his never ending quest to harm Layfield at all costs. Rather than investigate these matters of wrongdoing by Wakefiled, Pachulski, through his lawyers, created a false impression with law enforcement (FBI, IRS and Homeland Security) that

Layfield had somehow attempted to obstruct the administration of the bankruptcy estate and had somehow improperly tried to represent some of the clients Pachulski himself had fired pursuant to the CTP. All of these misrepresentations were given to law enforcement in an effort to prevent Layfield from being released on bond and force him to remain in federal detention while trying to defend himself. All of these claims were false and were known to be false by Pachulski and his attorneys at the time they were made. In fact, had Pachulski needed or wanted information from Layfield he could have easily sought a 2004 Order for Examination or Production of Records, yet he never once utilized the most basic and well known procedures for obtaining information in the bankruptcy context. The records is clear and unrefuted. Instead, Pachulski directed his lawyers to systematically include negative and misleading information about Layfield in each and every Status Report for the purpose of creating the impression that Layfield had illegally fled to Costa Rica to avoid his obligations.

To make matters worse, while Pachulski was blowing through client money with frivolous and wasteful expenditures, the California law firm, Maximum Legal (California), LLP (hereinafter "MLC") that was stolen from the L&B bankruptcy estate, was actually 99.99% owned by Maximum Legal, LLC and .01% owned by Todd Wakefield ("Wakefield"). This legal ownership is both legally and factually significant because at the time of Pachulski's appointment, former L&B Officers, Directors and Owners, Joseph Barrett and Todd Wakefield were attempting to pursue a fraudulent Chapter 11 bankruptcy for MLC by fictitiously claiming that Todd Wakefield magically became the 100% owner of MLC as of the date of the MLC Ch. 11 bankruptcy filing on July 12, 2017. Had Pachulski conducted even the most minimal amount of due diligence, he would have discovered that it is a legal impossibility for Wakefield to own 100% of an LLP under California law and that Wakefield and Barrett were attempting to secure as many of the former high value cases for themselves without regard to the creditors of L&B or the estate of L&B. In fact, to further their deception, Wakefield and Barrett filed a d/b/a/ with the Los Angeles County Recorder for The Barrett Law Firm, with the owner being MLC. Wakefield and Barrett made public statements about starting a brand new law firm without any mention that they were secretly operating underneath the umbrella of MLC.

At the time of MLC's Chapter 11 filing, Wakefield, Barrett and Brill were all aware that the law firm of Jones Waldo of Salt Lake City had been hired in early 2017 to implement a reorganization of L&B and ML and had specifically requested that Wakefield, in his capacity as General Counsel of L&B, form MLC with the agreed upon ownership structure of 99.99% to ML and 0.01% to Wakefield. Ultimately, the plan of deception designed by Brill, Wakefield and Barrett was discovered by L&B's secured lender Advocate Capital ("Advocate") and Advocate commenced a fraud lawsuit against Wakefield, Barrett and other related entities. Curiously, Advocate did not name Brill or his law firm in the fraud lawsuit despite clear and convincing evidence that Brill assisted in the filing of the fraudulent MLC Ch. 11 without the requisite corporate authority.

Rather than seek to preserve estate assets for the benefit of the clients who had claims against L&B for unpaid settlements, from September 2017 through the date of filing this Motion, Pachulski, by and through his law firm, decided to target Creditor Layfield as a corporate wrongdoer and took every opportunity to damage Creditor Layfield by filing inflammatory statements in pleadings, cooperating with State Bar Prosecutors to have Layfield disbarred, cooperating with law enforcement to provide misleading and incomplete information all while lining their pockets with nearly one million dollars in unnecessary legal fees. To make matters worse, Pachulski and his lawyers failed to investigate the conduct of Barrett and Wakefield and others who took over valuable L&B cases while having no regard for the monies that could have easily been collected on behalf of L&B to satisfy outstanding client claims if the quantum meruit claims had been pursued against these corporate wrongdoers. None of this is surprising considering the fact that the lead attorney for Pachulski's firm is married to a partner at Brill's law firm and an obvious conflict exists. Simply put, it became easy and convenient for Pachulski and his law firm to place all blame for the demise of L&B on Layfield and execute a strategy designed to inflict as much harm and embarrassment on Layfield while refusing to discharge their duties appropriately. Today, Pachulski has failed to recover even five percent (5%) of the potential value from the L&B estate and not one client or creditor other than Advocate has been paid a dime.

To make matters worse, while Layfield was incarcerated Pachulski decided to double down

on his efforts to harm Layfield by conspiring with Advocate Capital and others to force Layfield into an involuntary Chapter 7 bankruptcy and force the appointment of a Chapter 7 Trustee all the while knowing that Layfield would be unable to oppose any of these motions due to Layfield's incarceration. The absurdity of this strategy is that Layfield was incarcerated next door to this courthouse and despite making numerous requests, Layfield was not permitted to attend any hearings, gain access to bankruptcy related legal materials in order to file oppositions to the various proceedings and was never formally served with the involuntary Chapter 7 Petition. This was all done with full knowledge of Pachulski that Layfield was a creditor of L&B as opposed to Pachulski's assertion that it was the other way around.

All of these matters set forth above make it clear that Pachulski should be relieved of his duties as Trustee, that the L&B case should be converted to a Chapter 7 and that this Court establish a protocol to properly administer this estate for the benefit of the clients who are owed money as opposed to lining the pockets of Pachulski and his law firm.

### IT IS UNDISPUTED THAT LAYFIELD WAS ENTITLED TO AN ANNUAL SALARY OF $1 MILLION PER YEAR AS THE CEO OF L&B AND THUS LAYFIELD IS A CREDITOR OF L&B AND NOT A DEBTOR

At the time of L&B's bankruptcy petition, Layfield had not been paid his regular salary through payroll since January 2016. All other officers, directors and owners, including Wakefield and Barrett were paid their salaries, which for Barrett included a base salary of $300,000 per year plus a car allowance of at least $1,200 per month as a 10% owner of L&B. Layfield's annual salary of $1 million per year as the 90% owner of L&B was entered into the L&B's payroll system, Gusto, and also well documented in L&B's Human Resource Management Systems Zenefits and Namely. Furthermore, this fact has further been confirmed through interviews of law enforcement with the former Human Resource Director Katherine Bello as recent as the Spring of 2018. As a result of Layfield not receiving his regular compensation, on the date this case commenced, Layfield was owed at least 18 months of unpaid salary for a total amount in excess of one million five hundred

9

thousand dollars ($1,500,000). Although Layfield agrees that periodic distributions were made to him during the course of his salary deferral, a forensic accounting must be completed in order to determine the actual amount of his claim due to offsets of monies advanced by Layfield, monies distributed to Layfield, monies charged on Layfield's personal credit cards for L&B expenses as well as other unreimbursed expenses.

## AS AN OFFICER AND DIRECTOR OF L&B, LAYFIELD IS ENTITLED TO INDEMNIFICATION PURSUANT TO CALIFORNIA CORPORATIONS CODE SECTION 204 ET. AL.

Layfield has previously made a request for indemnification pursuant to L&B Bylaws and California Corporations Code section 204 in writing to Pachulski, which has been ignored. Layfield is subject to numerous legal proceedings, judgments, administrative proceedings and criminal proceedings in connection with his operation of L&B. Layfield has been found guilty of nothing and was forced to default on his State Bar trial due to lack of counsel and an inability to provide an adequate defense. Pachulski's refusal to acknowledge Layfield's indemnification rights under California Corporations Code section 204 has caused substantial harm to Layfield. In fact, the judgment against Layfield of approximately $4.5 million in favor of Advocate Capital, which was used as a basis to force Layfield into involuntary bankruptcy, with the assistance of Pachulski, is actually a debt more appropriately attributed to L&B. Furthermore, both Pachulski and Advocate are aware that until the administration of this estate is complete, it is impossible to calculate what amount, if any, Layfield may be responsible for under his personal guarantee. Layfield further disputes whether that guarantee is enforceable as a result of the misconduct of Pachulski and Advocate in securing a fraudulent judgment based on defective service of process. As set forth in the next section below, Layfield disputes whether the judgment is valid due to Advocate's lawyers committing a fraud on the court in connection with the proceedings underlying the judgment.

# **LAYFIELD IS ENTITLED TO INDEMNIFICATION FOR THE JUDGEMENT ENTERED AGAINST HIM PERSONALLY FROM ADVOCATE CAPITAL AND NOW ASSIGNED TO WELLGEN**

In a Declaration filed by Advocate's lawyer on May 23, 2018 in Support of the Involuntary Chapter 7 Petition to force Layfield into bankruptcy, the following was stated:

> As set forth more fully in the declaration of Mark E. Speidel, Mr. Layfield left the United States for Costa Rica in or about June 2017. Mr. Layfield returned to the U.S. from Costa Rica in October 2017. It appears Mr. Layfield remained in the United States for two days before returning to Costa Rica. LAYFIELD again re-entered the United States on February 19, 2018 and was scheduled to depart on February 24, 2018, from Newark airport in New Jersey.

However, in complete contradiction to the above statement, in an Opposition filed by Mr. Golden to Layfield's Motion to Set Aside the Default Judgment obtained, Golden's law firm took a completely opposite position six weeks earlier on April 9, 2018.

> The Defendant's Motion is borderline absurd in light of the facts here. The Horner Declaration makes clear that the Defendant was personally served with the Complaint. The Defendant identified himself to the process server. Thus, there can be no question that the Defendant was in fact the person to whom the summons and complaint was served. The Horner Declaration further explains that, the process server has seen photos of the Defendant, and the photos matched the individual he served. In light of what we know about the credibility of the Defendant, his unsupported allegations that he was never served should not be considered by the Court. The Defendant has never responded to the Complaint. Indeed, the Motion does not suggest that the Defendant has made any attempt to respond to the Complaint.

The Opposition filed by Golden refers to a Declaration by Horner who claims to have personally served Layfield with the Summons and Complaint on September 20, 2017 at 118 Union Jack Mall, Marina del Rey, California 90292 while Layfield was in San Jose, Costa, Rica staying at the Marriott in Escazu.  It should be noted that due to Layfield's incarceration, Layfield was never served with the Opposition referenced above, never had the opportunity to file a Reply to refute the false claims of Horner and thus Layfield's Motion to Set Aside the Default Judgment was denied in a scathing Order issued by the District Court Judge, who was convinced by the false Horner Declaration that Layfield was in fact present in a house he sold 10 months earlier for $3.15 million,

11

was trolling around the neighborhood visiting a fictitious boat he doesn't own and then somehow magically appeared simultaneously at the U.S. Embassy in Costa Rica to sign notarized documents. Once the District Court Judge realizes how he was duped, it is anticipated that a different outcome will occur. Layfield is in the process of moving for reconsideration of that decision because the facts will show the following:

1. Layfield could not have been at the residence of 118 Union Jack Mall for several reasons. First, he has not resided in that home since 2013. The home was sold for approximately $3,150,000 to a third party in January of 2017 and that purchaser has resided continuously there ever since. A quick review of the Los Angeles County Recorder's Office will confirm that fact.

2. Secondly, Layfield was residing in Tamarindo, Costa Rica at that time and travelled by automobile from Tamarindo, Costa Rica to San Jose, Costa Rica and stayed in a hotel from September 20, 2017 through September 24, 2017. This can be confirmed in numerous ways. First, Layfield can produce the receipts from the hotel stay as well as time stamped photographs of the trip.

3. Thirdly, the primary purpose of the trip to San Jose was to get a document notarized by a United States notary and the only place in the Republic of Costa Rica to obtain a U.S. Notary is the U.S. Embassy. Layfield can produce both my receipt for the notary service as well as the notarized document for the morning of September 21, 2018 at 8 am. Layfield was required to show his U.S. passport in connection with that notarial service.

4. Layfield visited the Trilogia/Escazu office of Maximum Legal Costa Rica following the notary appointment in order to arrange for the Fedex shipping of those documents back to the United States. The office was located next door to the Marriott hotel.

Despite the fact that Advocate's lawyers have taken inconsistent positions under penalty of perjury regarding Layfield's whereabouts on September 20, 2017, the facts will clearly demonstrate that Layfield could not have been at 118 Union Jack Mall, Marina del Rey, CA 90292 on that date. Therefore, any judgment obtained by fraud is invalid on its face and can't be used to place Layfield into an involuntary bankruptcy with the appointment of a Trustee. This is a disputed debt and is

further belied by the fact that Layfield is entitled to indemnification from L&B for these losses. Layfield's claim against L&B for these losses is currently in excess of $30 million although until this estate is properly administered, it is impossible to know what the true amount is.

## LAYFIELD IS ENTITLED TO INDEMNIFICATION FOR CLIENT CLAIMS ARISING OUT OF L&B WHICH ARE MOUNTING DUE TO PACHULSKI'S FAILURE TO MAKE ANY REMITTANCES AND PACHULSKI'S AGREEMENT TO ALLOW THE L&B PROFESSIONAL LIABILITY POLICY TO BE RESCINDED

Numerous parties have sued Layfield and others in various civil proceedings throughout the United States. The majority of these claims should have L&B as an indispensible party, yet most of the Plaintiffs have intentionally failed to name L&B so as to avoid the complexities associated with the bankruptcy stay. In keeping with the spirit and intent of the bankruptcy code, this court should extend the automatic stay to all former officers, directors and principals of L&B. The losses and claims of Layfield resulting from these proceedings is mounting and currently exceed $30,000,000. This court should establish a procedure to properly administer these claims in one forum as opposed to forcing the former officers, directors and principals from individually litigating these matters throughout the U.S. at their own expenses  Furthermore, by not extending the automatic stay to the former officers, directors and principals, it is making the administration of the estate more complex, more costly and could result in inconsistent rulings. This situation is further exacerbated by the fact that Pachulski was allowed to consent to rescinding the L&B professional liability policy for a small cash payment, which left all insured parties exposed.

## LAYFIELD IS ENTITLED TO INDEMNIFICATION FOR PACHULSKI'S CONTINUED FAILURE TO FILE PAYROLL TAX RETURNS, REMIT PAYROLL TAXES AND REMIT 401K CONTRIBUTIONS

At the time of Pachulski's appointment, Layfield was in the process of finalizing the 2016 corporate tax return for L&B. This corporate tax return was anticipated to show a substantial loss for the year 2016 on approximately $11 million of revenue. Although not an expert in corporate tax returns, Layfield was advised by L&B's CPA, Jeff Bullock, that a mechanism existed to file for

13

loss carry-back returns which would have generated significant refunds of taxes previously paid. Those refunds could have been used to file the June 30, 2017 payroll tax returns and complete all 401k deposit obligations. Upon Layfield's resignation from L&B, Pachulski failed to finalize the tax return preparation and failed to mitigate further damage to the bankruptcy estate by failing to file the payroll tax returns and remit employment taxes. Instead, Pachulski decided to pay himself almost $700,000 and pay Advocate capital several hundred thousand dollars in an obvious display of self-dealing. Layfield is personally responsible for these payments in the face of Pachulski's refusal to pay these know obligations. Layfield's claim for these unpaid tax amounts is estimated to be approximately $250,000.

## LAYFIELD HAS DAMAGE CLAIMS AGAINST L&B, PACHULSKI AND PACHULSKI'S LAWYERS FOR GROSS NEGLIGENCE IN ADMINISTERING THE L&B ESTATE

Layfield continues to suffer economic damages as a result of Pachulski's failure to properly administer the L&B estate. To date, Pachulski has failed to identify the assets of L&B, which primary consisted of "work in progress" and "costs advanced" on behalf of hundreds of clients. In a contingent fee practice, these claims are often resolved under the quantum meruit standard. L&B had millions of dollars in quantum meruit claims and millions of dollars in advanced costs that have somehow evaporated into thin air. Had these claims been properly handled, there would be sufficient assets to pay all client claims and vendors. Now, the only person that appears to be getting paid is Pachulski and his law firm. Layfield intends to pursue Pachulski for the gross negligence in administering this estate. The damages are not quantifiable at this time, but most likely exceeds several million dollars.

## LAYFIELD IS ENTITLED TO DAMAGES FOR PACHULSKI'S FAILURE TO PROPERLY HANDLE THE PINEDA $3.5 MILLION SETTLEMENT PAYMENT AS WELL AS PACHULSKI'S FAILURE TO FOLLOW WELL ESTABLISHED LIEN LAW TO ENSURE PAYMENT TO US CLAIMS OPCO, MAXIMUM LEGAL HOLDINGS, LLC AND OTHERS

The facts regarding the handling of the Pineda settlement are indisputable. At the time this

bankruptcy was filed, the clients in the Pineda matter were clients of Maximum Legal Holdings, LLC, (MLH) the 100% owner of L&B and not clients of L&B. The clients terminated the relationship with L&B and signed new representation agreements with MLH. As a result, any 2-200 referral fee agreements became null and void. Therefore, any party to the 2-200 only had a claim for the reasonable value of the services performed under quantum meruit principles. That included The Dominguez Firm and others. L&B had a valid and enforceable quantum meruit claim for the fees and advocate capital had an undisputed claim to the costs that were advanced. The total fees plus costs awarded by the court approximately $1.2 million. MLH borrowed approximately $700,000 as a fee advance on the fees to be awarded. Upon L&B being forced into bankruptcy, Pachulski assisted The Dominguez Firm in getting the clients of MLH to fire MLH and hire The Dominguez Firm. The Dominquez Firm stepped in and attempted to collect 50% of the fee without giving L&B or MLH to opportunity to assert its proper quantum meruit claims. This resulted in The Dominguez Firm receiving approximately 50% of the total proceeds. Had Pachulski followed the black letter law in the State of California on attorney liens, The Dominguez Firm would have only been entitled to its own "quantum meruit" claim for the fees, which would have been negligible. Since L&B and MLH performed ALL of the work on the matter, nearly 100% of the fees should have been allocated to L&B and MLH. In connection with that analysis, the lienholder US Opco would have been paid its full lien amount of $700,000. Now, as a result of Pachulski failing to follow black letter law and giving preferential treatment to The Dominguez Firm, Layfield is subject to another civil claim by US Opco.

### PACHULSKI, PACHULSKI'S LAWYERS, WAKEFIELD, BARRETT, BRILL AND OTHERS PROVIDED FALSE AND MISLEADING INFORMATION TO LAW ENFORCEMENT, THE BANKRUPTCY COURT IN CALIFORNIA AND THE BANKRUPTCY COURT IN FLORIDA IN AN ATTEMPT TO HARM LAYFIELD, CAUSE HIM TO BE INDICTED AND CAUSED HIM TO BE DETAINED WITHOUT BOND FOR APPROXIMATELY 6 MONTHS

Layfield has claims related to the intentional harm inflicted on Layfield by Pachulski, Pachulski's lawyers, Wakefield, Barrett, Brill and others who provided false, incomplete and misleading information to law enforcement. As an initial matter, investigative records show that Pachulski's lawyers left law enforcement with the impression that Layfield had failed to provide requested information to the Trustee and had failed to provide access to vital corporate records. These misrepresentations caused harm to Layfield as a result of law enforcement believing Layfield had intentionally devised a scheme to abscond with funds and flee the country. Additionally, Pachulski, Pachulski's lawyers, Wakefield, Barrett and Brill made numerous filings and statements suggesting that Layfield had absconded with somewhere between $5 and $12 million of client funds. Considering that Pachulski had complete access to L&B bank records, Pachulski knew without question that all of these claims were false. In fact, Pachulski knew that Layfield received no greater than his annual compensation during the period of time in question. All parties either knew of this fact or could have easily known these facts through minimal investigation. This is simple elementary mathematics of plus and minus. If Pachsulski, as the Trustee, had simply requested bank records from the only two banks ever used by L&B, Esquire Bank and Wells Fargo, Pachulski could have simply added and subtracted the inflows and outflows to Layfield to determine that it was mathematically impossible for Layfield to have absconded with millions of dollars. Either through willful blindness or intentional conduct, Pachulski left the public to believe that Layfield had stolen millions of dollars and fled to Costa Rica. These actions helped support the flawed government investigation into Layfield that ultimately resulted in him being arrested and detained without bond for over six months. Layfield has suffered massive financial losses as a result of this misconduct and has claims against all individuals responsible for these misrepresentations that resulted in him being prosecuted for mail fraud in violation of 18 U.S.C. § 1341, Mail Fraud and 18 U.S.C. § 1956 Money Laundering. We must all remind ourselves that an indictment is nothing more than a one-sided finding of probable cause and has no bearing on innocence or guilt. We will have to wait for the jury trial to occur before continuing to pass judgment. To further compound the problem, while Layfield was incarcerated, many people decided to double-down on their aggressiveness toward Layfield and became even more brazen and

reckless with their court filings and public statements. In one recent court filing with the a bankruptcy court in Florida, Wakefield went so far as to claim that he resigned from L&B when he supposedly learned of Layfield's misconduct. See the matter In re Finton Case No. 1:16-bk-19222, Florida Southern Bankruptcy Court. Although Wakefield saw fit to make this brazen claim, the facts will show that Wakefield had worked with Layfield to reorganize the L&B case portfolio and assets throughout the Spring and early Summer of 2017 into a new venture called Maximum Legal, LLC and Wakefield agreed to purchase an interest in that entity from Layfield for $4 million under a note. Wakefield's claim that he resigned due to his learning of Layfield's alleged misappropriation is easily refuted by hundreds of emails, documents and witnesses to the true facts. In fact, one needs to look no further than the June 5, 2017 memo written by Wakefield outlining his transition from L&B to Maximum Legal, LLC. In short, Wakefield's outrageous comments show a blatant disregard for the truth and a continued willingness to commit bankruptcy fraud and obstruct justice. These matters will all form the basis for Adversary Proceedings that should rightfully be administered under the equitable remedies as fashioned by this court or any other court of competent jurisdiction.

## CONCLUSION

Attached herewith as Exhibit A is the Proof of Claim for Philip Layfield. Attached herewith is the Proof of Claim for Maximum Legal Holdings, LLC. For the reasons set forth above, Layfield hereby requests a Status Conference to address the matters raised herein and for the opportunity to be heard. If a hearing is required, Layfield requests the opportunity to appear by telephone since he is currently residing in Delaware and needs to obtain court approval for travel which may not be viable in time for an expedited hearing.

Respectfully submitted,

Dated: August 16, 2018

By: _____

Philip Layfield in Pro Per and as Manager of Maximum Legal Holdings, LLC, the 100% owner of Layfield & Barrett, APC

18